**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| OMAR WILLIAMS, | ) |
| | ) |
| | ) No. 17 C 5186 |
| Plaintiff, | ) |
| v. | ) Hon. Virginia M. Kendall |
| | ) |
| CITY OF CHICAGO, COOK COUNTY, | ) |
| ILLINOIS, CAROL MARESSO, MARCO | ) |
| GARCIA, DONALD HILL, and MEGAN | ) |
| GOLDISH, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Omar Williams has filed this 42 U.S.C. § 1983 action alleging multiple constitutional rights and state law violations by Defendants City of Chicago (the "City"); Cook County, Illinois; Chicago Police Officers Carol Maresso, Marco Garcia, and Donald Hill (collectively, "Officers"); and former Cook County Assistant State's Attorney Megan Goldish. All Defendants have moved to dismiss the claims against them. *See* (Dkts. 32, 41, 45). The City has also moved, alternatively, to bifurcate the *Monell* claims. (Dkt. 22). For the reasons stated below, Goldish's and Cook County's motion is granted in part and denied in part, the Officers' motion is granted in part and denied in part, the City's motion to dismiss is denied, and the City's motion to bifurcate is granted.

## BACKGROUND[1]

On July 1, 2011, some 30–40 people were socializing in a parking lot in the Little Village neighborhood of Chicago when two men—Andre Gladney and Javonne Oliphant—were shot. *Id.* at ¶¶ 14–15. Gladney, who had been drinking and had earlier taken ecstasy and PCP,

---

[1] For purposes of Defendants' motions to dismiss, the Court assumes as true all well-plead allegations set forth in Williams's complaint. *See Williamson v. Curran*, 714 F.3d 432, 435 (7th Cir. 2013).

survived; Oliphant did not. *Id.* at ¶¶ 14–19. Gladney had been in possession of a Ruger .45 caliber handgun, which he discarded as he fled the scene after being shot. *Id.* at ¶¶ 16, 20. Antoine Williams ("Antoine"), Plaintiff's cousin, also had been in the parking lot at the time of the shooting. Antoine is a paraplegic who requires a wheelchair and a specially equipped van for transportation. Williams and another individual, Keith Slugg, a parolee confined to house arrest, were employed by the Illinois Department of Human Services to drive Antoine's van in the summer of 2011. Williams drove the van during the day and Slugg drove the van at night. Slugg had left his home for his driving shift on July 1, and he was with Antoine in the parking lot at the time of the shooting. *Id.* at ¶¶ 17–18.

Officers Garcia and Hill immediately began to investigate the shooting. Specifically, on July 2, 2011, the two officers interviewed Gladney, who was still in the hospital being treated for his wounds. Gladney, who had been shot from behind while texting, told the officers that he did not know who shot him. The officers recorded their interview of Gladney in a General Progress Report ("GPR") that they later provided to Officer Maresso and that Maresso lost or destroyed. *Id.* at ¶¶ 21–23. Others present at the scene also were interviewed. One such witness, Jason Jones, gave a description of the shooter that was inconsistent with Williams's appearance; the GPR for the Jones interview did not include any mention of Williams. Another witness, Kenneth McNeal, was interviewed twice, and first explained to Hill and Garcia who he saw at the lot on the night of the shootings. The GPR of this interview was lost or destroyed. *Id.* at ¶ 25. McNeal later explicitly told Garcia and Hill that he did *not* see Williams at the parking lot on the night of the shooting. *Id.* at ¶ 31. Despite this statement, the GPR for this interview did not mention Williams, and McNeal was not asked about Slugg. *Id.* at ¶¶ 31–32.

In August 2011, Garcia and Hill obtained surveillance video footage of the shootings that reflected that Antoine's van was present and that the shooter or gunman was associated with the van. Williams contends that Garcia and Hill "were told" that Williams was the driver of the van and therefore they immediately suspected that he was a shooter or the shooter. So Garcia and Hill summoned Gladney to review the surveillance footage. According to Williams, even after watching the footage, Gladney continued to tell the officers that he did not see who had shot him. Garcia and Hill allegedly used the recovered Ruger handgun to threaten Gladney (presumably with criminal charges) and "successfully pressured Gladney to say" that it was Williams who shot him. *Id*. at ¶ 28. A GPR for the interview was created, and notably, it only discussed the shooting of Gladney; it did not mention the shooting of Oliphant. *Id*. at ¶ 29.

At some point after this interview, Garcia and Hill "realized that Slugg, and not [Williams], was driving the van" on the night of the shooting. *Id*. at ¶ 33. Accordingly, Slugg was detained and questioned extensively about the shootings, but again, the GPR of his interview was lost or destroyed. *Id*. at ¶ 34. Shortly thereafter, Slugg was murdered, and, according to Williams, Defendants decided to charge Williams with the crimes. *Id*. at ¶ 35. To do so, Garcia and Hill conducted a third interview of Gladney, which began on September 27, 2011; Assistant State's Attorney Goldish was present for this interview. Williams alleges that Garcia, Hill, and Goldish "made very clear what they wanted Gladney to 'say' in a statement." *Id*. at ¶ 36. Gladney allegedly refused to make the requested statement, and his refusal was met with renewed threats concerning his handgun and additional threats to turn him over to federal authorities, since a federal warrant for his arrest for a heroin trafficking offense in Iowa was outstanding. Some 17 hours later, Gladney signed a 17-page statement dated September 28, 2011, that Williams contends was authored by Goldish and Garcia and that contained numerous

false statements, including that Gladney saw Williams charge at Oliphant and shoot him at close range, that Gladney had been unarmed, and that he was not drunk. *Id.* at ¶¶ 37–38. After signing the statement, Gladney was permitted to leave the police station. Mere hours later, Goldish approved felony charges against Williams—who had been arrested the previous day. In addition to Gladney's new statement, Williams contends that Garcia authored (1) a false "Supplementary Report" dated September 22, 2011, that identified Williams to match Jones's description of the shooter, and (2) a false GPR dated September 28, 2011, regarding an interview with Antoine stating that Antoine relayed that Williams had been driving his van on the night of July 1 even though Antoine had not said that and Garica already knew that Slugg had been driving the van. *Id.* at ¶ 47. A grand jury hearing was held on October 11, 2011; McNeal was asked 107 questions, which Williams alleges were intentionally selective because none of them regarded whether McNeal saw Williams at the parking lot the night of the shooting. *Id.* at ¶ 31.

After Williams was indicted and before he went to trial, Maresso attempted to link Williams to physical evidence from the crime scene. Specifically, Williams alleges that Garcia authored a January 28, 2012 Supplementary Report that falsely identified the Ruger as belonging to and used by Williams. *Id.* at ¶ 47. Also, in October 2012 Maresso requested a comparison of Williams's DNA with that of evidence collected from the handlebars of a bicycle recovered from the scene, despite the fact that Maresso already know that fingerprints on the bicycle did not match Williams's. *Id.* at ¶¶ 40–41. The DNA results, which were returned in July 2014, were negative. In January 2016, Maresso requested a comparison of Williams's DNA to that found on the Ruger handgun despite the fact that the gun was known to be Gladney's; the results did not implicate Williams. *Id.* at ¶¶ 43–44. Those results were not forwarded to Williams's attorney until January 12, 2017. *Id.* at ¶ 44.

Williams was tried on charges of first degree murder, attempted first degree murder, and reckless discharge of a firearm in 2017. Notably, McNeal testified at trial and identified Slugg as the driver of the van. *Id*. at ¶ 32. On June 8, 2017, a jury acquitted Williams of all charges after deliberating for less than 90 minutes. By that date, Williams had spent more than five-and-a-half years in custody at the Cook County Jail.

Five days later, Williams filed this seven-count lawsuit alleging: malicious prosecution and violation of his rights to due process and a fair trial against Garcia, Hill, and Goldish (Count I); federal § 1983 conspiracy against Garcia, Hill, Goldish, and Maresso (Count II); a *Monell*[2] claim against the City for its policies and practices of (a) conducting coercive witness interrogations, (b) producing false reports and giving false statements and testimony, (c) pursuing prosecutions based on statements obtained in unlawful interrogations, and (d) failing to pursue and disclose exculpatory evidence (Count III); vicarious liability against the City (Count IV); indemnification by the City and Cook County (Count V); Illinois conspiracy (Count VI); and Illinois malicious prosecution against Garcia, Hill, Maresso, and Goldish (Count VII). Specific to Count III, Williams alleges that the Chicago Police Department has a history and practice of keeping "street files," which include (and conceal from the defense) potentially exculpatory material. *See id*. at ¶ 45 (citing Chicago Tribune, February 13, 2016, "Old police street files raise question: Did Chicago cops hide evidence?" http://www.chicagotribune.com/news/ct-chicago-police-street-files-met-20160212-story.html). According to Williams, "Defendants followed that practice in this case as well," because three GPRs were lost or destroyed. *Id*. at ¶ 46. In addition, Williams alleges that Garcia falsified reports linking Plaintiff to the crimes and that Defendants "selectively and intentionally omitted

---

[2] *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

from their reports exculpatory information which contradicted" their concocted narrative about Plaintiff. *Id*. at ¶¶ 47–48.[3]

## **LEGAL STANDARD**

Defendants seek dismissal of Williams's claims against them under Federal Rule of Civil Procedure 12(b)(6), which challenges the claims' legal sufficiency. For a claim to survive a motion to dismiss brought pursuant to Rule 12(b)(6), it must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when the complaint contains factual content that supports a reasonable inference that the defendants are liable for the harm. *Id*. In making the plausibility determination, the Court relies on its "judicial experience and common sense." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679). The complaint should be dismissed only if the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations. *Christensen v. Cty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007) (citations omitted). That being said, a "pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). For purposes of this motion, the Court accepts as true all well-pleaded allegations in the complaint and draws all reasonable inferences in Williams's favor. *See Williamson*, 714 F.3d at 435.

---

[3] After the briefing on the pending motions was completed, Williams sent two letters containing additional authority for the Court's consideration. As the Officers point out (Dkt. 66), Williams did not follow the correct procedure for introducing supplemental authority. For clarity, the correct procedure is for Williams to file a motion for leave to file supplemental authority and to notice that motion for a particular date where the parties can appear and be heard.

**DISCUSSION**

**I.      § 1983 Claim Against Garcia, Hill, and Goldish (Count I)**

Williams alleges that Garcia, Hill, and Goldish violated his Fourth and Fourteenth Amendment rights to due process and a fair trial. Specifically (and as clarified by his motion-to-dismiss briefing, (*see, e.g.*, (Dkt. 56) at 3)), Williams alleges that Defendants improperly subjected him to judicial proceedings without the requisite probable cause and knowing that he was innocent in violation of the Fourth Amendment, and they violated his due process rights by depriving him of exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and by fabricating evidence that was used as illegitimate probable cause evidence to support Williams's arrest, detention, indictment, and criminal trial.

**A.      Fourth Amendment Claim**

In moving to dismiss Williams's Fourth Amendment claim, Goldish and Cook County (together, "Cook County Defendants") and the Officers argue that no viable federal malicious prosecution claim exists. (Dkt. 32) at 11–12; (Dkt. 47) at 5. Regardless of the particular language used in the Complaint, the Fourth Amendment is the relevant constitutional source for Williams's claim that he was arrested and prosecuted without probable cause. In *Manuel v. City of Joliet*, — U.S. —, 137 S. Ct. 911 (2017), the Supreme Court held that the Fourth Amendment right to be free from an unlawful government seizure extends to claims for unlawful pretrial detention, even after legal process begins. Although the particular contours of such a Fourth Amendment claim, including the timing of its accrual, have not yet been established, *id*. at 920–22, Williams's more than five-year pretrial detention allegedly without probable cause based on Goldish and the Officers' actions qualifies for this type of claim. *See, e.g.*, *Blocker v. City of Chicago*, 2017 WL 3278323, at *4 (N.D. Ill. Aug. 2, 2017) (assuming that prolonged detention without probable cause violates the Fourth Amendment).

To bring a claim for violation of the Fourth Amendment per *Manuel*, courts have set forth the following elements: "the defendant[s] (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Kuri v. City of Chicago*, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017) (citing *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013) and *Blocker*, 2017 WL 3278323, at *4). "[P]robable cause for an arrest exists 'if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime.'" *United States v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015) (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013)). Furthermore, "*Manuel* teaches that pretrial detention unsupported by any probable cause—for example, where, as in *Manuel*, the only basis for the plaintiff's detention was fabricated evidence—violates the Fourth Amendment." *Chachere v. City of Chicago*, 2018 WL 1087643, at *7 (N.D. Ill. Feb. 28, 2018).

Williams's complaint satisfies the elements of this claim. He has alleged that Goldish, Garcia, and Hill coerced a statement containing falsehoods from Gladney that was used to procure felony charges against Williams immediately after it was given and used to support his detention and prosecution. In fact, he alleges that Gladney's September statement was the only evidence that Defendants had to support probable cause because the other investigative evidence was deficient. (Dkt. 1) at ¶ 52. These allegations are sufficient at this time to allege that he was charged and held without probable cause based on Goldish and the Officers' conduct. *See, e.g.*, *Kuri*, 2017 WL 4882338, at *7 (on summary judgment, finding that defendants could not "manufacture their own probable cause by fabricating evidence and manipulating eyewitnesses to implicate him in the shooting").

Accordingly, the Court rejects Goldish's argument that Williams has insufficiently alleged her involvement in this claim so as to adequately allege causation. She acknowledges that the allegations against her involve the Gladney statement, but she argues that the complaint lacks allegations that this statement was used in ways other than authorizing formal felony charges against Williams—such as in the grand jury or at trial. *See* (Dkt. 32) at 10–11.[4] And although Goldish makes a fleeting reference to the intervening cause of a grand-jury indictment (*id.* at 11), this argument is not developed to the extent that could support a dismissal of the Fourth Amendment claim against Goldish. In any event, "an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor" can prevent "the chain of causation" from being broken by an indictment. *Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017) (quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)). Since Williams includes such allegations of pressure and knowingly false statements, his claim will proceed. For this same reason, the Officers' argument that because the State's Attorney prosecutes a criminal action—not the police—he cannot sustain a malicious prosecution action against the police does not require dismissal of this claim. (Dkt. 60) at 6.

Alternatively, the Officers argue that even if Williams's has a Fourth Amendment claim, the statute of limitations began to run when charges against him were approved, on September 28, 2011. Therefore, the Officers argue that the statute of limitations expired on September 28, 2013 and that this suit is untimely. (Dkt. 47) at 8–9. Section 1983 provides a mechanism for vindicating federal rights, but does not create any substantive rights. *Ledford v. Sullivan*, 105 F.3d 354, 356 (7th Cir. 1997). Instead, courts must "identify the specific constitutional right" at issue, *Albright v. Oliver*, 510 U.S. 266, 271 (1994); after which the court looks to the common

---

[4] Williams argues that Gladney did in fact testify before the grand jury and at trial (Dkt. 38) at 11, but Goldish is correct that Williams's complaint does not contain factual allegations to this effect.

law of torts to provide the contours and prerequisites of the § 1983 claim. *Manuel*, 137 S. Ct. at 920. Because § 1983 does not contain a statute of limitations, the court looks to the law of the state where the injury occurs to determine the appropriate limitations period. In Illinois, the limitations period is two years. 735 ILCS 5/13-202. Williams filed his complaint on July 13, 2017, meaning that his claim is untimely if it accrued before July 13, 2015.

After *Manuel*, any pretrial detention based on fabricated evidence is a Fourth Amendment violation that continues past the start of legal process up to trial. *Manuel* left open, however, the issue of when such a claim accrues, remanding to the Seventh Circuit "to decide which common law tort is most analogous to the Fourth Amendment post-legal-process pretrial detention violation, and what the elements of such a claim are, and when the claim accrues." *Bolden v. City of Chicago*, 2017 WL 8186995 at *6 (N.D. Ill. Dec. 12, 2017) (citing *Manuel*, 137 S. Ct. at 920). However, *Manuel* noted that eight of the ten "courts of appeals that have recognized a Fourth Amendment claim . . . have incorporated a 'favorable termination' element and so pegged the statute of limitations to the dismissal of the criminal case." *Manuel*, 137 S. Ct. at 921. Because a cause of action cannot accrue before all elements have occurred, these courts have held that a Fourth Amendment pretrial detention claim does not accrue until the proceedings have terminated in the accused's favor. *Id.*; *accord Carter v. City of Chicago*, 2018 WL 1726421, at *4 (N.D. Ill. Apr. 10, 2018). And as Williams points out, any claim for violation of his Fourth Amendment rights while he was still in pretrial detention would have implicated *Heck v. Humphrey*, 512 U.S. 477 (1994) and likely would have been barred based on that precedent because of the nature of his claim: he challenges the probable cause underlying every aspect of his proceedings as based on fabricated evidence. (Dkt. 56) at 6–7; *see Wiley v. City of Chicago*, 361 F.3d 994, 997–98 (7th Cir. 2004) ("[I]f [the plaintiff's] attack on his arrest

would challenge the only evidence supporting a potential conviction, then his claim did not begin to accrue until the charges were dismissed . . . .").  Applying that reasoning here, the Court finds that Williams's Fourth Amendment claim accrued on June 8, 2017, when he was acquitted on the charges against him, and accordingly, Williams timely filed his claim.

### B. Fourteenth Amendment Claim

The Fourteenth Amendment's Due Process Clause is the relevant constitutional source for Plaintiff's claim that Defendants violated his right to a fair trial by failing to disclose exculpatory evidence.  This clause also applies to Williams's claim that Defendants coerced and used false information to charge Williams.  "There can be no doubt that the use of fabricated evidence to deprive a defendant of liberty violates the Fourteenth Amendment." *Carter*, 2018 WL 1726421, at *4.  That is, "a police officer who manufactures false evidence against the criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

At the outset here, the Court notes that, to the extent that Williams brings a claim for violation of his Fourteenth Amendment rights against Goldish, those allegations are limited to evidence fabrication.  As Goldish points out, the complaint only specifically alleges her involvement in Williams's criminal matter pertained to the taking of Gladney's September 28, 2011 statement.  (Dkt. 32) at 10–11.  Indeed, the complaint does not even allege that Goldish was aware of the exculpatory information allegedly withheld or destroyed by the Officers.  Accordingly, any claim for alleged *Brady* violations does not involve Goldish.  Similarly, Williams has alleged that Officer Maresso was involved in losing or destroying certain exculpatory evidence, but not that she was involved in creating any false reports; thus evidence-fabrication claim does not involve Officer Maresso.

### 1.     Alleged *Brady* Violation By Officers Maresso, Hill, and Garcia

First, Williams contends that the Officers destroyed or failed to disclose material as required by *Brady v. Maryland*, 373 U.S. 83, 87 (1963), thereby violating his right to a fair trial. *Rabe v. United Airlines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011).   *Brady* requires that the prosecution disclose exculpatory evidence if it is both favorable and material to the defense.   373 U.S. at 87.   This "obligation extends to police officers, insofar as they must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution."   *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007).   "[A] duty to refrain from bad-faith destruction flows necessarily, and obviously, from [*Brady*'s] familiar holding that suppression of material exculpatory evidence violates due process."   *Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015).   Specifically, Williams primarily alleges that the following evidence was lost, destroyed, or otherwise withheld:   (1) the GPR of Gladney's initial interview on July 2 (Dkt. 1) at ¶¶ 21–23; (2) McNeal's statements to police on that Williams was not at the parking lot the night of the shootings (Dkt. 1) at ¶¶ 31, 48; and (3) the GPR of Garcia and Hill's interview with Slugg, the prime suspect before Williams (Dkt. 1) at ¶ 34; (Dkt. 56) at 10–11.   The bad-faith destruction or loss of exculpatory evidence violates a suspect's right to a fair trial.   *Armstrong*, 786 F.3d at 532.

To prevail on a *Brady* claim for an officer's failure to disclose evidence, a plaintiff must show that (1) the evidence was favorable to him; (2) the officer concealed the evidence; and (3) the concealment prejudiced him.   *Gill v. City of Milwaukee*, 850 F.3d 335, 343 (7th Cir. 2017) (citing *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016)).   "Prejudice requires proof that the failure to disclose caused a deprivation of the accused's liberty."   *Id*.   The Officers first argue that Williams cannot state a claim for a due process violation for their failure to disclose certain witness statements and other exculpatory evidence because he was acquitted at trial. (Dkt. 60) at 10.   However, the Officers do not dispute that Williams was held for years in pretrial

detention, and although "civil *Brady* claims will be viable most often when a defendant has been wrongfully convicted and imprisoned as a result of the *Brady* violation[] . . . the key to a civil *Brady* claim is not a conviction or acquittal but a deprivation of liberty." *Cairel*, 821 F.3d at 833. In a situation such as Williams faced here, "where an accused is held in pretrial custody before acquittal or dismissal, a failure to disclose exculpatory evidence may cause the type of deprivation of liberty required for a *Brady* claim even if the case ends without a trial or conviction." *Id*.; *cf. Bianchi v. McQueen*, 818 F.3d 309, 320 (7th Cir. 2016) (no deprivation of liberty in connection with a fabricated-evidence due process claim where the plaintiff had been released on bond immediately after arrest and acquitted at trial). It is evident, therefore, that Williams's circumstances do not preclude a civil *Brady* claim.[5]

As to the elements of the claim, Williams has asserted sufficient allegations to plead the first two elements—that favorable evidence was concealed. Regarding the third element, the Officers contend that Williams's acquittal creates a bar to a showing of prejudice (or materiality as it is sometimes also referred) because an acquittal is "the same outcome [Williams] claim[s] would have happened if the evidence were timely disclosed." (Dkt. 47) at 5–6. This argument is similar to the argument that an acquittal bars a civil *Brady* claim in total, and it fails for the same reasons. Further, evaluating the sufficiency of Williams's allegations as to the third element, Williams alleges that the three withheld GPRs could have secured his release before trial because it undermined the charges against him, particularly in light of the allegedly thin evidence to support his detention in the first place. (Dkt. 1) at ¶ 60. This is especially true regarding the

---

[5] The Officers' citation to *Mosley v. City of Chicago*, 614 F.3d 391 (7th Cir. 2010) does not change this result, largely because the Officers have misstated the holding in that case. That case explicitly reserved a holding as to "whether our circuit recognizes a claim for a *Brady* violation when the trial results in an acquittal for a later case when this standard [of proof] is met." *Id*. at 398. In other words, the plaintiff's claim was dismissed in *Mosely* not because he was acquitted at trial, but instead because he failed to show that the defendant police officers withheld any material evidence that, if disclosed, would have led to the termination of his prosecution.

McNeal eyewitness statement that he did not see Williams at the parking lot on the night in question and that he saw Slugg driving Antoine's van that night. Although Williams's allegations regarding the other two undisclosed GPRs are not as strong, altogether, Williams's allegations are sufficient to plead that the undisclosed evidence was material.

Finally, with regard to one GPR (the July 2 Gladney interview) the Officers argue that Williams cannot state a *Brady*-violation claim on it because he knew about it before trial, and therefore no Brady violation occurred. (Dkt. 47) at 5. But accepting the allegations of the complaint as true and drawing all reasonable inferences in Williams's favor, this is not a viable basis on which to dismiss the claim. Whether Williams can prove his allegations is an issue that cannot be resolved at this stage of the case. In sum, Williams has stated a claim based on the Officers' alleged non-production of exculpatory evidence.

### 2. Fabrication of Evidence by Goldish, Hill, and Garcia

A police officer (or prosecutor) who manufactures false evidence against a criminal defendant violates due process if that evidence later deprives the defendant of liberty in some way. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (quoting *Whitlock*, 682 F.3d at 580). Indeed, convictions premised on deliberately falsified evidence "always violate the defendant's right to due process." *Id.* at 439; *see also Myvett v. Heerdt*, 232 F. Supp. 3d 1005, 1019 (N.D. Ill. 2017) ("[A] due process claim will lie when fabricated evidence is used to deprive a criminal defendant of liberty, even when the prosecution of that defendant is ultimately unsuccessful."). Here, Williams alleges that Goldish, Hill, and Garcia procured false evidence to charge him—Gladney's September 28, 2011 statement. He also alleges that Garcia and Hill falsified certain relevant police reports on his case. (Dkt. 1) at ¶¶ 38, 47.

This claim has two essential elements: (1) the defendants deliberately falsified evidence in bad faith or engaged in other misconduct (2) that caused a deprivation of Williams's liberty. *Armstrong*, 786 F.3d at 551. As to the first element—that the Defendants falsified evidence— the Officers argue that even if the September 28 Gladney interview and resultant statement were *coerced*, that alone does not mean that they were *fabricated*. (Dkt. 47) at 7–8. In support of this argument, the Officers cite *Petty v. City of Chicago*, 754 F.3d 416, 422–23 (7th Cir. 2014), which, after a full analysis of the plaintiff's complaint, concluded that his due process claim failed "because his claim is a 'coercion' case for which there is no cognizable due process claim, as opposed to an 'evidence fabrication' case where there is a cognizable claim." This is an accurate statement of precedent, but it does not require dismissal of Williams' claim against the Officers. This is because even though Williams alleges that Gladney's September 28 statement was coerced, he also adequately alleges that it contained false information. *See* (Dkt. 1) at ¶¶ 37–38 (Gladney saw Williams charge at and shoot Oliphant, Gladney was not drunk, and Gladney did not have a weapon).

The Officers also use *Petty* for the proposition that "'[m]anufactured false evidence' and 'false identification' are not magic talismans that will transform a coercion case into an evidence fabrication case and give rise to a cognizable claim where one does not exist." 754 F.3d at 423. In that case, the plaintiff alleged that the defendant police officers coerced a witness into giving false testimony by threatening him, but the plaintiff critically failed to allege (or prove) that the defendants knew the coerced testimony was false. *Id*. But here, the complaint goes further than generally alleging that some evidence was fabricated. It alleges that important credibility markers for Gladney—a "key witness"—were fabricated by Goldish and Garcia along with Gladney's identification of Williams as a shooter. And the complaint alleges that Goldish,

Garcia, and Hill knew the fabricated evidence was false, largely from the evidence that had been collected earlier in the investigation, both from the same witness and from others. (Dkt. 1) at ¶ 38. Further, not only is *Petty* distinguishable on account of the different nature of the allegations as compared to the present case, *Perry* also was decided on summary judgment and therefore under a different standard of proof on the part of the plaintiff.

Continuing on to the second element—causation—the complaint alleges that the Gladney statement was a key piece of evidence used to procure felony charges against him. *See Whitlock*, 682 F.3d at 580 (violation of due process to use fabricated evidence "to deprive the defendant of her liberty in some way."); *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him.") (citation omitted). Due to the inherently speculative task of analyzing causation in fabrication claims, a relatively broad standard for causation applies. *See Myvett*, 232 F. Supp. 3d at 1022–23 ("To require [a plaintiff] to quantify the impact of a single piece of information on an aggregate assessment based on multiple factors demands the impossible . . . It is [a plaintiff's] burden to prove causation, but [a] defendant . . . is not entitled to the benefit of a standard that his own actions rendered unachievable."). And if Williams has pled that the fabricated evidence (the statement and/or police reports) furthered the prosecution, he has done enough. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018). Williams allegations satisfy this element here. *See Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) (causation requirement satisfied where fabricated facts are "likely to influence" the decision to prosecute). Williams alleges that Goldish approved felony charges against Williams less than five hours after Gladney signed the statement that was coerced by Goldish, Garcia, and Hill and that contained knowingly fabricated statements, including his identification of Williams as the

shooter. With this allegation and drawing all reasonable inferences in Williams's favor, Williams sufficiently has plead causation. *See, e.g.*, *Moore v. City of Chicago Heights*, 2010 WL 148623, at *3 (N.D. Ill. Jan. 12, 2010). The Officers further argue that false police reports do not violate due process in the absence of a conviction. *See* (Dkt. 47) at 7. But as stated in *Myvett*, this argument fails because as long as the fabricated evidence was used to deprive Williams of his liberty, a conviction is not necessary. 232 F. Supp. 3d at 1019.

Finally, although the Officers argue that it was instead Gladney's August 9, 2011 statement that provided probable cause for Williams's detention (*see* (Dkt. 47) at 8), this is not what the complaint alleges and that will be an issue for discovery. The same is true for the Officers' discussion of which of Gladney's inconsistent statements were true or false. *See* (Dkt. 60) at 9. These are not issues that the Court can decide or even consider at this stage; they are issues for discovery. Overall, the motions to dismiss Count I are denied.

## II.    § 1983 Conspiracy (Count II)

For a § 1983 conspiracy claim, Williams must allege that "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Along with these elements, Williams must allege the parties, the general purpose, and the approximate date of the conspiracy. *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006). Even fully considering the allegations incorporated into Williams's federal conspiracy count, Count II falls short. Although the allegations reflect that Defendants worked the case together, nothing in the complaint suggests that Goldish and the Officers had any *agreement* to deprive Williams of his constitutional rights, and therefore, Williams's allegations that "Defendants . . . decided to falsely implicate Williams for the array of violent, criminal charges," "Defendants further

conspired to deprive Williams of potentially exculpatory information," and "Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means" (Dkt. 1) at ¶¶ 59–61, are nothing more than labels and conclusions that cannot save this claim absent any supporting factual allegations. *Iqbal*, 556 U.S. at 678; *cf. Hill v. City of Harvey*, 2018 WL 278720, at *5 (N.D. Ill. Jan. 3, 2018) (holding that conspiracy count was sufficiently pled where it contained allegations that defendants had conversations wherein one told the other that "they intended to tie the alleged crime" to the plaintiff and "if they couldn't make the attempted murder charge against [plaintiff] stick, the would 'get' [him] on something else"). As a result, Count II is dismissed.

### III. Immunities

As further bases for dismissal, the individual Defendants assert the affirmative defenses that they are entitled to immunity from suit in this action. Neither affirmative defense requires dismissal of Williams's claims at this time.

#### A. Absolute Prosecutorial Immunity

"Prosecutors are absolutely immune from liability for damages under § 1983 for conduct that is functionally prosecutorial; this immunity is understood to broadly cover all conduct associated with the judicial phase of the criminal process." *Bianchi*, 818 F.3d at 316 (citing *Van de Kamp v. Goldstein*, 555 U.S. 335, 341–43 (2009); *Burns v. Reed*, 500 U.S. 478, 486 (1991); *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976)). "[T]he question of immunity turns on the capacity or function that the prosecutor was performing at the time of the alleged wrongful conduct." *Whitlock*, 682 F.3d at 579–80. Therefore, courts take a "functional approach" in determining whether absolute prosecutorial immunity applies, considering "the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509

U.S. 259, 269 (1993).  A prosecutor is entitled to absolute immunity for acts undertaken in his role as an *advocate* for the state in preparing for the initiation of judicial proceedings or for trial. *Id*. at 273.  But "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'"  *Id*. at 273–74 (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973)).  Notably, absolute immunity shields prosecutors even if they act "maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence."  *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986).  However, "a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial."  *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012).

Thus, the pertinent question is whether Goldish acted as an "advocate for the State" or whether her actions were "investigative and unrelated to the preparation and initiation of judicial proceedings."  *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (citing *Buckley*, 509 U.S. at 273).  Goldish argues that her actions in this matter as set forth in the complaint were nothing more than the routine prosecutorial duties of interviewing a witness obtained by the police in their investigation, recording the witness's statement for use in the prosecution, and approving felony charges.  (Dkt. 32) at 8–9.  But the complaint alleges that Goldish was directly involved in conducting a pre-charging coercive overnight interview of Gladney and then authoring a statement riddled with falsehoods for Gladney to sign.  (Dkt. 1) at ¶¶ 37–38.[6]  Goldish then relied on this statement to procure charges against Williams only a few hours after it was signed.

---

[6] The complaint further alleges that Goldish conspired with the Officers to deprive Williams of his constitutional rights by committing *Brady* violations, which would present a different analysis.  But that claim is dismissed for the reasons set forth above.

The allegations of investigative misconduct are sufficient to defeat Goldish's motion to dismiss on the grounds of absolute prosecutorial immunity at this time. *See Buckley*, 509 U.S. at 276–78 (prosecutors were not entitled to absolute immunity where they allegedly fabricated evidence during an investigation before there was probable cause to arrest the petitioner); *Whitlock*, 682 F.3d at 579 (stating that a prosecutor does not have absolute immunity from a due process claim based on his pre-probable cause fabrication of evidence); *see, e.g.*, *Saunders v. City of Chicago*, 2013 WL 6009933, at *9 (N.D. Ill. Nov. 13, 2013), on reconsideration in part, 2014 WL 3535723 (N.D. Ill. July 11, 2014) (denying motion to dismiss on prosecutorial immunity grounds where defendants alleged "that the ASAs acted in concert with [d]efendant [o]fficers in their investigation and interrogation of the [p]laintiffs, in coercing and fabricating [p]laintiffs' confessions, and in coercing and fabricating incriminatory statements from other witnesses").

Despite Goldish's position, this case is not like *White v. City of Chicago*, 369 Ill. App. 3d 765 (1st Dist. 2006). There, the plaintiffs alleged that, one to two years after their arrests and indictments, the State's Attorney directed his office to investigate a double homicide. *Id*. at 776. Witness interviews were conducted, and the plaintiff alleged that the State's Attorney and an assistant prosecutor procured and encouraged the use of false witness testimony at the grand jury and at trial. *Id*. With respect to the pre-arrest witness interviews, the case did not involve allegations of coerced or false statements, and with regard to the later alleged false testimony, the court held that this was done by the prosecutors as advocates after a probable-cause determination had been made, and therefore they were immune. *Id*. at 777. Here, Williams alleges that Goldish acted with knowledge that she lacked probable cause and that she knowingly fabricated evidence to support charges. In other words, according to Williams, Goldish was directly involved in obtaining the false evidence and testimony that she later relied on in bringing

charges against Williams. At this stage of the proceedings, the Court is required to assume that all of Williams's allegations are true and draw all reasonable inferences in his favor. Therefore, the complaint has sufficiently pled Goldish was acting in an investigative capacity with regard to Gladney's September 28, 2011 statement.[7]

### B.    Qualified Immunity

For their part, the Officers argue that they are entitled to qualified immunity on the Fourteenth Amendment and the Fourth Amendment claims, solely based on argument that the contours of the claims were not clearly established in 2011. (Dkt. 47) at 10. But the Officers' argument, which spans only half of a page, is not developed, and therefore the Court will not address it at length at this time. It suffices to mention that generally for the Fourteenth Amendment claims, the Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way," *Whitlock*, 682 F.3d at 580 (citing *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988)); and a "*Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused . . . even evidence that is known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006). And although the exact contours of Williams's Fourth Amendment claim under *Manuel* are still coming into focus, the Fourteenth

---

[7] The Court notes, however, that the complaint alleges that Williams was arrested on September 27, 2011—the day before Gladney signed the statement at issue against Goldish, but the complaint does not indicate the grounds on which Williams was arrested or whether they were related to the July 1, 2011 shooting. If Williams was properly arrested on account of the shooting *prior* to the Gladney statement, this could affect the prosecutorial-immunity analysis. However, at this stage, taking all reasonable inferences in Williams's favor, the complaint does not on its face admit all of the ingredients of an impenetrable defense, particularly because it alleges that there was no probable cause at all to support Williams's arrest and detention. *See Xechem, Inc. v. Bristol–Meyers Squibb, Co.*, 372 F.3d 899, 901 (7th Cir. 2004) ("Only when the plaintiff pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6).").

Amendment's Due Process Clause has long forbade the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence or without probable cause. *See Avery*, 847 F.3d at 439 (7th Cir. 2017); *see also Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000) (eight months of pre-trial detention was a deprivation of liberty). However, this recitation does not prevent the Officers from reasserting and further developing the defense later on.

## IV.    *Monell* Claim Against the City (Count III)

### A.    The City's Motion to Dismiss

Turning next to Williams's claim against the City, the City can be subject to § 1983 liability under *Monell*, "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009) (citing *Monell*, 436 U.S. at 690); *see Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc) ("The critical question under *Monell* . . . is whether a municipal policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents."). To demonstrate that the City is liable for a harmful custom or practice, Williams must allege that it was aware of the risk created by the custom or practice and failed to take appropriate steps to protect him. *Thomas*, 604 F.3d at 303.

Williams's alleged *Monell* claim against the City is based on the its alleged policies, practices, and customs of conducting coercive interrogations to obtain confessions and false implications, producing false reports and giving false statements and testimony, continuing to pursue investigations based on statements obtained through unlawful interrogations, and failing to disclose potentially exculpatory evidence. (Dkt. 1) at ¶ 65. Further, Williams alleges that the

City fails to properly, train, supervise, or discipline its officers to prevent these constitutional violations. *Id*. at ¶¶ 66–67. Although stated broadly in Count III, Williams has alleged specific facts to support this allegation. First, Williams specifically alleges that two Officers were involved in obtaining Gladney's written statement implicating Williams. *Id*. at ¶¶ 36–38. Williams also specifically alleges that Officers drafted at least three reports that contained false information and also selectively omitted key exculpatory information from others. *Id*. at ¶¶ 47–48, 87. With regard to the exculpatory evidence, Williams has alleged that the City keeps street files—both historically and in this case—whereby potentially exculpatory is hidden and sometimes destroyed, like the numerous GPRs that were lost or destroyed during the investigation of Williams. *Id*. at ¶¶ 45–46. And Williams has alleged that this falsification and withholding of exculpatory information caused him to be charged, indicted, detained, and prosecuted. These allegations amount to more than just conclusions or labels.

Still, the City argues that Williams's *Monell* claim is deficient because it "mainly references his own alleged incident." (Dkt. 41) at 5–6. But even this argument acknowledges that Williams has included allegations of other instances with regard to the street files. *See* (Dkt. 1) at ¶ 45. Not only that, a plaintiff raising a *Monell* claim may rely solely on his own experience, rather than being required to plead examples of other individuals' experiences. *See White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (quoting *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)) (noting that plaintiff "was not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process"); *Williams v. City of Chicago*, 2017 WL 3169065, at *8–9 (N.D. Ill. July 26, 2017) ("Post-*White* courts analyzing *Monell* claims . . . have 'scotched motions to dismiss' premised on arguments that the complaint

does not contain allegations beyond those relating to the plaintiff.") (collecting cases). In determining whether a plaintiff has sufficiently pled a widespread practice in a *Monell* claim, the Court looks to the instances of misconduct alleged, the circumstances surrounding the alleged constitutional injury, and additional facts probative of a widespread practice or custom. *See, e.g.*, *Carmona v. City of Chicago*, 2018 WL 1468995, at *2 (N.D. Ill. Mar. 26, 2018). Looking at all of the circumstances here, Williams has alleged that no less than three GPRs were destroyed or lost and that multiple reports were falsified by the Officers (or numerous reports selectively omitted exculpatory information gained in witness interviews). Based on these allegations, Williams has sufficiently pled that the City has a policy or custom that violates the Constitution. *See, e.g.*, *Hill*, 2018 WL 278720, at *5 (finding nearly identical allegations sufficient to state a *Monell* claim, particularly when combined with the other instances of wrongdoing alleged in the complaint). Moreover, the Officers remain potentially liable on the underlying claims, so the Court denies the City's motion to dismiss the *Monell* claim against it at this stage.

### B.     The City's Motion to Bifurcate (Dkt. 22)

However, the City claims that bifurcation of (and then staying discovery on) the *Monell* claim is warranted because: (1) Williams must succeed on his claims against the individual Officers before he can prevail on his Monell claim; (2) bifurcation would serve the interest of litigation and judicial economy, particularly because Williams's *Monell* claim is so widely pled; (3) and bifurcation will assist in eliminating the risk of unfair prejudice against the parties—that is, prejudice against the Officers.; and (4) bifurcation will not prejudice Williams's recovery of compensatory damages due to the City's contractual obligation to indemnify the Officers. Finally, the City has agreed to the entry of judgment against it—by way of a Limited Consent Agreement—should Williams prevail on his claims against the Officers. (Dkts. 22, 22-1).

According to the City, the Limited Consent Agreement means that discovery and trial on the *Monell* claim may not be necessary and benefits Williams because he would not be required to prove the elements of § 1983 municipal liability.

### 1. Legal Standard

Under Federal Rule of Civil Procedure 42(b), the Court has considerable discretion to decide claims or issues in separate trials "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b); *see Krocka v. City of Chicago*, 203 F.3d 507, 516 (7th Cir. 2000). Bifurcation may be appropriate if one or more of the Rule 42(b) criteria is met as long as bifurcation will not prejudice the non-moving party or violate the Seventh Amendment, "which guarantees a jury trial for civil cases in federal court." *See Treece v. Hochstetler*, 213 F.3d 360, 365 (7th Cir. 2000); *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 700 (7th Cir. 2007).

"Bifurcation may be appropriate if 'the separation would prevent prejudice to a party or promote judicial economy.'" *See, e.g.*, *Horton v. City of Chicago*, 2016 WL 316878, at *2 (N.D. Ill. Jan. 26, 2016) (citing *Chlopek*, 499 F.3d at 700). Such motions are "now commonplace and '[c]ourts in our district have both granted and denied similar motions . . . [t]hus there is a going body of precedent in this district for both granting and denying bifurcation in § 1983 cases.'" *See, e.g.*, *Allison v. Gallagher*, 2012 WL 4760863, at *1 (N.D. Ill. Oct. 5, 2012) (citations omitted). The increasing frequency of bifurcation motions and the willingness of many judges to grant them stems in large part from the recognition that, in many instances, "claims of municipal liability require an extensive amount of work on the part of plaintiff's attorneys and experts, and an extraordinary amount of money must be spent in order to prepare and prove them." *Moore v. City of Chicago*, 2007 WL 3037121, at *9 (N.D. Ill. Oct.15, 2007).

### 2.    Split or Inconsistent Verdicts

The City first argues that bifurcation is appropriate because Williams must succeed in his action against the individual Officers before he can obtain a judgment against the City pursuant his *Monell* claim.   (Dkt. 22) at 4.   As the City also concedes and as Williams elaborates, however, "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 798–99 (1986)) (emphasis in original). Rather, "to determine whether the [City]'s liability is dependent on its officers, we look to the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.*; *see also, e.g.*, *Horton*, 2016 WL 316878, at *4.

Williams's *Monell* claim relates specifically to the City's alleged practices of coercing false testimony, creating false or misleading investigative reports, and failing to preserve and produce exculpatory evidence at times through the use of "street files."   The City argues that these theories of municipal liability first require a jury to find that the Officers did in fact violate Williams's constitutional rights.   Looking first at the allegations of coerced testimony and false reports, those violations depend on individual Officer actions. *See, e.g.*, *Harris v. City of Chicago*, 2016 WL 3261522, at *3 (N.D. Ill. June 14, 2016) ("Here, however, the actions of the individual officers in collecting and fabricating evidence against [plaintiffs] are the source of the alleged harm to the plaintiffs, and any 'policy' exerted harm through those actions, not independently of them.") (citing *Taylor v. Kachiroubas*, 2013 WL 6050492, at *4 (N.D. Ill. Nov. 15, 2013)).   Even if the City had a policy or practice of permitting its officers' to coerce false testimony or to create false investigative reports, the harm caused by the practice could only manifest itself through the officers' actions.

The same conclusion applies to the exculpatory evidence and street files allegations. Any harm caused by a policy or practice to withhold from discovery or not preserve exculpatory evidence or an alleged street-file policy or practice could only manifest itself through the Officers actually withholding such evidence or maintaining such files, and therefore a finding of municipal liability is predicated on a finding first that the Officers themselves were liable. *See, e.g.*, *Andersen v. City of Chicago*, 2016 WL 7240765, at *4 (N.D. Ill. Dec. 14, 2016) (reaching this same conclusion regarding a street-file *Monell* claim); *Veal v. Kachiroubas*, 2014 WL 321708, at *4 (N.D. Ill. Jan. 29, 2014) ("It is true that a municipality can be held liable for failure to train and supervise its employees in the appropriate handling of exculpatory evidence, . . . . But that does not mean that could occur without officer liability in Veal's case.") (citation omitted). As such, this case presents "a significant possibility that after narrowly litigating the underlying Section 1983 claim, proceeding to the more expansive *Monell* issues may become entirely unnecessary." *Ackerman v. Allen*, 2017 WL 1536447, at *5 (N.D. Ill. Apr. 27, 2017).

In response, Williams contends that the Officers' alleged qualified immunity defense creates the possibility that the Officers could be found not liable while the City could be found liable. *See* (Dkt. No. 35) at 12–13. However, whether the Officers can be found liable is beside the point; rather, the issue is "whether the individual defendants committed a constitutional violation that is a prerequisite for" the City's liability. *See, e.g.*, *Taylor*, 2013 WL 6050492, at *4. Moreover, the fact that the City has consented to entry of judgment against itself in the event that the Officers are found to have violated Williams's constitutional rights "even if one or all Defendant Officers is/are further found to be not liable to [Williams] because one or more of the is/are entitled to qualified immunity" undermines Williams's position. *See, e.g.*, *Horton*, 2016 WL 316878, at *4; (Dkt. 22-1) at 3. The language of the Limited Consent Agreement also serves

to distinguish this case from *Estate of Loury by Hudson v. City of Chicago*, 2017 WL 1425594 (N.D. Ill. Apr. 20, 2017), on which Williams relies. (Dkt 35) at 12. Specifically, in that case, the court found that bifurcation could create unnecessary complexity and confusion in the situation wherein the individual defendants were found immune. But the consent agreement proposed there failed to contain a provision that provided for this particular situation. The same problem does not exist here. In sum, because there is no way that a jury could consistently find the City liable without first finding the Officers liable, this factor weighs in favor of bifurcation.

### 3. Litigation or Judicial Efficiency and Economy

The parties also dispute whether bifurcation will best serve the interests of economy and efficiency. As noted above, the City believes that bifurcation will allow the parties to potentially avoid unduly burdensome and unnecessary discovery related to the City's policies and procedures. Williams responds that judicial economy will not be served by bifurcation and stay of discovery on the *Monell* claim. First, he argues that the City's estimation of the scope and expense of *Monell* discovery is premature and too speculative, particularly because, in his view, his *Monell* claim is more limited than in other cases involving excessive force and also because his individual and municipal claims overlap. (Dkt. 35) at 5–6. In addition, Williams argues that bifurcation could require duplicative discovery and trials, and it could create endless discovery disputes regarding whether certain discovery is *Monell*-related. *Id*. at 13–14.

First, the City argues that, based on the broad *Monell* allegations in Williams's complaint alone, discovery into the alleged unlawful policies and practices would be expansive. At this point, Williams argues that the City's arguments are too speculative and conclusory. *See* (Dkt. 35) at 5. But they are not. Indeed, just regarding the street files kept for investigations of "serious crimes," Williams's complaint cites to an article concerning the practice going back to

the 1940s. *See* (Dkt. 1) at ¶ 45. Accordingly, the Court cannot find fault with the City's assertion that the *Monell* discovery will be extensive and will require various forms of expert discovery. And although Williams argues that the *Monell* discovery in this case would be "more narrowly tailored" than in excess-force cases, Williams's own arguments reflect the breadth of his allegations—City practices and policies regarding various forms of misconduct in the investigation of "major gun crimes," although to be sure, nothing in Williams's complaint limits his *Monell* claim to "major gun crimes" or even defines that term. Even with this amorphous limitation, discovery related to all *Brady* violations could very well be incredibly wide-ranging and therefore burdensome for the City.

Williams further argues that the overlap of discovery essential to the individual claims and the municipal claim both makes bifurcation unnecessary and ultimately will have a less efficient effect, because it will create discovery disputes and require duplicative efforts. On the necessity front, this Court encountered a nearly identical scenario and similar arguments in *Andersen v. City of Chicago*, 2016 WL 7240765 (N.D. Ill. Dec. 14, 2016). In *Anderson*, the plaintiff alleged that he had been wrongfully charged, tried, convicted, and incarcerated on the basis of fabricated or coerced evidence and that the defendants had kept and failed to disclose its "street files"—which led to the plaintiff being denied access to exculpatory information. *Id.* at *1–2. The plaintiff there brought both a § 1983 claim against individual CPD officers and a *Monell* claim against the City for the practice of coercing false confessions and keeping street files. Like here, the City moved for bifurcation of the *Monell* claims against it, arguing in part that bifurcation would best serve the interest of judicial economy and would not affect the plaintiff's eventual recovery of damages because the City, like here, consented to the entry of

judgment if the individual officer defendants were found to have violated the plaintiff's constitutional rights. *Id*. at *4.

There, the plaintiff objected to bifurcation, arguing that the discovery essential to the claims against individual officers and the City overlapped significantly, thereby making bifurcation unnecessary. *Id*. at *5. The Court rejected this argument. Specifically, the Court found the overlap between the individual claims and the street-file claims specious, noting that the plaintiff had failed "to explain how discovery related to whether there was a street file in this case overlaps significantly with the much broader issue of whether the City had a policy or practice of allowing street files in all of its criminal investigations and prosecutions. Even assuming that a street file existed in this case—an assumption that the City denies throughout its briefing—the existence of that file would constitute only a small amount of the discovery that would underlie a department-wide *Monell* claim." *Id*. The Court's reasoning in *Anderson* is directly applicable to this case, particularly in that Williams has not explain how the individual discovery based on his allegations of misconduct against the Officers involved in his case overlaps in a meaningful way with his contention that the City maintained a coercive investigative practice and maintained street files.

Finally, as to Williams's contention that bifurcation will create inefficiency, that argument also fails for many of the reasons already discussed in Section IV(B)(2). In particular, Williams's *Monell* claims are dependent on his establishing the liability of the Officers and the City has offered a Limited Consent Agreement that awards damages to Williams in the event that the Officers are found to have violated his constitutional rights, regardless of any immunity arguments. Accordingly, first addressing the individual claims may eliminate the need to proceed to the *Monell* claims at all, and bifurcation may also significantly expedite litigation of

the individual claims themselves. This is because instead of focusing on street files from decades ago or broad questions about the City's training or disciplinary policy, the parties can focus on establishing what happened to Williams and whether it violated his constitutional rights. As this opinion indicates, that task will already be quite onerous because of the nature, number, and severity of the claims Williams has asserted. "By limiting the scope of this initial stage of litigation, it is possible to resolve these threshold issues more quickly." *Ackerman*, 2017 WL 1536447, at *5. In addition to these points, as discussed above, Williams's individual claims and his *Monell* claims do not overlap in a significant manner, such that the discovery disputes Williams anticipates should occur with frequency. And from the Court's view, the parties thus far have appear to be cooperating in the discovery process, so the consideration of a history of disputes does not apply here and the Court remains confident that the parties will work together to resolve their discovery disputes. *Cf. Terry v. Cook Cty. Dep't of Corr.*, 2010 WL 2720754, at *3 (N.D. Ill. July 8, 2010) (denying bifurcation where there "already are discovery disputes brewing"). For all of these reasons, efficiency and economy counsel in favor of bifurcation.

### 4. Prejudice

Having found that the Rule 42(b) criteria are met, bifurcation is appropriate as long as it will not prejudice the non-moving party or violate the Seventh Amendment. On this front, the City argues that allowing the case to move forward as a whole would serve to prejudice the Officers, specifically due to the introduction of alleged acts of misconduct by various non-defendant police officers. (Dkt. 22) at 10–11; *see also Ackerman*, 2017 WL 1536447, at *5. In addition, the City argues that Williams will not be prejudiced without *Monell* discovery because the Limited Consent Agreement provides that the City will agree to judgment against itself if the jury finds any individual Officer liable. *Id*. at 13–15. Based upon the above findings and the

fact that numerous courts have found that bifurcation allows parties to bypass burdensome and potentially unnecessary litigation and related costs, bifurcation appears to present benefits to both parties. *See, e.g.*, *Andersen*, 2016 WL 7240765, at *5; *Medina*, 100 F. Supp. 2d at 895; *Moore*, 2007 WL 3037121, at *9.

Importantly, Williams argues that bifurcation of his *Monell* claim will frustrate his efforts to seek relief beyond money damages, such as deterring future official misconduct and initiating reform in the police department. (Dkt. 35) at 8–9. Williams is correct that the Limited Consent Agreement is limited to compensatory damages, but that likely is because Williams's complaint only seeks compensatory relief at this time. *See* (Dkt. 1). And although Williams may seek to deter future official misconduct by way of a substantial judgment against the City, Williams's complaint does not limit any extraordinarily large judgment to his *Monell* claim; instead, it is entirely possible that Williams could be awarded a large judgment against the Officers, which presumably send the same message to the City and police department. This is particularly so here, where the City has admitted that it will pay whatever compensatory damages are awarded against its employees. (Dkt. 22-1); *see, e.g.*, *Parker v. Banner*, 479 F. Supp. 2d 827, 829 (N.D. Ill. 2007) (because the City will pay for any proven claims, the damages award will send a message either way). This is not to minimize Williams's desired non-economic benefit from bringing suit against the City. But after carefully considering the arguments on both sides, the Court finds bifurcation to be appropriate in this case.

V.      **State Law Claims**

Using Illinois law, Williams sets forth claims for *respondeat superior* against the City (Count IV), indemnification by the City and Cook County (Count V), civil conspiracy (Count VI), and malicious prosecution (Count VII). The Cook County Defendants do not meaningfully

argue for dismissal of the state-law claims. Instead, they assert the perfunctory argument in support of dismissal of the state-law claims that the Court should decline to exercise supplemental jurisdiction over such claims after dismissing Williams's federal claims. The Officers include even less substance in support of the same argument ((Dkt. 47) at 10), and the City does not address the state law claims asserted against it. *See* (Dkt. 41); *see, e.g.*, *Hill*, 2018 WL 278720, at *6 (where defendants did not challenge certain allegations, they waived their argument and their motions to dismiss those allegations were denied). Because the Court has not dismissed the federal claims, the motions to dismiss the state claims are denied, with one exception: in line with the analysis set forth in Section II above, Williams's Illinois conspiracy claim is deficient because it fails to allege concerted action. *See Fritz v. Johnston*, 209 Ill. 2d 302, 317 (2004) ("the elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act").

## CONCLUSION

For the reasons stated above, the Cook County Defendants' (Dkt. 32) and Officers' (Dkt. 45) motions to dismiss are granted as to the conspiracy counts (Count II and Count VI), and they are denied in all other respects. The City's motion to dismiss (Dkt. 41) is denied. However, the City's motion to bifurcate the *Monell* claim (Count III) is granted. (Dkt. 22).


_____
Hon. Virginia M. Kendall
United States District Judge

Date: June 1, 2018