IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OMAR WILLIAMS,<br><br>   Plaintiff,<br>v.<br><br>CITY OF CHICAGO,<br>COOK COUNTY, ILLINOIS,<br>CAROL MARESSO,<br>MARCO GARCIA,<br>DONALD HILL, and<br>MEGAN GOLDISH<br><br>   Defendants. | Case No. 2017 C 5186<br><br>Hon. Virginia M. Kendall |

## **FIRST AMENDED COMPLAINT**

Plaintiff Omar Williams ("Williams"), for his First Amended Complaint against Defendants City of Chicago ("Chicago"), Cook County, Illinois ("Cook County"), Chicago Police Officers Carol Maresso (Star No. 20183) ("Maresso"), Marco Garcia (Star No. 21408) ("Garcia"), and Donald Hill (Star No. 21426) (collectively "Defendant Officers"), and former Cook County Assistant State's Attorney Megan Goldish ("Goldish"), (Chicago, Cook County, Defendant Officers, and Goldish are collectively referred to as "Defendants"), states as follows:

### **Introduction**

1. On June 8, 2017 Omar Williams was found not guilty on charges of first degree murder, attempted first degree murder and reckless discharge of a firearm, crimes that he allegedly committed on July 1, 2011 ("the shootings"). The trial lasted three and a half days; the jury returned Williams' acquittal after deliberating for less than 90 minutes.

2. Williams spent five years, eight months and twelve days as an innocent, pre-trial detainee in Cook County Jail, where he was subjected to abhorrent living conditions and the near-constant threat of violence.

3. Williams now sues the Defendant Officers because his arrest, charge and trial were the products of perjured statements, falsified police records, and missing or destroyed exculpatory evidence (*Brady* material).

4. The Cook County State's Attorney's Office ("CCSAO") is likewise complicit because Goldish – along with Garcia – authored a key eyewitness statement that was freighted with coerced lies. That statement was then used by Goldish to approve the felony charges filed against Williams.

5. Williams now brings this lawsuit seeking compensation for the injuries he suffered because of the violations of his civil rights that occurred from the date of his arrest – September 27, 2011 – through June 8, 2017.

**Jurisdiction And Venue**

6. Williams brings federal claims pursuant to 42 U.S.C. § 1983 to redress the deprivation of his rights under the United States Constitution, and related claims under common law of the State of Illinois.

7. This Court has jurisdiction over Williams's federal claims pursuant to 28 U.S.C. § 1331 and over his state law claims pursuant to 28 U.S.C. § 1367.

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to Williams's claims all occurred within this judicial district. Venue is also proper in this district under 28 U.S.C. § 1391(c)(2) because the Court has personal jurisdiction over all the defendants. Venue may also be proper in this district under 28 U.S.C. § 1391(b)(1) if all defendants still reside in this judicial district.

## The Parties

9. Williams is 28 years old and currently resides in the Chicagoland area. On September 27, 2011, he was 22 years old and resided in Chicago.

10. Chicago is a municipal corporation under the laws of the State of Illinois. Chicago is responsible for the acts of its employees while acting within the scope of their employment. At all relevant times Chicago was the employer of the Defendant Officers.

11. Cook County is a governmental entity operating within the State of Illinois, which includes the CCSAO. Cook County is responsible for the acts of its employees while acting within the scope of their employment. At times relevant to this action, Cook County was the employer of Goldish.

12. At all relevant times, Maresso, Garcia and Hill were officers with the Chicago Police Department ("CPD"). Each Defendant Officer is sued in his or her individual capacity. Each Defendant Officer acted under color of law, and acted within the scope of his or her employment during the investigation of the crime at issue.

13. At all relevant times, Goldish was a prosecutor with the CCSAO. She is sued in her individual capacity. She acted under color of law, and acted within the scope of her employment during the investigation of the shooting.

## The Shootings

14. Andre Gladney ("Gladney") and Javonne Oliphant ("Oliphant") were both shot multiple times at roughly 11:07 p.m. on the night of July 1, 2011. Gladney sustained nine non-fatal gunshot wounds to his rear, back and legs; Oliphant died after being struck in the head and chest, as well as the shoulder, hand and armpit.

15. At the time, Gladney and Oliphant were socializing at the ABLA-Robert Brooks Homes parking lot ("the lot") located on the 1300 block of West Hastings in Chicago. The lot

was a popular hangout location for members of that community; there were roughly 30 to 40 people congregating there the night of the shootings.

16. Twelve spent cartridge casings from a 9 mm Glock semi-automatic handgun and six .40 caliber casings were recovered at the scene. Also recovered was a fully loaded Ruger .45 caliber handgun ("the Ruger") that belonged to Gladney.

17. Antoine Williams ("Antoine") and Keith Slugg ("Slugg") were also at the lot that night. Antoine - Omar Williams' cousin – is a paraplegic; he requires a wheelchair and specially equipped van ("the van") for transportation. Omar Williams and Slugg were both employed by the Illinois Department of Human Services to drive Antoine during the summer of 2011 – Omar in the day shift, Slugg in the night shift.

18. Slugg was a parolee at the time, confined to house arrest, and authorized to leave his home only to drive the van for the second shift for Antoine. Slugg left his home at 4:39 p.m. on July 1 to begin his shift and returned home at 1:59 a.m. the following morning – almost an hour past his mandated curfew.

19. At the time of the shooting, Gladney was drinking alcohol, had earlier ingested ecstasy and PCP, and had been smoking cannabis throughout the entire day, as confirmed by a toxicology report.

20. After being shot, Gladney took off running northwest-bound out of the lot and through an adjoining playground, where he tossed the Ruger on the ground. An ambulance took him to Cook County Hospital, where he was treated for multiple gunshot wounds. During treatment he submitted to blood testing and a toxicology screening; he was released the next day.

### Gladney Has No Idea Who Shot Him From Behind

21. Gladney gave his first of many statements at the hospital in the afternoon of July 2, 2011, when he was visited and interviewed by Garcia and Hill. By this time the hospital staff noted that Gladney was lucid and responsive.

22. Among other things, Gladney told Garcia and Hill that he had no idea who had shot him, as he was texting his girlfriend and was shot from behind. He also told them about his use of PCP and other drugs that night; a fact they confirmed when they obtained Gladney's toxicology report.

23. Garcia and Hill recorded their interview of Gladney in a General Progress Report ("GPR"), which they allegedly gave to Maresso, who lost or destroyed it.

### Other Witness Accounts

24. The CPD interviewed several other people, including Jason Jones, a security guard for Kates Security, who was patrolling the ABLA-Robert Brooks Homes on the night of the shooting. In multiple interviews, Jones stated that he saw a single shooter, whom he described as "5'07", 170 pounds, with dark skin and short dreadlocks." Omar Williams - 6'0'', 220 pounds, with light skin and a buzz cut - did not fit Jones' contemporaneous, specific description.

25. On or about July 8, 2011, Hill and Garcia interviewed Kenneth McNeal, who was at the lot the night of the shootings. During that interview, Mr. McNeal told Hill and Garcia who he saw at the lot before the shootings. The GPR of that interview was lost or destroyed.

### August 9, 2011: A New Story From Gladney

26. Several weeks after the shooting, an arrest warrant was issued for Gladney for a prior unrelated Aggravated Driving Under the Influence ("DUI") charge. Gladney was arrested

- 5 -

on July 22, 2011, and was held in a Mental Health Facility at the Cook County Jail until he was released on July 25, 2011 based on "Time Considered Served."

27.     On August 9, 2011, Garcia and Hill obtained video files from surveillance cameras located at the lot for the night and early morning of July 1-2, 2011. The files, though grainy, captured the shootings, as well as several minutes before and after the incident. Additionally, the files were annotated with internal editing by the video administrator to state that the "shooter arrives in a van." One of the videos was titled: "gunmen [sic] arrives in a van." Garcia and Hill had been told that Omar Williams was a driver of Antoine Williams's van; hence, they immediately suspected that Omar was one of the two shooters.

28.     Upon receipt of the videos, Garcia and Hill brought Gladney to Area Four Headquarters to show him the videos. Gladney again stated that he did not see who shot him from behind while he was texting his girlfriend. Garcia and Hill then threatened Gladney about his gun – the Ruger – which was found on the scene, and successfully pressured Gladney to say that the person who shot him in the back was Omar Williams.

29.     Garcia and Hill created a new GPR that allegedly memorialized the August 9, 2011, interview. That GPR made no mention of Oliphant, let alone Gladney's witnessing of Oliphant's shooting; Gladney never said anything on August 9, 2011 about witnessing the shooting of Oliphant.

30.     Hill also created a Case Supplementary Report based on the videos and the August 9, 2011 Gladney interview. In that report, dated September 22, 2011, Hill described the driver of the van as "offender #1."

### The August 14, 2011 Re-interview Of McNeal

31.     On August 14, 2011, Hill and Garcia interviewed Kenneth McNeal a second time. During this interview he specifically told Hill and Garcia that he did not see Omar Williams at

- 6 -

the lot on the night of July 1, 2011. Garcia prepared a GPR of that interview but left out that key fact; the GPR says nothing about Omar Williams at all. Later, on October 19, 2011, the CCSAO had McNeal testify before the grand jury; they asked him 107 questions, all carefully avoiding whether he saw Omar Williams at the lot that night.

32. During the August 14, 2011 interview, Hill and Garcia never asked McNeal about van-driver Slugg; nor did they show him any of the videos. At trial, McNeal was shown the video of the driver exiting the van, at which point McNeal unequivocally and without hesitation identified the driver as Slugg.

### **Defendants Learn That Slugg Was Driving**

33. At some point after August 9, 2011 – likely before their August 14, 2011 re-interview of McNeal -- Hill and Garcia realized that Slugg, and not Omar Williams, was driving the van on the night of July 1, 2011. Slugg was well known to the CPD, as he was on parole for a conviction for Unlawful Possession and Use of a Firearm by a Felon. During the summer of 2011, Slugg was essentially under house arrest and on electronic monitoring. In fact, Slugg was only authorized to leave his residence for his job as the second shift driver of the van from 4:00 p.m. until 1:00 a.m. Accordingly, Hill and Garcia sought to question Slugg about the shootings.

34. Their opportunity came on August 21, 2011, when the CPD arrested Slugg after he ran a stop sign. Slugg was detained at the CPD Station at 3151 West Harrison for approximately 24 hours, during which time Hill and Garcia questioned him extensively about the July 1, 2011 shootings. At one point, Hill and Garcia placed Slugg in front of a "one-way" window for a purported viewing by a witness. The GPR of the interview of Slugg was lost or destroyed.

**Slugg Is Murdered**

35. Slugg was murdered execution-style on August 28, 2011. After Slugg's murder, Defendants could have closed the book on "offender # 1," but they decided instead to charge Omar Williams. But this strategy would require Gladney to tell an even bigger lie than the one that had been coerced on August 9, 2011: they needed Gladney to say he had actually witnessed Omar shooting Oliphant.

**Gladney's New Statement**

36. Hill and Garcia picked Gladney up for further questioning at noon on September 27, 2011. Over the next 17 hours they – along with Goldish – made very clear what they wanted Gladney to "say" in a signed statement. When Gladney balked, Garcia again brought up the Ruger, and the fact that Garcia knew that Gladney was "on the run from the Feds" (a federal warrant had issued for Gladney's arrest on September 20, 2011 for heroin trafficking in Cedar Rapids, Iowa). Garcia told Gladney that they would not turn him over to "the Feds" if he cooperated and agreed with what they wanted him to say.

37. Eventually, at 5:40 a.m., on September 28, 2011, Gladney signed a 17-page written statement authored by Garcia and Goldish that told another new story – specifically that Gladney saw Omar Williams charge at Oliphant and fatally shoot him at close range while Gladney fled. In exchange, Gladney was allowed to leave the station without being arrested on the federal warrant, or being charged for the Ruger.

38. Critically, the September 28, 2011 statement authored by Garcia and Goldish contained additional statements which Defendants also knew to be false, including the "fact" that Gladney's statement was consistent with the interview he gave on August 9, 2011 ("and I were [sic] honest with the police in August and told them what Omar… had done to Andre and Javonne [Oliphant]"). The new statement also stated that Gladney "did not have any weapons on

- 8 -

him", a "fact" which Defendants knew to be false. (Indeed, Garcia had threatened Gladney with being charged for his Ruger found at the scene). The signed statement also stated that Gladney "was not drunk." While that "fact" may have been technically true, Defendants knew that Gladney was high on PCP and other substances that night.

39. At 10:21 a.m. – less than five hours after Gladney signed Defendants' prepared statement – Goldish gave felony approval to charge Omar Williams with the shootings.

### **Plan B – The Bicycle**

40. Defendants recognized that they lacked hard evidence tying Omar Williams to the shootings. Gladney's statement was coerced, and he had originally told Hill and Garcia that he had not seen the shootings. Plus, Gladney was high on PCP that night, and no physical evidence pointed to Omar Williams. They also knew that Slugg was the driver of the van (at trial, CCSAO abandoned any pretense that Omar Williams was driving the van, telling the jury: "Who cares whether Keith Slugg was driving the van."). Accordingly, Maresso attempted to link Omar Williams to a bicycle found at the scene.

41. In October of 2012, Maresso was informed that latent prints found on the bicycle did not match Omar Williams. Hence, on February 25, 2013, Maresso sent a DNA sample from Omar Williams to the Illinois State Police Lab for testing against DNA swabbing taken from handle bar grips from that bicycle. Maresso knew that, due to the backlog for DNA testing at that lab, it would take nearly a year to get results.

42. On July 9, 2014, Maresso received the lab results: no link to Omar Williams could be determined. The bicycle was a dead end.

### **The "Hail Mary"**

43. Maresso made one last desperate attempt to link Omar Williams to the crime on January 7, 2016, by sending DNA swabs from Gladney's Ruger found at the scene to the State

Police lab for testing. This was an act of desperation because that fully loaded gun had not been discharged, and it was impossible for that P345 gun to have discharged the shells (9 mm and 40 cal.) found at the scene. Moreover, Defendants knew that the gun was Gladney's, and Defendants had been sitting on DNA swabs from that gun since July 2, 2011. Nonetheless, Maresso knew that this move would effectively delay trial for at least another year.

44. On November 2, 2016, Maresso received the expected results: no link to Omar Williams could be determined. Those results were eventually provided to Mr. Williams' counsel on January 12, 2017.

### **Defendants Hid Or Destroyed *Brady* Material, And Otherwise Falsified Reports**

45. The CPD has an unfortunate history of keeping "street files" during investigations of serious crimes. Under this pattern and practice, potentially exculpatory information--sometimes in an actual file, sometimes not--is unlawfully hidden from defense counsel. See Chicago Tribune, February 13, 2016, "Old police street files raise question: Did Chicago cops hide evidence?" - http://www.chicagotribune.com/news/ct-chicago-police-street-files-met-20160212-story.html. (In 90% of the cases studied, information was not disclosed to the defense "including names and accounts of eyewitnesses [and] statements in detectives' notes that contradict later versions of typed reports....").

46. Defendants followed that practice in this case as well. Examples of exculpatory material hidden or destroyed include the GPR of the July 2, 2011 interview of Gladney (which, according to Garcia and Hill, was given to Maresso), the GPR of the mid-July, 2011 interview of McNeal and the GPR of the late August 2011 interrogation of Slugg.

47. Defendants also falsified reports so that they implicated Omar Williams in the shootings. For example, in his September 22, 2011 Supplementary Report, Garcia falsely identified Omar Williams as having a "Dreadlocks Hair style." Then, in his January 28, 2012

Supplementary Report, Garcia falsely identified the Ruger P345 found at the scene (Gladney's gun) as belonging to and used by Omar Williams. In his September 28, 2011 GPR of an interview of Antoine Williams, Hill also falsely reported Antoine Williams as stating that Omar Williams was driving the van the night of July 1, 2011 (Antoine Williams actually stated that Omar Williams drove the van during the day shift at that time; Defendants already knew that Slugg was the night shift driver on July 1, 2011).

48. In addition to outright falsification of reports, Defendants selectively and intentionally omitted from their reports key exculpatory information which contradicted their narrative on Omar Williams. For example, eyewitness Kenneth McNeal told Hill and Garcia twice (in mid-July and on August 14, 2011) that Omar Williams was not at the scene of the shootings. As addressed above, the July 2011 GPR was never produced; however, in his August 14, 2011 GPR, Garcia chose not to write anything about that key disclosure. Indeed, Garcia's GPR mentions nothing at all about asking McNeal whether Omar Williams was at the scene. As addressed above, on October 19, 2011, before the grand jury, the CCSAO posed 107 questions to McNeal, carefully avoiding any question that would elicit testimony whether he saw Omar Williams at the scene. At trial, Mr. McNeal forcefully and without hesitation identified the driver exiting the van in the video as Keith Slugg.

## Count I - 42 U.S.C. §1983
## Federal Malicious Prosecution and Due Process

49. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

50. Defendants Garcia, Hill and Goldish, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Williams of his constitutional rights to due process and a fair trial.

51. Said Defendants caused Williams to be maliciously prosecuted for a crime knowing he was innocent. That resulted in the deprivation of his liberty in violation of his procedural and substantive right to due process guaranteed by the Fourteenth Amendment, and the right to be free of unreasonable seizures guaranteed by the Fourth and Fourteenth Amendments.

52. Said Defendants caused Williams to be improperly subjected to judicial proceedings for which there was no probable cause. Defendants aggressively pursued Williams's criminal prosecution despite the lack of any shred of supporting physical evidence or any probable cause Defendants had no evidence other than the fabricated statements of Gladney.

53. These efforts misled and misdirected the criminal prosecution to the detriment of Williams.

54. The fabricated evidence violated Williams's due process when it was used to deprive him of his liberty, and as illegitimate probable cause for his arrest, detention, indictment, and fraudulent criminal trial.

55. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Williams's favor after the State was thoroughly incapable of convicting Williams following a jury trial.

56. Defendants accused Williams of grave criminal conduct despite knowing that those accusations were without probable cause, or reasonably should have known that any "corroborating eyewitness testimony" was beyond incredible under the circumstances.

57. As a result of this violation of his Fourth and Fourteenth Amendment constitutional rights, Williams suffered physical harm, financial damages, and severe emotional distress and anguish.

## Count II - 42 U.S.C. §1983
## Conspiracy to Deprive Williams of His Constitutional Rights

58. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

59. Defendants, acting within the scope of their employment and under color of law, decided to falsely implicate Williams for the array of violent, criminal charges and deprive him of his constitutional rights, including but not limited to his rights to due process and a fair trial, and the right to be free from the use of falsified evidence to indict, detain and bring him to trial.

60. Hill, Garcia and Maresso shared among themselves facts and findings determined by their joint investigation. Hill, Garcia and Maresso all knew from statements Gladney gave on July 2, 2011 that he did not know who shot him or Oliphant. They also knew that Gladney was high on PCP and other substances the night of July 1, 2011. No later than August 9, 2011, knowing that Williams was not responsible for the Gladney and Oliphant shootings, they agreed that they would attempt to frame him for the crime. This plan involved authoring falsified Case Supplementary Reports that implicated Williams and were contradicted by other evidence.

61. Hill and Garcia received video files from surveillance cameras on August 9, 2011, by which point they knew that Williams was one of the drivers of the van. They also knew that Slugg, not Williams, was driving the van the night of July 1, 2011. Hill and Garcia showed the videos to Gladney on August 9 and re-interviewed him; the falsified GPR that Hill and Garcia authored that day now claimed that Williams was (i) at the scene of the crime; and (ii) was responsible for shooting Gladney; but (iii) made no mention of Oliphant's shooting.

62. Hill and Garcia created another GPR after re-interviewing McNeal on August 14, 2011; despite McNeal telling the officers that Williams was not present at the scene of the crime on July 1, 2011, the falsified report made no mention of this fact.

63. On September 27, 2011 – the day Williams was arrested - Hill and Garcia took Gladney to Area 4 Headquarters for further questioning. It was there that Goldish joined the ongoing conspiracy of Hill, Garcia and Maresso. At that time, Hill, Garcia and Goldish agreed on a plan to coerce Gladney into providing a false statement that implicated Williams for a crime that they knew he did not commit.

64. Over the course of 17 hours, Garcia threatened Gladney in order to procure the false statement and go along with the Defendants' plan; Goldish wrote the statement herself, then used that statement, in addition to falsified and/or contradictory Case Supplementary Reports, to approve felony charges against Williams.

65. Defendants further conspired to deprive Williams of potentially exculpatory information to which he was lawfully entitled and which would have led to him not being charged, if they had faithfully and honestly disclosed relevant *Brady* evidence.

66. Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.

67. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

68. Defendants willfully conspired with malice and/or reckless indifference to the rights of Williams.

### Count III - 42 U.S.C. §1983
### *Monell* Policy Claim Against Chicago

69. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

70. At all times relevant, Defendant Chicago's municipal policy makers with final policymaking authority as CPD supervisors ratified, condoned, and facilitated the following policies, practices, and customs within the CPD:

(a) Conducting unlawfully coercive interrogations of witnesses, suspects and arrestees to obtain confessions and false implication of others;

(b) Producing false reports, and giving false statements and testimony about interrogations, confessions, and witness statements;

(c) Pursuing and obtaining prosecutions and detentions based on statements obtained through unlawful interrogations; and

(d) Failing to pursue and/or disclose legitimate, potentially exculpatory evidence.

71. As a result of Chicago and the CPD's policies and practices described above, members of the CPD, including the Defendant Officers, acted with impunity when they violated citizens' civil rights, including Williams's.

72. Chicago's failure to train, supervise, and discipline Defendant Officers effectively condoned, ratified and sanctioned these Defendant Officers' violation of Williams's constitutional rights.

73. Chicago's policies and practices discussed herein were consciously approved by Chicago's policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

74. Defendant Officers acted pursuant to the CPD's policies and practices described above.

75. Chicago maintained and implemented the CPD's policies and practices described above with deliberate indifference to Williams's constitutional rights.

76. Williams's rights were violated, and he suffered physical harm, financial damages, and sever emotional distress and anguish as a direct and proximate result of Chicago's policies, practices and customs.

77. Chicago is liable for the Defendant Officers' misconduct.

## Count IV - State Law Claim
### Respondeant Superior

78. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

79. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers were members of, and agents of, the CPD acting at all relevant times within the scope of employment and under color of law.

80. Defendant Chicago is liable for Williams's damages (and any award of attorneys' fees) that were caused by the misconduct of the Defendant Officers and any unidentified Officers of the CPD.

## Count V - State Law Claim
### Indemnification

81. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

82. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

83. Chicago must indemnify the Defendant Officers for all judgments entered against them.

84. Cook County must indemnify Goldish for all judgments entered against her.

**Count VI - State Law Claim**
**Civil Conspiracy**

85. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

86. Defendants, acting in concert, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

87. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity in furtherance of the conspiracy.

88. The misconduct described was undertaken by Defendants with malice, willfulness and reckless indifference to the rights of Williams.

89. Williams suffered damages, including severe emotional distress and anguish as a proximate result of Defendants' misconduct and conspiracy to engage in misconduct.

**Count VII - State Law Claim**
**Malicious Prosecution**

90. Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

91. As described above, the Defendant Officers and Goldish caused Williams to be improperly subjected to judicial proceedings for which there was no probable cause. They knowingly provided falsified statements to ensure that Williams would be arrested and prosecuted for a crime knowing that he was innocent.

92. Defendants Garcia and Hill coerced false statements that implicated Williams in a crime that he did not commit. Goldish - along with Garcia – fabricated an eyewitness statement for Gladney to sign that falsely implicated Williams and served as the basis for his charging and trial.

93. The proceedings were terminated in Williams's favor by a jury verdict.

94. The proceedings were instituted and continued maliciously, resulting in injury. The Defendant Officers and Goldish acted with malice, willfulness and reckless indifference to Williams's rights.

95. Williams sustained and continues to sustain injuries, including but not limited to physical injury, loss of liberty and pain and suffering because of Defendants' misconduct.

## JURY DEMAND

Plaintiff Williams demands a trial by jury.

Dated: July 26, 2018

                                                  Respectfully submitted,

                                                  */s/ Paul K. Vickrey*
Paul K. Vickrey
Patrick F. Solon
Dylan M. Brown
Gretchen L. Schmidt
Vitale, Vickrey, Niro & Gasey
311 S. Wacker Drive, Suite 2470
Chicago, IL 60606
Phone: (312) 236-0733
vickrey@vvnlaw.com
solon@vvnlaw.com
dbrown@vvnlaw.com
schmidt@vvnlaw.com
***Attorneys for Plaintiff***

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 26, 2018 the foregoing:

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

was filed electronically with the Clerk of the Court for the Northern District of Illinois using the Court's Electronic Case Filing System, which will send notification to the registered participants of the ECF System as listed:

| | |
|---|---|
| Eric S. Palles<br>Gary Ravitz<br>Ravitz & Palles, P.C.<br>203 N. LaSalle Street, Suite 2100<br>Chicago, IL 60601<br>312-558-1689<br>epalles@ravitzpalles.com<br>gravitz@ravitzpalles.com<br><br>***Attorneys for City of Chicago, Carol Maresso, Margo Garcia and Donald Hill*** | James Hanlon<br>Allyson L. West<br>50 W. Washington Street<br>Richard J. Daley Center, Room 500<br>Chicago, IL 60602<br>(312) 603-1902<br>james.hanlon@cookcountyil.gov, jhanlonj@gmail.com<br>allyson.west@cookcountyil.gov<br><br>Kenneth M. Battle<br>Winnefred A. Monu<br>O'Connor & Battle, LLP<br>20 N. Clark Street, 16th Floor<br>Chicago, IL 60601<br>312-786-4600<br>kbattle@mokblaw.com<br>wmonu@mokblaw.com<br><br>***Attorneys for Cook County and Megan Goldish*** |

I certify that all parties in this case are represented by counsel who are CM/ECF participants.

                                                */s/ Paul K. Vickrey*
                                                ***Attorney for Omar Williams***