## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS EASTERN DIVISION

OMAR WILLIAMS, )
                    Plaintiff, )
     v. )
                                  )
CITY OF CHICAGO, )      Case No. 17 C 5186
COOK COUNTY, ILLINOIS, )
CAROL MARESSO, MARCO GARCIA, )      Hon. Virginia M. Kendall,
J. DONALD HILL, and MEGAN GOLDISH, )
                                  )
                Defendants. )

### DEFENDANTS MEGAN GOLDISH AND COOK COUNTY'S ANSWER TO
### PLAINTIFF'S COMPLAINT AND AFFIRMATIVE DEFENSES

Defendants Megan Goldish and Cook County (collectively the "CCSAO Defendants"),

by Kenneth M. Battle and Winnefred A. Monu of O'Connor & Battle, LLP, hereby submit their

answer and affirmative defenses to Plaintiff's Complaint.

### Introduction

1.       On June 8, 2017 Omar Williams was found not guilty on charges of first degree murder, attempted first degree murder and reckless discharge of a firearm, crimes that he allegedly committed on July 1, 2011 ("the shootings"). The trial lasted three and a half days; the jury returned Williams' acquittal after deliberating for less than 90 minutes.

**ANSWER**: **The CCSAO Defendants, upon information and belief, admit that Omar**

**Williams ("Plaintiff") was found not guilty on charges of first degree murder, attempted**

**first degree murder and reckless discharge of a firearm, crimes that he allegedly**

**committed on July 1, 2011. The CCSAO Defendants lack sufficient information and**

**knowledge to form a belief as to the truth or falsity of the remaining allegations**

**contained in this paragraph.**

2.       Williams spent five years, eight months and twelve days as an innocent, pre-trial detainee in Cook County Jail, where he was subjected to abhorrent living conditions and the near-constant threat of violence.

**ANSWER**: **On information and belief, the CCSAO Defendants admit that Williams spent five years, eight months and twelve days as a pretrial detainee in Cook County Jail. The CCSAO Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

3.      Williams now sues the Defendant Officers because his arrest, charge and trial were the products of perjured statements, falsified police records, and missing or destroyed exculpatory evidence (*Brady material*).

**ANSWER**: **The CCSAO Defendants admit Williams is suing the Defendant Officers, but lack sufficient information and knowledge to form a belief as to the truth or falsity of the allegations contained in this paragraph.**

4.      The Cook County State's Attorney's Office ("CCSAO") is likewise complicit because Goldish – along with Garcia – authored a key eyewitness statement that was freighted with coerced lies. That statement was then used by Goldish to approve the felony charges filed against Williams.

**ANSWER**: **The CCSAO Defendants deny the allegations in this paragraph.**

5.      Williams now brings this lawsuit seeking compensation for the injuries he suffered because of the violations of his civil rights that occurred from the date of his arrest – September 27, 2011 – through June 8, 2017.

**ANSWER**: **The CCSAO Defendants admit that this lawsuit purports to seek compensation and deny any allegations of wrongdoing and deny the remaining allegations contained in this paragraph.**

## Jurisdiction and Venue

6.      Williams brings federal claims pursuant to 42 U.S.C. § 1983 to redress the deprivation of his rights under the United States Constitution, and related claims under common law of the State of Illinois.

**ANSWER**: **The CCSAO Defendants admit that this lawsuit purports to bring federal claims pursuant to 42 U.S.C. § 1983 to redress the deprivation of Plaintiff's rights under**

the United States Constitution, and related claims under common law of the State of Illinois.

7. This Court has jurisdiction over Williams' federal claims pursuant to 28 U.S.C. § 1331 and over his state law claims pursuant to 28 U.S.C. § 1367.

**ANSWER**: **The CCSAO Defendants admit this Court has jurisdiction over Plaintiff's**

**claims.**

8. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the events giving rise to Williams's claims all occurred within this judicial district. Venue is also proper in this district under 28 U.S.C. § 1391(c)(2) because the Court has personal jurisdiction over all the defendants. Venue may also be proper in this district under 28 U.S.C. § 1391(b)(1) if all defendants still reside in this judicial district.

**ANSWER**: **The CCSAO Defendants admit that venue is proper.**

## The Parties

9. Williams is 28 years old and currently resides in the Chicagoland area. On September 27, 2011, he was 22 years old and resided in Chicago.

**ANSWER: On information and belief, the CCSAO Defendants admit Williams is 28 years**

**old and was 22 years old on September 27, 2011. The CCSAO Defendants lack sufficient**

**information and knowledge to form a belief as to the truth or falsity of the remaining**

**allegations contained in this paragraph.**

10. Chicago is a municipal corporation under the laws of the State of Illinois. Chicago is responsible for the acts of its employees while acting within the scope of their employment. At all relevant times Chicago was the employer of the Defendant Officers.

**ANSWER**: **The CCSAO Defendants, upon information and belief, admit that City of**

**Chicago is a municipal corporation under the laws of the State of Illinois and that at all**

**relevant times, the City of Chicago was the employer of the Defendant Officers. The**

**CCSAO Defendants lack information and knowledge sufficient to form a belief as to the**

**truth or falsity of the remaining allegations contained in this paragraph.**

11. Cook County is a governmental entity operating within the State of Illinois, which includes the CCSAO. Cook County is responsible for the acts of its employees while

acting within the scope of their employment. At times relevant to this action, Cook County was the employer of Goldish.

**ANSWER: The CCSAO Defendants admit that Cook County is a governmental entity operating within the State of Illinois, which includes the CCSAO and that at all relevant times, Cook County was the employer of Goldish. The CCSAO Defendants deny the remaining allegations contained in this paragraph because these allegations constitute a legal conclusion and contain a vague, incomplete, and/or inaccurate statement of the law.**

12.     At all relevant times, Maresso, Garcia and Hill were officers with the Chicago Police Department ("CPD"). Each Defendant Officer is sued in his or her individual capacity. Each Defendant Officer acted under color of law, and acted within the scope of his or her employment during the investigation of the crime at issue.

**ANSWER: On information and belief, the CCSAO Defendants admit that, at all relevant times, Maresso, Garcia and Hill were officers with the Chicago Police Department ("CPD"). The CCSAO Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

13.     At all relevant times, Goldish was a prosecutor with the CCSAO. She is sued in her individual capacity. She acted under color of law, and acted within the scope of her employment during the investigation of the shooting.

**ANSWER: The CCSAO Defendants admit the allegations contained in this paragraph but deny any allegations of wrongdoing.**

<u>**The Shootings**</u>

14.     Andre Gladney ("Gladney") and Javonne Oliphant ("Oliphant") were both shot multiple times at roughly 11:07 p.m. on the night of July 1, 2011. Gladney sustained nine non- fatal gunshot wounds to his rear, back and legs; Oliphant died after being struck in the head and chest, as well as the shoulder, hand and armpit.

**ANSWER: Upon information and belief, the CCSAO Defendants admit Gladney and Oliphant were both shot multiple times at roughly 11:07 p.m. on the night of July 1, 2011 and as a result, Oliphant died. On information and belief, the CCSAO Defendants admit**

Gladney sustained nine non- fatal gunshot wounds to his rear, back and legs; Oliphant died after being struck in the head and chest, as well as the shoulder, hand and armpit. The CCSAO Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

15.     At the time, Gladney and Oliphant were socializing at the ABLA-Robert Brooks Homes parking lot ("the lot") located on the 1300 block of West Hastings in Chicago. The lot was a popular hangout location for members of that community; there were roughly 30 to 40 people congregating there the night of the shootings.

**ANSWER**: Upon information and belief, the CCSAO Defendants admit that Gladney and Oliphant were present at the ABLA-Robert Brooks Homes parking lot located on the 1300 block of West Hastings in Chicago at approximately 11:07 p.m. on the night of July 1, 2011 and that the lot was a popular hangout for members of that community. The CCSAO Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

16.     Twelve spent cartridge casings from a 9 mm Glock semi-automatic handgun and six .40 caliber casings were recovered at the scene. Also recovered was a fully loaded Ruger .45 caliber handgun ("the Ruger") that belonged to Gladney.

**ANSWER**: On information and belief, the CCSAO Defendants admit that twelve spent cartridge casings from a 9 mm Glock semi-automatic handgun and .40 caliber casings were recovered at the scene. On information and belief, the CCSAO Defendants admit that a Ruger .45 caliber handgun was also recovered at the scene. The CCSAO Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the remaining allegations in the paragraph.

17.     Antoine Williams ("Antoine") and Keith Slugg ("Slugg") were also at the lot that night. Antoine - Omar Williams' cousin – is a paraplegic; he requires a wheelchair and specially equipped van ("the van") for transportation. Omar Williams and Slugg were both employed by the Illinois Department of Human Services to drive Antoine during the summer of 2011 – Omar in the day shift, Slugg in the night shift.

**ANSWER: On information and belief, the CCSAO Defendants admit that Antoine Williams ("Antoine") was at the lot that night. On information and belief, the CCSAO Defendants further admit that Antoine – Omar Williams' cousin – is a paraplegic; he requires a wheelchair and specially equipped van ("the van") for transportation. The CCSAO Defendants lack sufficient information and knowledge to form a belief as to the truth or falsity of the remaining allegations in this paragraph.**

18.     Slugg was a parolee at the time, confined to house arrest, and authorized to leave his home only to drive the van for the second shift for Antoine. Slugg left his home at 4:39 p.m. on July 1 to begin his shift and returned home at 1:59 a.m. the following morning – almost an hour past his mandated curfew.

**ANSWER: The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

19.     At the time of the shooting, Gladney was drinking alcohol, had earlier ingested ecstasy and PCP, and had been smoking cannabis throughout the entire day, as confirmed by a toxicology report.

**ANSWER: The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.**

20.     After being shot, Gladney took off running northwest-bound out of the lot and through an adjoining playground, where he tossed the Ruger on the ground. An ambulance took him to Cook County Hospital, where he was treated for multiple gunshot wounds. During treatment he submitted to blood testing and a toxicology screening; he was released the next day.

**ANSWER: On information and belief, the CCSAO Defendants admit that, after being shot, Gladney took off running, and that an ambulance took him to Cook County Hospital, where he was treated for multiple gunshot wounds. The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.**

## Gladney Has No Idea Who Shot Him From Behind

21.     Gladney gave his first of many statements at the hospital in the afternoon of July 2, 2011, when he was visited and interviewed by Garcia and Hill. By this time the hospital staff noted that Gladney was lucid and responsive.

**ANSWER: On information and belief, the CCSAO Defendants admit Gladney gave his first statement at the hospital in the afternoon of July 2, 2011, when he was visited and interviewed by Garcia and Hill. The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

22.     Among other things, Gladney told Garcia and Hill that he had no idea who had shot him, as he was texting his girlfriend and was shot from behind. He also told them about his use of PCP and other drugs that night; a fact they confirmed when they obtained Gladney's toxicology report.

**ANSWER: The CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

23.     Garcia and Hill recorded their interview of Gladney in a General Progress Report ("GPR"), which they allegedly gave to Maresso, who lost or destroyed it.

**ANSWER: The CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

## Other Witness Accounts

24.     The CPD interviewed several other people, including Jason Jones, a security guard for Kates Security, who was patrolling the ABLA-Robert Brooks Homes on the night of the shooting. In multiple interviews, Jones stated that he saw a single shooter, whom he described as "5'07", 170 pounds, with dark skin and short dreadlocks." Omar Williams - 6'0", 220 pounds, with light skin and a buzz cut - did not fit Jones' contemporaneous, specific description.

**ANSWER: On information and belief, the CCSAO Defendants admit that CPD interviewed several other people, including Jason Jones, a guard for Kates Security, who was patrolling the ABLA-Robert Brooks Homes on the night of the shooting. In multiple**

interviews, Jones stated that he saw one shooter, whom he described as "5'07", 170 pounds, with dark skin and short dreadlocks." The CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

25.     On or about July 8, 2011, Hill and Garcia interviewed Kenneth McNeal, who was at the lot the night of the shootings. During that interview, Mr. McNeal told Hill and Garcia who he saw at the lot before the shootings. The GPR of that interview was lost or destroyed.

ANSWER: The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

## August 9, 2011: A New Story from Gladney

26.     Several weeks after the shooting, an arrest warrant was issued for Gladney for a prior unrelated Aggravated Driving under the Influence ("DUI") charge. Gladney was arrested on July 22, 2011, and was held in a Mental Health Facility at the Cook County Jail until he was released on July 25, 2011 based on "Time Considered Served."

ANSWER: The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

27.     On August 9, 2011, Garcia and Hill obtained video files from surveillance cameras located at the lot for the night and early morning of July 1-2, 2011. The files, though grainy, captured the shootings, as well as several minutes before and after the incident. Additionally, the files were annotated with internal editing by the video administrator to state that the "shooter arrives in a van." One of the videos was titled: "gunmen [sic] arrives in a van." Garcia and Hill had been told that Omar Williams was a driver of Antoine Williams's van; hence, they immediately suspected that Omar was one of the two shooters.

ANSWER: On information and belief, the CCSAO Defendants admit that, on August 9, 2011, Garcia and Hill obtained video files from surveillance cameras located at the lot for the night and early morning of July 1-2, 2011. On information and belief, the CCSAO Defendants admit the files captured the shootings, as well as several minutes before and after the incident. The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this

paragraph.

28.     Upon receipt of the videos, Garcia and Hill brought Gladney to Area Four Headquarters to show him the videos. Gladney again stated that he did not see who shot him from behind while he was texting his girlfriend. Garcia and Hill then threatened Gladney about his gun – the Ruger – which was found on the scene, and successfully pressured Gladney to say that the person who shot him in the back was Omar Williams.

**ANSWER**: **On information and belief, the CCSAO Defendants admit Garcia and Hill brought Gladney to Area Four Headquarters.  The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.**

29.     Garcia and Hill created a new GPR that allegedly memorialized the August 9, 2011, interview. That GPR made no mention of Oliphant, let alone Gladney's witnessing of Oliphant's shooting; Gladney never said anything on August 9, 2011 about witnessing the shooting of Oliphant.

**ANSWER**: **The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.**

30.     Hill also created a Case Supplementary Report based on the videos and the August 9, 2011 Gladney interview. In that report, dated September 22, 2011, Hill described the driver of the van as "offender #1."

**ANSWER**: **On information and belief, the CCSAO Defendants admit the allegations in this paragraph.**

## The August 14, 2011 Re-interview Of McNeal

31.     On August 14, 2011, Hill and Garcia interviewed Kenneth McNeal a second time. During this interview he specifically told Hill and Garcia that he did not see Omar Williams at the lot on the night of July 1, 2011. Garcia prepared a GPR of that interview but left out that key fact; the GPR says nothing about Omar Williams at all. Later, on October 19, 2011, the CCSAO had McNeal testify before the grand jury; they asked him 107 questions, all carefully avoiding whether he saw Omar Williams at the lot that night.

**ANSWER**:  **The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.**

32.     During the August 14, 2011 interview, Hill and Garcia never asked McNeal about van-driver Slugg; nor did they show him any of the videos. At trial, McNeal was shown the video of the driver exiting the van, at which point McNeal unequivocally and without hesitation identified the driver as Slugg.

**ANSWER**:  **The CCSAO Defendants lack information and knowledge sufficient to form a**

**belief as to the truth or falsity of the allegations contained in this paragraph.**

<u>**Defendants Learn That Slugg Was Driving**</u>

33.     At some point after August 9, 2011 – likely before their August 14, 2011 re- interview of McNeal -- Hill and Garcia realized that Slugg, and not Omar Williams, was driving the van on the night of July 1, 2011. Slugg was well known to the CPD, as he was on parole for a conviction for Unlawful Possession and Use of a Firearm by a Felon. During the summer of 2011, Slugg was essentially under house arrest and on electronic monitoring. In fact, Slugg was only authorized to leave his residence for his job as the second shift driver of the van from 4:00p.m. until 1:00 a.m. Accordingly, Hill and Garcia sought to question Slugg about the shootings.

**ANSWER**: **The CCSAO Defendants lack information and knowledge sufficient to form a**

**belief as to the truth or falsity of the allegations contained in this paragraph.**

34.     Their opportunity came on August 21, 2011, when the CPD arrested Slugg after he ran a stop sign. Slugg was detained at the CPD Station at 3151 West Harrison for approximately 24 hours, during which time Hill and Garcia questioned him extensively about the July 1, 2011 shootings. At one point, Hill and Garcia placed Slugg in front of a "one-way" window for a purported viewing by a witness. The GPR of the interview of Slugg was lost or destroyed.

**ANSWER**: **The CCSAO Defendants lack information and knowledge sufficient to form a**

**belief as to the truth or falsity of the allegations contained in this paragraph.**

<u>**Slugg Is Murdered**</u>

35.     Slugg was murdered execution-style on August 28, 2011. After Slugg's murder, Defendants could have closed the book on "offender # 1," but they decided instead to charge Omar Williams. But this strategy would require Gladney to tell an even bigger lie than the one that had been coerced on August 9, 2011: they needed Gladney to say he had actually witnessed Omar shooting Oliphant.

**ANSWER**: **The CCSAO Defendants lack sufficient information and knowledge upon**

**which to form a belief as to the truth or falsity of the allegations contained in this**

paragraph.

### Gladney's New Statement

36.     Hill and Garcia picked Gladney up for further questioning at noon on September 27, 2011. Over the next 17 hours they – along with Goldish – made very clear what they wanted Gladney to "say" in a signed statement. When Gladney balked, Garcia again brought up the Ruger, and the fact that Garcia knew that Gladney was "on the run from the Feds" (a federal warrant had issued for Gladney's arrest on September 20, 2011 for heroin trafficking in Cedar Rapids, Iowa). Garcia told Gladney that they would not turn him over to "the Feds" if he cooperated and agreed with what they wanted him to say.

**ANSWER**: **On information and belief, the CCSAO Defendants admit that Hill and Garcia picked Gladney up for further questioning on September 27, 2011.  The CCSAO Defendants deny the allegations made concerning Goldish, and are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

37.     Eventually, at 5:40 a.m., on September 28, 2011, Gladney signed a 17-page written statement authored by Garcia and Goldish that told another new story – specifically that Gladney saw Omar Williams charge at Oliphant and fatally shoot him at close range while Gladney fled. In exchange, Gladney was allowed to leave the station without being arrested on the federal warrant, or being charged for the Ruger.

**ANSWER**: **Upon information and belief, the CCSAO Defendants admit that at 5:40 a.m., on September 28, 2011, Gladney signed a 17-page written statement implicating Omar Williams in Oliphant's murder. The CCSAO Defendants, upon information and belief, deny the remaining allegations contained in this paragraph.**

38.     Critically, the September 28, 2011 statement authored by Garcia and Goldish contained additional statements which Defendants also knew to be false, including the "fact" that Gladney's statement was consistent with the interview he gave on August 9, 2011 ("and I were [sic] honest with the police in August and told them what Omar... had done to Andre and Javonne [Oliphant]"). The new statement also stated that Gladney "did not have any weapons on him", a "fact" which Defendants knew to be false. (Indeed, Garcia had threatened Gladney with being charged for his Ruger found at the scene). The signed statement also stated that Gladney "was not drunk." While that "fact" may have been technically true, Defendants knew that Gladney was high on PCP and other substances that night.

**ANSWER**:  **To the extent paragraph 39 contains allegations regarding Defendant Goldish's conduct, the CCSAO Defendants deny the allegations.  The CCSAO Defendants,  upon information  and  belief, deny  the remaining  allegations  contained  in  this paragraph.**

39.       At 10:21 a.m. – less than five hours after Gladney signed Defendants' prepared statement – Goldish gave felony approval to charge Omar Williams with the shootings.

**ANSWER: Upon information and belief, the CCSAO Defendants admit that Goldish received approval to approve the charging of Omar Williams with the  shootings, but lacks sufficient  information  and  knowledge  to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

### Plan B – The Bicycle

40.       Defendants recognized that they lacked hard evidence tying Omar Williams to the shootings. Gladney's statement was coerced, and he had originally told Hill and Garcia that he had not seen the shootings. Plus, Gladney was high on PCP that night, and no physical evidence pointed to Omar Williams. They also knew that Slugg was the driver of the van (at trial, CCSAO abandoned any pretense that Omar Williams was driving the van, telling the jury: "Who cares whether  Keith  Slugg  was  driving  the  van.").  Accordingly,  Maresso attempted  to  link  Omar Williams to a bicycle found at the scene.

**ANSWER**: **The CCSAO Defendants lack sufficient information and knowledge to form a belief as to the  truth  or  falsity  of  the  allegations  concerning  the  actions  of  the Officers Hill and Garcia. To the extent this paragraph contains allegations related to conduct by Defendant Goldish, Defendants deny the allegations. The CCSAO Defendants are without knowledge or information sufficient to form a  belief as to  the  truth of the  remaining allegations in this paragraph.**

41.       In October of 2012, Maresso was informed that latent prints found on the bicycle did not match Omar Williams. Hence, on February 25, 2013, Maresso sent a DNA sample from Omar Williams to the Illinois State Police Lab for testing against DNA swabbing taken from handle bar grips from that bicycle. Maresso knew that, due to the backlog for DNA testing at that lab, it would take nearly a year to get results.

**ANSWER**: **The CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

42.      On July 9, 2014, Maresso received the lab results: no link to Omar Williams could be determined. The bicycle was a dead end.

**ANSWER**: **The CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph.**

## The Hail Mary

43.      Maresso made one last desperate attempt to link Omar Williams to the crime on January 7, 2016, by sending DNA swabs from Gladney's Ruger found at the scene to the State Police lab for testing. This was an act of desperation because that fully loaded gun had not been discharged, and it was impossible for that P345 gun to have discharged the shells (9 mm and 40 cal.) found at the scene. Moreover, Defendants knew that the gun was Gladney's, and Defendants had been sitting on DNA swabs from that gun since July 2, 2011. Nonetheless, Maresso knew that this move would effectively delay trial for at least another year.

**ANSWER**: **To the extent this paragraph contains allegations of conduct by the CCSAO Defendants, they deny the allegations. The CCSAO Defendants, upon information and belief, deny the allegations contained in this paragraph.**

44.      On November 2, 2016, Maresso received the expected results: no link to Omar Williams could be determined. Those results were eventually provided to Mr. Williams' counsel on January 12, 2017.

**ANSWER**: **Upon information and belief, the CCSAO Defendants admit that the lab results did not establish a dispositive link to Omar Williams. The CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph.**

## Defendants Hid or Destroyed Brady Material, and Otherwise Falsified Reports

45. The CPD has an unfortunate history of keeping "street files" during investigations of serious crimes. Under this pattern and practice, potentially exculpatory information-- sometimes in an actual file, sometimes not--is unlawfully hidden from defense counsel. See Chicago Tribune, February 13, 2016, "Old police street files raise question: Did Chicago

copshideevidence?"http://www.chicagotribune.com/news/ct-chicago-police-street-files-met-20160212-story.html. (In 90% of the cases studied, information was not disclosed to the defense "including names and accounts of eyewitnesses [and] statements in detectives' notes that contradict later versions of typed reports....").

**ANSWER**: **To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

46.     Defendants followed that practice in this case as well. Examples of exculpatory material hidden or destroyed include the GPR of the July 2, 2011 interview of Gladney (which, according to Garcia and Hill, was given to Maresso), the GPR of the mid-July, 2011 interview of McNeal and the GPR of the late August 2011 interrogation of Slugg.

**ANSWER**: **To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

47.     Defendants also falsified reports so that they implicated Omar Williams in the shootings. For example, in his September 22, 2011 Supplementary Report, Garcia falsely identified Omar Williams as having a "Dreadlocks Hair style." Then, in his January 28, 2012 Supplementary Report, Garcia falsely identified the Ruger P345 found at the scene (Gladney's gun) as belonging to and used by Omar Williams. In his September 28, 2011 GPR of an interview of Antoine Williams, Hill also falsely reported Antoine Williams as stating that Omar Williams was driving the van the night of July 1, 2011 (Antoine Williams actually stated that Omar Williams drove the van during the day shift at that time; Defendants already knew that Slugg was the night shift driver on July 1, 2011).

**ANSWER**: **To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

48.     In addition to outright falsification of reports, Defendants selectively and intentionally omitted from their reports key exculpatory information which contradicted their

narrative on Omar Williams. For example, eyewitness Kenneth McNeal told Hill and Garcia twice (in mid-July and on August 14, 2011) that Omar Williams was not at the scene of the shootings. As addressed above, the July 2011 GPR was never produced; however, in his August 14, 2011 GPR, Garcia chose not to write anything about that key disclosure. Indeed, Garcia's GPR mentions nothing at all about asking McNeal whether Omar Williams was at the scene. As addressed above, on October 19, 2011, before the grand jury, the CCSAO posed 107 questions to McNeal, carefully avoiding any question that would elicit testimony whether he saw Omar Williams at the scene. At trial, Mr. McNeal forcefully and without hesitation identified the driver exiting the van in the video as Keith Slugg.

**ANSWER: To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants lack information and knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.**

<u>**Answer to Count I – 42 U.S.C. §1983**</u>
<u>**Federal Malicious Prosecution and Due Process**</u>

49.     Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

**ANSWER: The CCSAO Defendants incorporate their answers to each of the previous paragraphs as if fully restated herein.**

50.     Defendants Garcia, Hill and Goldish, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Williams of his constitutional rights to due process and a fair trial.

**ANSWER: To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants, on information and belief, deny the remaining allegations contained in this paragraph.**

51.     Said Defendants caused Williams to be maliciously prosecuted for a crime knowing he was innocent. That resulted in the deprivation of his liberty in violation of his procedural and substantive right to due process guaranteed by the Fourteenth Amendment, and the right to be free of unreasonable seizures guaranteed by the Fourth and Fourteenth Amendments.

**ANSWER: To the extent this paragraph makes allegations against the CCSAO Defendants,**

**they deny the allegations. The CCSAO Defendants, on information and belief, deny the**

**remaining allegations contained in this paragraph.**

52. Said Defendants caused Williams to be improperly subjected to judicial proceedings for which there was no probable cause. Defendants aggressively pursued Williams's criminal prosecution despite the lack of any shred of supporting physical evidence or any probable cause Defendants had no evidence other than the fabricated statements of Gladney.

**ANSWER: To the extent this paragraph makes allegations against the CCSAO Defendants,**

**they deny the allegations. The CCSAO Defendants, on information and belief, deny the**

**remaining allegations contained in this paragraph.**

53. These efforts misled and misdirected the criminal prosecution to the detriment of Williams.

**ANSWER: To the extent this paragraph makes allegations against the CCSAO Defendants,**

**they deny the allegations. The CCSAO Defendants, on information and belief, deny the**

**remaining allegations contained in this paragraph.**

54. The fabricated evidence violated Williams's due process when it was used to deprive him of his liberty, and as illegitimate probable cause for his arrest, detention, indictment, and fraudulent criminal trial.

**ANSWER: To the extent this paragraph makes allegations against the CCSAO Defendants,**

**they deny the allegations. The CCSAO Defendants, on information and belief, deny the**

**remaining allegations contained in this paragraph.**

55. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Williams's favor after the State was thoroughly incapable of convicting Williams following a jury trial.

**ANSWER: The CCSAO Defendants admit the proceedings were terminated in Williams'**

**favor after a jury trial. To the extent this paragraph makes allegations against the CCSAO**

**Defendants, they deny the allegations. The CCSAO Defendants, on information and belief,**

deny the remaining allegations contained in this paragraph.

56.     Defendants accused Williams of grave criminal conduct despite knowing that those accusations were without probable cause, or reasonably should have known that any "corroborating eyewitness testimony" was beyond incredible under the circumstances.

**ANSWER**:  **To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants, on information and belief, deny the remaining allegations contained in this paragraph.**

57.     As a result of this violation of his Fourth and Fourteenth Amendment constitutional rights, Williams suffered physical harm, financial damages, and severe emotional distress and anguish.

**ANSWER**:  **To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants, on information and belief, deny the remaining allegations contained in this paragraph.**

## Answer to Count II - 42 U.S.C. §1983
### Conspiracy to Deprive Williams of His Constitutional Rights

58.     Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

**ANSWER**:  **The CCSAO Defendants incorporate their answers to each of the previous paragraphs as if fully restated herein.**

59.     Defendants, acting within the scope of their employment and under color of law, decided to falsely implicate Williams for the array of violent, criminal charges and deprive him of his constitutional rights, including but not limited to his rights to due process and a fair trial, and the right to be free from the use of falsified evidence to indict, detain and bring him to trial.

**ANSWER**:  **To the extent this paragraph alleges conduct by CCSAO Defendants, they deny the allegations CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

60.     Hill, Garcia and Maresso shared among themselves facts and findings determined by their joint investigation. Hill, Garcia and Maresso all knew from statements Gladney gave on July 2, 2011 that he did not know who shot him or Oliphant. They also knew that Gladney was

high on PCP and other substances the night of July 1, 2011. No later than August 9, 2011, knowing that Williams was not responsible for the Gladney and Oliphant shootings, they agreed that they would attempt to frame him for the crime. This plan involved authoring falsified Case Supplementary Reports that implicated Williams and were contradicted by other evidence.

**ANSWER**: **CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph.**

61. Hill and Garcia received video files from surveillance cameras on August 9, 2011, by which point they knew that Williams was one of the drivers of the van. They also knew that Slugg, not Williams, was driving the van the night of July 1, 2011. Hill and Garcia showed the videos to Gladney on August 9 and re-interviewed him; the falsified GPR that Hill and Garcia authored that day now claimed that Williams was (i) at the scene of the crime; and (ii) was responsible for shooting Gladney; but (iii) made no mention of Oliphant's shooting.

**ANSWER**: **On information and belief, CCSAO Defendants admit that Hill and Garcia received video files from surveillance cameras on August 9, 2011. On information and belief, CCSAO Defendants admit that Hill and Garcia showed the videos to Gladney on August 9 and re-interviewed him. CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

62. Hill and Garcia created another GPR after re-interviewing McNeal on August 14, 2011; despite McNeal telling the officers that Williams was not present at the scene of the crime on July 1, 2011, the falsified report made no mention of this fact.

**ANSWER**: **On information and belief, the CCSAO Defendants admit that Hill and Garcia re-interviewed McNeal on August 14, 2011. CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

63. On September 27, 2011 – the day Williams was arrested - Hill and Garcia took Gladney to Area 4 Headquarters for further questioning. It was there that Goldish joined the ongoing conspiracy of Hill, Garcia and Maresso. At that time, Hill, Garcia and Goldish agreed on a plan to coerce Gladney into providing a false statement that implicated Williams for a crime that they knew he did not commit.

**ANSWER: On information and belief the CCSAO Defendants admit that Hill and Garcia took Gladney to Area 4 Headquarters for further questioning on September 27, 2011. The CCSAO Defendants further admit that Williams was arrested on September 27, 2011. The CCSAO Defendants deny the remaining allegations in paragraph 64.**

64.     Over the course of 17 hours, Garcia threatened Gladney in order to procure the false statement and go along with the Defendants' plan; Goldish wrote the statement herself, then used that statement, in addition to falsified and/or contradictory Case Supplementary Reports, to approve felony charges against Williams.

**ANSWER: The CCSAO Defendants admit that Goldish wrote out the Gladney statement. To the extent the remainder of this paragraph alleges conduct by CCSAO Defendants, they deny the allegations   CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

65.     Defendants further conspired to deprive Williams of potentially exculpatory information to which he was lawfully entitled and which would have led to him not being charged, if they had faithfully and honestly disclosed relevant Brady evidence.

**ANSWER: To the extent this paragraph alleges conduct by CCSAO Defendants, they deny the allegations CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

66.     Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER: To the extent this paragraph alleges conduct by CCSAO Defendants, they deny the allegations CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

67.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

**ANSWER**: **To the extent this paragraph alleges conduct by CCSAO Defendants, they deny the allegations C C S A O Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

68.    Defendants willfully conspired with malice and/or reckless indifference to the rights of Williams.

**ANSWER**: **To the extent this paragraph alleges conduct by CCSAO Defendants, they deny the allegations CCSAO Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.**

### Answer to Count III - 42 U.S.C. §1983 *Monell* Policy Claim against Chicago

**The allegations in Count III are not directed towards the CCSAO Defendants, nor do they seek any relief from the CCSAO Defendants; therefore, the CCSAO Defendants make no answer thereto. To the extent that an answer is required as to any of the paragraphs contained herein, they are denied.**

### Count IV - State Law Claim Respondent Superior

**The allegations in Count IV are not directed towards the CCSAO Defendants, nor do they seek any relief from the CCSAO Defendants; therefore, the CCSAO Defendants make no answer thereto. To the extent that an answer is required as to any of the paragraphs contained herein, they are denied.**

### Count V - State Law Claim
### Indemnification

69.    Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

**ANSWER**: **The CCSAO Defendants incorporate their answers to each of the previous paragraphs as if fully restated herein.**

70.    Illinois law provides that public entities are directed to pay any tort judgment

for compensatory damages for which employees are liable within the scope of their
employment activities.

**ANSWER**: **The CCSAO Defendants deny the allegations contained in this paragraph
because these allegations constitute a legal conclusion and contain a vague, incomplete,
and/or inaccurate statement of the law.**

71.        Chicago must indemnify the Defendant Officers for all judgments entered against
them.

**ANSWER**: **The CCSAO Defendants lack information and knowledge sufficient to form a
belief as to the truth or falsity of the allegations contained in this paragraph.**

72.        Cook County must indemnify Goldish for all judgments entered against her.

**ANSWER**: **The CCSAO Defendants admit Cook County is required to indemnify Goldish
under certain circumstances, but deny this paragraph is an accurate statement of the law.**

### Count VI - State Law Claim
**Civil Conspiracy**

73.        Plaintiff incorporates each preceding paragraph of this Complaint as if fully
restated herein.

**ANSWER**: **The CCSAO Defendants incorporate their answers to each of the previous
paragraphs as if fully restated herein.**

74.        Defendants, acting in concert, conspired by concerted action to accomplish an
unlawful purpose by unlawful means.

**ANSWER**: **To the extent this paragraph alleges conduct by CCSAO Defendants, they deny
the allegations CCSAO Defendants are without knowledge or information sufficient to form
a belief as to the truth of the remaining allegations in this paragraph.**

75.        In furtherance of the conspiracy, Defendants committed overt acts and were
otherwise willful participants in joint activity in furtherance of the conspiracy.

**ANSWER**: **To the extent this paragraph alleges conduct by CCSAO Defendants, they deny**

the allegations CCSAO Defendants are without knowledge or information sufficient to form

a belief as to the truth of the remaining allegations in this paragraph.

76.  The misconduct described was undertaken by Defendants with malice, willfulness and reckless indifference to the rights of Williams.

**ANSWER**: **To the extent this paragraph alleges conduct by CCSAO Defendants, they deny**

**the allegations CCSAO Defendants are without knowledge or information sufficient to form**

**a belief as to the truth of the remaining allegations in this paragraph.**

77.  Williams suffered damages, including severe emotional distress and anguish as a proximate result of Defendants' misconduct and conspiracy to engage in misconduct.

**ANSWER**: **To the extent this paragraph alleges conduct by CCSAO Defendants, they deny**

**the allegations CCSAO Defendants are without knowledge or information sufficient to form**

**a belief as to the truth of the remaining allegations in this paragraph.**

### Count VII - State Law Claim
**Malicious Prosecution**

78.  Plaintiff incorporates each preceding paragraph of this Complaint as if fully restated herein.

**ANSWER**: **The CCSAO Defendants incorporate their answers to each of the previous**

**paragraphs as if fully restated herein.**

79.  As described above, the Defendant Officers and Goldish caused Williams to be improperly subjected to judicial proceedings for which there was no probable cause. They knowingly provided falsified statements to ensure that Williams would be arrested and prosecuted for a crime knowing that he was innocent.

**ANSWER**: **The CCSAO Defendants deny the allegations contained in this paragraph.**

80.  Defendants Garcia and Hill coerced false statements that implicated Williams in a crime that he did not commit. Goldish - along with Garcia – fabricated an eyewitness statement for Gladney to sign that falsely implicated Williams and served as the basis for his charging and trial.

**ANSWER**: **To the extent this paragraph makes allegations against the CCSAO Defendants,**

they deny the allegations. The CCSAO Defendants, on information and belief, deny the remaining allegations contained in this paragraph.

81.     The proceedings were terminated in Williams's favor by a jury verdict.

**ANSWER**: **Upon information and belief, the CCSAO Defendants admit the allegations contained in this paragraph.**

82.     The proceedings were instituted and continued maliciously, resulting in injury. The Defendant Officers and Giancola acted with malice, willfulness and reckless indifference to Williams's rights.

**ANSWER:** **To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants, on information and belief, deny the remaining allegations contained in this paragraph.**

83.     Williams sustained and continues to sustain injuries, including but not limited to physical injury, loss of liberty and pain and suffering because of Defendants' misconduct.

**ANSWER**: **To the extent this paragraph makes allegations against the CCSAO Defendants, they deny the allegations. The CCSAO Defendants, on information and belief, deny the remaining allegations contained in this paragraph.**

WHEREFORE, Defendant Defendants Goldish and the County request judgment in its favor and against Plaintiff on this count of Plaintiff's Complaint; award it such costs as provided by law; and grant it such other relief as the Court deems just and proper.

## <u>AFFIRMATIVE DEFENSES</u>

1. The County is immune from the imposition of punitive damages under both state and federal law. Moreover, under Illinois law, the Cook County cannot be required to indemnify an employee for punitive damages, nor may it pay a judgment for punitive damages. 745 ILCS 10/2-102; *City of Newport v. Facts Concerts*, 453 U.S. 247, 271 (1981).

2. To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff has a duty to mitigate, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in the case.

3. The County is not liable to Plaintiff for any state or federal claims for which the ASA Megan Goldish is not liable to Plaintiff. Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/2-109; *see City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

4. Plaintiff is not entitled to attorney's fees for his state law claims. *See Pennsylvania Truck Lines, Inc. v. Solar Equity Corp.*, 882 F.2d 221, 227 (7th Cir. 1989); *Kerns v. Engelke*, 76 Ill. 2d 154, 166, 390 N.E.2d 859, 865 (1979); *Miller v. Pollution Control Board*, 267 Ill. App.3d 160, 171, 642 N.E.2d 475, 485 (4th Dist. 1994).

5. As to Plaintiff's state law claims, a public employee, acting within the scope of her employment is not liable for any injury caused by the act or omission or another person. 745 ILCS 10/2-204. Megan Goldish is public employee, who at all times material to the events alleged in Plaintiff's Complaint, acted within the scope of her employment and is therefore not liable for the acts or omissions of other people. Because Megan Goldish is not liable to Plaintiff, the County is not liable to Plaintiff. 745 ILCS 10/2-109.

6. As to Plaintiff's state law claims, Goldish is not liable for any of these claims alleged because a public employee is not liable for injury caused by her instituting or prosecuting any judicial or administrative proceeding within the scope of her employment, unless she acts maliciously and without probable cause. 745 ILCS 10/2-

208 (2014). Because Goldish is not liable to Plaintiff, the County is not liable to Plaintiff.  745 ILCS 10/2-109.

7. As to Plaintiff's state law claims, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for any injury resulting from her act or omission in determining policy when acting in the exercise of such discretion even if abused. 745 ILCS 10/2-201. Goldish is a public employee serving in a positions involving the exercise of discretion and is not liable for any injury resulting from such exercise of discretion. Because Goldish is not liable to Plaintiff, the County is not liable to Plaintiff. 745 ILCS 10/2-109.

8. Plaintiff's Fourth Amendment "malicious prosecution" claim (Count I) is untimely. *See Manuel v. City of Joliet*, 137 S.Ct. 911 (2017). A claim "accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages." *Wallace v. Kato*, 549 U.S. 384, 391 (2007).  Under the Fourth Amendment, a person has a right to be free from unreasonable search and seizure without probable cause. *See e.g. Manuel*, 137 S.Ct. 911. Thus, a claim arising under the Fourth Amendment for pre-trial detention, *see id.*, begins to accrue at the time the legal process results in a person being held pending trial and not upon completion of that trial. In addition, this District follows Illinois' two-year statute of limitations in Section 1983 claims. 735 ILCS 5/13–202. Therefore, in this case, the statute of limitations on Plaintiff's claim arising under the Fourth Amendment for his pretrial detention began to run at the time he left police custody and was held over on probable cause following his appearance in court on June 9, 2014 that resulted in his detention pending trial. It did not begin to run at his last appearance in court on September 21,

2016 when he was found not-guilty of all charges. Therefore, Plaintiff's Fourth Amendment "malicious prosecution" claim should have been filed by June 9, 2016, at the latest, for it to be timely. Because this case was filed after the statute of limitations ran on Plaintiff's Fourth Amendment "malicious prosecution" claim, *see* ECF No. 1, such claim is untimely.

9.  To the extent Plaintiff asserts a Due Process "fabrication of evidence" claim, such a claim is not cognizable. Where a criminal defendant's prosecution is based on allegedly false evidence and he is eventually found not guilty at trial, no Due Process violation occurs. *See Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016); *Petty v. City of Chicago*, 754 F.3d 416, 422-423 (7th Cir. 2014); *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012); *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010); *Brooks v. City of Chicago*, 564 F.3d 830, 833 (7th Cir. 2009); *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003); *see also Saunders v. City of Chicago*, Case No. 12 C 9158, 2014 WL 3535723, *4 (N.D. Ill. July 11, 2014) (Dow, J.). This is true even where he is held in custody during the pendency of his trial. *White v. City of Chicago*, No. 14-cv-9915, 2016 WL 640523 (Feb. 18, 2016) (J. Feinerman).

10. To the extent Plaintiff attempts to assert a *Brady* claim, such claim fails because the allegedly fabricated evidence was known to Plaintiff at the time of his criminal prosecution. "A *Brady* violation occurs when the government fails to disclose evidence materially favorable to the accused." *Bielanski v. County of Kane*, 550 F. 3d 632, 643 (7th Cir. 2008) (citing *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006)). To show that evidence was suppressed, Plaintiff must also demonstrate that "the evidence was known, or reasonably should have been known, [and] the evidence was not otherwise

available . . . through the exercise of reasonable diligence." *See United States v. Knight*, 342 F.3d 697, 705 (7th Cir. 2003). Because Plaintiff cannot show that any alleged evidence was not known, or could not reasonably have been known, and that the evidence was therefore available to him through the exercise of reasonable diligence, Plaintiff cannot establish a *Brady* claim.

11. At all relevant times, Megan Goldish was an Assistant State's Attorney working for the Cook County State's Attorneys' Office. In this capacity, she performed acts toward initiating a prosecution and presenting the State's case. Because the conduct complained of on the part of ASA Goldish arises out of the initiation and prosecution of criminal charges, Plaintiff's claims are barred on the basis of absolute prosecutorial immunity.

12. At all relevant times, Megan Goldish was an Assistant State's Attorney working for the Cook County State's Attorneys' Office. To the extent any of her actions are not protected by absolute prosecutorial immunity, she is protected by qualified immunity as her actions were at all times proper in light of clearly established law.

13. Plaintiff's claims against Megan Goldish are really claims against a State official based upon her actions as an Assistant State's Attorney, functions that fall within the scope of her employment and authority as an Assistant State's Attorney.

14. Plaintiff's claims against Megan Goldish relate to the initiation of charges against and the criminal prosecution of Plaintiff. The State's Attorney is the constitutional officer vested with exclusive discretion in the initiation and management of a criminal prosecution. The prosecution of Plaintiff's case is therefore, well within the scope of the State's Attorney's authority. The Illinois Court of Claims has sole and exclusive jurisdiction over Plaintiff's state law claims against Megan Goldish.

## JURY DEMAND

Defendants hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues triable.

**WHEREFORE**, Defendants respectfully request judgment in their favor and against Plaintiff on all counts and claims in the complaint, dismissal of this case with prejudice, an award of costs, attorneys' fees, and such further relief as this court deems just and equitable.

**Dated:  August 9, 2018**                                      Respectfully Submitted,

                                                      COOK COUNTY and MEGAN
                                                      GOLDISH,


                                                      /s/ Kenneth M. Battle
                                                       One of their Attorneys




Kenneth M. Battle
Winnefred A. Monu
O'CONNOR & BATTLE, L.L.P.
20 N. Clark St., Suite 1600
Chicago, IL 60602
312-786-4600
kbattle@mokblaw.com
wmonu@mokblaw.com

## CERTIFICATE OF SERVICE

I, Winnefred Monu, an attorney, certify that a copy of the attached instrument was served via electronic case filing to all parties of record, on this 9th day of August, 2018.


                                          /s/ Winnefred A. Monu_____