# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| OMAR WILLIAMS, | ) |
| *Plaintiff*, | ) |
| v. | ) No. 17 C 5186 |
| CITY OF CHICAGO, MARCO GARCIA, DONALD HILL, | ) Judge Virginia M. Kendall |
| *Defendants*. | ) |

## MEMORANDUM ORDER AND OPINION

On September 28, 2011, officers of the Chicago Police Department ("CPD") arrested Plaintiff Omar Williams for the murder of Javonne Oliphant and attempted murder of Andre Gladney. On June 8, 2017, after Plaintiff had spent five years and eight months in jail, a jury acquitted Plaintiff of all charges following a three-day trial. Plaintiff subsequently filed this lawsuit against the City of Chicago and several government agents, alleging, *inter alia*, that Defendants violated his Fourth Amendment right to be free from unreasonable seizures by arresting and detaining him without probable cause.

Before the Court is Defendants' Motion for Summary Judgment. (Dkt. 182.) For the reasons set forth below, the Motion is denied in part and granted in part.

## PRELIMINARY OBJECTIONS

### I. Local Rule 56.1 Objections

As a preliminary matter, Defendants object to Plaintiff's statement of facts on the grounds that it does not comply with Local Rule 56.1(b)(3)(C). Indeed, Plaintiff's statements of facts consists of many paragraphs that are far from "short" as required by the rule. Paragraph 24, for

1

example, includes twelve sentences. Plaintiff also includes argumentative statements and theories that lack substantiation in violation of the rules. For example, paragraph thirteen reads in part: "There was absolutely no basis for Garcia's claim that the P345 was Omar Williams' gun. Hill, likely seeking to downplay his partner's outright fabrication, testified that the P345 'wasn't important.'" (Dkt. 196 ¶ 13.) This sort of language, which appears throughout Plaintiff's statement of facts, is clearly argumentative and improper in a 56.1 statement of facts. Rather than take the drastic measure of striking Plaintiff's statement of facts in its entirety, the Court took care to only consider material facts supported by citations to the record, rather than argumentation. *See Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015) (district courts have discretion to enforce Local Rule 56.1).

## II. Hearsay Objections

Defendants object to Plaintiff's reliance on hearsay statements made by Andre Gladney in Plaintiff's underlying criminal trial. Defendants' objections are unfounded at this stage of the litigation because the non-moving party on a motion for summary judgment need not "'depose her own witnesses or produce evidence in a form that would be admissible at trial in order to avoid summary judgment.'" *Hummel v. St. Joseph Cty. Bd. of Com'rs*, 817 F.3d 1010 (7th Cir. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). Were Mr. Gladney to take the stand in an eventual trial in this case, he would be able to offer the same testimony that he offered in the earlier criminal trial. Likewise, were he to be declared unavailable to testify under Rule 804(a), his testimony from the earlier trial may fall within the 804(b)(1) hearsay exception. Accordingly, the Court takes Gladney's trial testimony into account for purposes of this Motion.

Defendants likewise object to Plaintiff's reliance on a conversation he allegedly overheard on speakerphone between Antoine Williams and Keith Slugg. Without ruling on the issue, the

Court notes for purposes of this Motion that this conversation arguably falls within the scope of the present-sense-impression hearsay exception. As such, there is a possibility that the conversation could be admissible at trial, so the Court will consider that conversation for purposes of this Motion.

## BACKGROUND

Unless otherwise indicated, the following facts are undisputed for purposes of this Motion.

<u>The Shooting</u>

On July 1, 2011 at approximately 11:07 PM, Andre Gladney ("Gladney") and Javonne Oliphant ("Oliphant") were shot multiple times in the parking lot of the ABLA-Robert Brooks Homes located on the 1300 block of West Hastings in Chicago, Illinois. (Dkt. 186 ¶ 4.) While Gladney survived the shooting, Oliphant did not. (*Id.*)

<u>The Investigation</u>

The CPD assigned Detective Carol Maresso as the scene detective on the night of the shooting. (Dkt. 186 ¶ 5.)[1] Within a day of the shooting, CPD assigned detectives Marco Garcia and Donald Hill to investigate the shooting. (*Id*. ¶¶ 6, 8.)

Officers recovered twelve spent cartridge casings from a 9 mm Glock semiautomatic weapon, six .40 caliber casings, and a fully loaded Ruger P345 handgun at the scene. (Dkt. 196 ¶ 1.) Believing that ownership of the fully-loaded Ruger P345 was unimportant to his investigation, Detective Hill did not investigate to whom the Ruger P345 belonged. (Dkt. 186-18 at p. 11.) Detective Garcia states that he never determined ownership of the Ruger P345, although a report he wrote identified Plaintiff as the owner. (Dkt. 186-14 at pp. 3, 10.) Garcia states that the

---

[1] Maresso was a Defendant in this case, but Plaintiff moved to dismiss her with prejudice on January 19, 2019. (Dkt. 142.)

field within the report that identified the owner of the weapon was populated by error. (*Id.* at p. 10)

At the time of the shooting, roughly twenty people were present in the parking lot. (Dkt. 196 ¶ 1.) Among the people present were Antoine Williams and Keith Slugg ("Slugg").[2] (*Id.* ¶ 2.) Antoine Williams is a quadriplegic who requires a specifically equipped van for transportation. (*Id.*) The Illinois Department of Human Services employed Omar Williams ("Plaintiff") and Slugg as drivers of such a van for Antoine. (*Id.*) Omar typically worked the day shift, driving the van from 10:00 AM to 4:00 PM daily, while Slugg typically worked the "next shift." (*Id.*; Dkt. 186-12 at p. 5:1–11.)

Slugg was a parolee confined to house arrest on electronic monitoring, but he was authorized to leave his home to drive the van. (Dkt. 196 ¶ 30.) His monitoring data show that he left his home at 4:39 PM on the night of the shooting and returned home at 1:59 AM the following morning. (*Id.*) Two days after the shooting, Detective Thomas Deacy of the Gang Investigations Unit—at the direction of Sergeant Charles Daley—issued an investigative alert for Slugg stating that Slugg was a "Targeted Repeat Offender Apprehension and Prosecution" target. (*Id.* ¶ 32.) No documents presently exist explaining why the investigative alert was issued and Deacy and Daley testified that they do not recall why they issued the alert. (*Id.* ¶ 33.) On August 21, 2011, the University of Illinois at Chicago Police arrested Slugg for reckless driving. (*Id.* ¶ 35.) While in jail, police used Slugg as a filler in two line-ups for another homicide case. (Dkt. 196-6 at pp. 2–3.) According to Plaintiff's deposition testimony, after Slugg was released from jail, Slugg called Antoine Williams to tell Antoine that while he was in jail, police questioned him in connection

---

[2] Defendants do not specifically admit that Slugg was present, but McNeal testified that he was, and Defendants provide no citation to the record indicating that he was not there. Because the only information in the record is that Slugg was present, the Court considers this an undisputed fact for purposes of this Motion.

4

with Oliphant's murder. (Dkt. 196 ¶ 35.) Plaintiff reports that he overheard this conversation because he was next to Antoine Williams who had his phone on speakerphone. (Dkt. 186-12 at p. 7:14–16.) Despite Plaintiff's belief that police questioned Slugg in connection with the shooting, both Garcia and Hill deny that Slugg was a suspect, and the investigative file includes no mention of Slugg. (Dkt. 196 ¶ 36.) Slugg was killed on August 28, 2011. (*Id.* ¶ 35.)

Jason Jones was another witness at the scene of the shooting. (*Id.* ¶ 10.) Jones told Detective Hill that he saw a shooter who was approximately five-foot seven-inches tall, weighed approximately 170 pounds, had black hair, and wore dreadlocks. (*Id.*) At the time of his arrest, Plaintiff weighed 230 pounds, was five-foot eleven-inches tall, and had a short hair style. (*Id.*)

On July 2, 2011, Detective Donald Hill ("Hill") interviewed Gladney at Stroger Hospital where Gladney was recovering from his injuries. (*Id.* ¶ 6.) In that interview, Gladney informed Hill that when Gladney was shot, he was texting and had his back turned such that he did not see the shooter. (Dkt. 186-18 at p. 7.) Hill prepared a General Progress Report ("GPR") regarding his July 2, 2011 interview of Gladney, but the GPR is now missing. (Dkt. 196 ¶ 6; Dkt. 186-18 at p. 7.) Stroger Hospital conducted a toxicology report for Gladney on July 2, 2011, which showed that he had cannabis, PCP, and alcohol in his system. (Dkt. 196 ¶ 7; Dkt. 186-16 at p. 2.) Detectives Garcia and Hill claim that they did not see Gladney's toxicology report and were unaware whether Gladney was sober at the time of the shooting. (Dkt. 196 ¶ 8; Dkt. 186 at p. 4.)

On August 9, 2011 detectives Hill and Garcia obtained a DVD of a grainy surveillance video of the shooting scene, which they studied for several hours. (Dkt. 196 ¶ 14.) Based on their study of the surveillance footage, Detectives Garcia and Hill determined that a van pulled in to the parking lot and the driver of the van—who Hill referred to as "Offender No. 1"—was a shooter.

(*Id.*; Dkt. 186-14 at p. 44.) According to Hill, the video depicted two shooters acting in concert. (Dkt. 186 ¶ 11.)

Also on August 9, 2011, after detectives Hill and Garcia watched the surveillance footage, they interviewed Gladney a second time. (Dkt. 196 ¶ 15.) During this second interview, Gladney told the detectives that he saw Omar Williams walk up behind him and shoot him in the back. (*Id.*) Detectives Hill and Garcia claim that when they showed Gladney the video, he identified Plaintiff and Carnell Jones[3] as the two shooters. (Dkt. 183-24 at p. 7.) During Detective Garcia's third interview of Gladney on September 27, 2011, Gladney reported seeing Omar shoot him in the back and shoot the other victim, Javonne Oliphant. (Dkt. 196 ¶ 18.) During this third interview, Gladney explained to Garcia that Plaintiff usually drove the van, but Garcia stated that he never asked Gladney who else drove the van. (Dkt. 186-14 at p. 7.) Gladney also related during this interview that he and Oliphant were at the ABLA Homes on the night of the shooting when Oliphant approached Antoine Williams to buy cocaine, which resulted in an argument and the eventual shooting by Plaintiff and Carnell Jones. (Dkt. 186 ¶¶ 26–27.)

Kenneth McNeal was another witness present at the scene of the shooting. (Dkt. 196 ¶ 17.) Detectives Hill and Garcia interviewed McNeal during the initial investigation of the shooting. (*Id.*; Dkt. 186-18 at p. 10.) When the detectives asked McNeal whether he saw Omar Williams at the scene of the shooting, McNeal responded that he did not. (Dkt. 186-4 at p. 3.) Detective Garcia prepared a GPR of the August 14, 2011 interview of McNeal; the GPR does not reflect that McNeal stated that he did not see Omar at the scene of the shooting. (Dkt. 196 ¶ 17; Dkt. 186-49.) Detective Garcia spoke with Assistant State's Attorney Toni Giancola prior to her examination of McNeal before the grand jury in Plaintiff's underlying criminal proceeding. (Dkt. 196 ¶ 26.) In Giancola's

---

[3] Carnell Jones was Plaintiff's co-defendant in the underlying criminal trial.

6

questioning of McNeal, she asked whether McNeal had seen who shot Gladney and Oliphant. (Dkt. 186-3 at p. 8–9.) McNeal stated that he could not see the person well enough to identify them other than he was sure that the person was a male. (*Id.* at p. 9.)

On September 26, 2011, Detectives Hill and Garcia interviewed Carnell Jones after arresting him in possession of two firearms whose calibers matched those of the weapons used in the shooting. (Dkt. 186 ¶¶ 15–16.) The detectives recount that Jones stated in that interview that "he heard Omar killed [Oliphant]." (*Id.* ¶ 16.) Although Detective Hill stated that all homicide-related statements were videotaped, there is no videotape of the Carnell Jones interview. (*Id.* ¶ 16.)

On September 28, 2011, Detectives Hill and Garcia interviewed Antoine Williams, who was driven to the scene of the shooting in the van specially equipped to accommodate his disability. (Dkt. 196 ¶ 19.) In that interview, Antoine confirmed that Omar was paid to drive Antoine around in the van. (*Id.*) In Detective Hill's GPR of that interview, Hill wrote that "Antoine related Omar drove him their" [sic], meaning that Omar had driven Antoine to the scene of the shooting. (Dkt. 186-5.) In the "Clear Closed" report that Detectives Garcia and Hill authored, they again wrote: "Antoine related Omar drove him their" [sic] (*i.e.*, drove him to the scene of the shooting). (Dkt. 186-42 at p. 15.) In Hill's deposition, however, when asked whether Antoine had stated in the interview that Omar drove him to the parking lot that night, Hill responded that "[Antoine] just said he drove him around in his van." (Dkt. 186-18 at p. 20.)

Detectives Hill and Garcia authored their Clear Closed Report on January 28, 2011. (Dkt. 186 ¶ 29.) In that report, they describe meeting with Javaris Oliphant (brother of the deceased Javonne Oliphant) on September 28, 2011. (*Id.*) According to the report, Javaris told the detectives that (1) Carnell Jones told him that he had not shot Javonne and (2) Gladney told him that Plaintiff

7

killed Javonne and Carnell Jones shot Gladney. (*Id.*) No contemporaneous record or GPR has been identified for the interview of Javaris Oliphant. (*Id.*)

Prior to Assistant State's Attorney Toni Giancola's examination of Gladney in Plaintiff's grand jury proceedings on October 13, 2011, Detective Garcia spoke to Giancola about Garcia's prior interviews of Gladney. (Dkt. 196 ¶ 27.) In his grand jury testimony, Gladney testified that he saw Omar grab him from behind and shoot him. (*Id.*) He also testified that he saw Omar shoot Oliphant. (*Id.*) On October 21, 2011, a grand jury indicted Plaintiff and Carnell Jones on charges of first-degree murder and aggravated battery. (Dkt. 186 ¶ 33.)

In February 2103, Detective Garcia obtained samples of Plaintiff's DNA and sent them to the State Police Crime Lab to compare them to DNA found on a bicycle at the scene of the shooting. (Dkt. 196 ¶ 28.) The results came back negative. (*Id.*)

On January 2016, the Chicago Police Department sent swab samples from the Ruger P345 found at the scene of the shooting to the Illinois State Police Crime Lab to see if they matched the DNA of Carnell Jones or Plaintiff. (*Id.* ¶29; Dkt. 186-17 at p. 1.) The swab samples had been collected on July 2, 2011. (Dkt. 186-44 ¶ 14.) The results indicated that the swab contained DNA from at least three people, rendering the sample unsuitable for comparisons. (Dkt. 186-17 at p. 1.)

<u>The Trial</u>

Plaintiff's trial took place in June 2017, and the State called Gladney as a witness. (Dkt. 186-8.) Gladney testified that he lied to Detectives Hill and Garcia (and by extension, to the grand jury) in their interview of him when he told them that he saw Omar shoot him. (Dkt. 196 ¶ 15.) Gladney further testified that he lied because the detectives told him that they would turn him over to federal authorities (who had a warrant out for his arrest) if he did not tell them what they wanted to hear—namely, that he saw Omar Williams shoot him. (*Id.*) Gladney

8

also testified that he was not sure who drove the van on the night of the shooting. (*Id.* ¶ 16.) Finally, Gladney testified that when he was shot, he got along well with Omar and had never been in a physical altercation with Omar. (*Id.* ¶ 21.)

The Defense called McNeal as a witness and played the surveillance video for him in court. (*Id.* ¶ 39.) Upon watching the video, McNeal identified Slugg as the driver of the van. (*Id.*)

Henry Conforti, President of Operations Protocol Monitoring for the Illinois Department of Corrections, testified at Plaintiff's trial that Keith Slugg was a parolee confined to electronic monitoring during the summer of 2011. (*Id.* ¶ 38.) Conforti also testified that Slugg was authorized to leave home between 3:00pm and 1:00am to drive Antoine Williams's van. (*Id.*) Finally, Conforti testified that on the night of the shooting, Slugg left his home at 4:39pm and returned at 1:59am the following morning. (*Id.*)

Detective Garcia testified at the trial that he had found a gun in Plaintiff's possession at the time of Plaintiff's arrest. (*Id.* ¶ 40.) Plaintiff did not have a gun on his person when he was arrested. (*Id.*)

Following a three-day trial, the jury found Plaintiff not guilty of all charges. (Dkt. 186 ¶ 34.)

Carnell Jones was tried simultaneously by a separate jury. (*Id.* ¶ 35.) Jones was convicted of first-degree murder, attempted murder, and aggravated battery. (*Id.*)

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a

9

verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of material fact exists, the Court must draw all reasonable inferences in favor of the party opposing the motion. *Anderson,* 477 U.S. at 255; *see also Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018).

## DISCUSSION

### I. Count I: Lack of Probable Cause for Arrest & Pretrial Detention

Plaintiff's first claim is that the Chicago Police Department arrested and detained him without probable cause to believe that he had committed a crime, in violation of the Fourth Amendment's protection against unreasonable seizures. Defendants claim that probable cause existed for Plaintiff's arrest in connection with the shooting of Oliphant and Gladney. If probable cause did exist, it would be a complete defense to Plaintiff's claim of unlawful detention. *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006). Defendants also raise qualified immunity as a defense to the Fourth Amendment Claim.

#### A. Probable Cause

A seizure is reasonable under the Fourth Amendment if it based on probable cause. *Bailey v. United* States, 568 U.S. 186, 192 (2013). Probable cause for an arrest exists where the totality of the facts and circumstances known to the officer at the time of arrest "would warrant a reasonable, prudent person in believing that the arrestee had committed . . . a crime." *United States v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015) ((quoting *Abbott v. Sangamon Cty*., 705 F.3d 706, 714 (7th Cir. 2013)). Probable cause does not require a showing of criminal activity by a preponderance of the evidence. *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012).

In this case, Defendants base their defense that probable cause existed on the following undisputed facts. First, Gladney stated in his second and third interviews with the detectives that he had seen Plaintiff shoot him. Second, Carnell Jones stated in an interview with the detectives (for which there is no contemporaneous record) that he saw Plaintiff shoot Javonne Oliphant. Third, Javaris Oliphant told the detectives that Gladney told him that Plaintiff killed Javonne Oliphant.

A complaint by the putative victim of the alleged crime or a single witness is "generally sufficient to establish probable cause, unless the officer has a reason to question the witness's account." *Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007). Here, there are two witnesses—Gladney and Carnell Jones—who allegedly reported to the officers that they had seen Plaintiff fire shots on the night of July 1, 2011. The record, however, raises doubt as to the reliability of those witness accounts. First, Gladney's account of the shooting evolved dramatically from his first interview in which he indicated that he was texting and could not see who shot him, to his second and third interviews and grand jury testimony, in which he indicated that he saw Plaintiff shoot him. Gladney's story then changed again during the jury trial when he stated that the detectives had coerced him into testifying against Plaintiff. The fact that Gladney's story so frequently evolved would give a reasonable jury in this case grounds to conclude that the officers had reason not to rely on Gladney's account. A reasonable jury could conclude that Gladney's testimony alone did not give Officers Hill and Garcia probable cause to arrest Plaintiff.

A reasonable jury could also conclude that the other two accounts on which Defendants rely were similarly flawed such that they could not serve as a basis for a finding of probable cause. Carnell Jones's statement is self-serving, as he was another primary suspect in the shooting investigation. Given that there is also no contemporaneous record of Jones's alleged statement, a

reasonable jury could infer that this statement did not give rise to probable cause. And Javaris Oliphant's statement, for which there also is no contemporaneous record, is hearsay on hearsay. Even if it is somehow admissible at trial, a reasonable jury could choose to place little weight on it for purposes of determining whether probable cause existed.

The parties do not dispute that police recovered no physical evidence at the scene of the shooting linking Plaintiff to the shooting. Neither the bicycle swabs nor the gun swabs revealed evidence linking Plaintiff to the scene of the crime. Additionally, Jason Jones, a witness to the shooting, identified a shooter as a 5'7"-tall, 170 lbs. male wearing dreadlocks—a description that does not correspond with Plaintiff's known physical characteristics. McNeal also indicated that he did not see Plaintiff at the scene of the shooting and when he watched the surveillance video in court, he identified Slugg as the driver of the van. Notably, the detectives had previously identified the driver as "Offender Number One." And while the GPR for Hill's interview of Antoine indicates that Antoine said that Plaintiff drove him to the scene of the shooting, Hill's own deposition testimony refutes that. According to Hill's deposition, Antoine just told him that Omar drove him in the van, not that Omar drove him to the scene of the shooting.

On this record, a reasonable jury could conclude that several of the alleged bases for Defendants' claim that they had probable cause to arrest and continue to detain Plaintiff lacked merit. Drawing all reasonable inferences in favor of Plaintiff, as the Court must at this stage, Plaintiff has presented enough circumstantial evidence to create a genuine issue of material fact about whether probable cause existed to arrest him. This fact issue precludes the Court from entering summary judgment, unless Defendants can establish that they are entitled to qualified immunity. *See Belcher v. Norton*, 497 F.3d 742 (7th Cir. 2007) (holding that a genuine issue of material fact about whether probable cause for arrest existed precluded summary judgment).

B.     **Qualified Immunity**

Defendants argue that even if Plaintiff has raised a triable issue regarding probable cause, Detectives Hill and Garcia are still entitled to qualified immunity. Hill and Garcia are entitled to qualified immunity if they can demonstrate that "a reasonable officer could have believed [Plaintiff's] arrest to be lawful in light of clearly established law and the information the [arresting] officers possessed." *Gutierrez v. Kermon*, 772 F.3d 1003, 1008 (7th Cir. 1998) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Qualified immunity would provide Detectives Hill and Garcia shelter from liability if they "reasonably but mistakenly believed they [had] probable cause" to arrest Plaintiff and keep him in detention throughout the pre-trial period. *Gutierrez*, 772 F.3d at 1008. Courts refer to this mistaken but reasonable belief as "arguable probable cause." *Wollin v. Gondert*, 192 F.3d 616 (7th Cir. 1999).

On the record before the Court, there is no physical evidence connecting Plaintiff to the scene of the shooting. An eyewitness, Kenneth McNeal, explicitly and consistently declared that he did not see Plaintiff at the scene of the shooting. Another eyewitness, Jason Jones, identified the shooter as an individual whose physical characteristics do not match Plaintiff's. Gladney's testimony changed so dramatically over the course of the investigation that a jury could find that a reasonable detective could not rely solely on that testimony as a basis for probable cause, especially given Gladney's state of intoxication at the time of the shooting. Moreover, while the detectives determined that one of the shooters was the driver of the van, the record suggests that Plaintiff normally did not drive the van at the hour of the shooting, and McNeal quickly identified the driver of the van in the surveillance footage as Keith Slugg, not Plaintiff. The only undisputed, reliable evidence that generally connects Plaintiff to the crime scene is that Plaintiff sometimes drove the van from which a shooter exited. But according to Detective Hill's own deposition

testimony, Antoine never indicated that Omar drove the van to scene of the shooting. Given the dearth of physical evidence or reliable witness testimony connecting Plaintiff to the shooting, Defendants have not demonstrated that arguable probable cause existed for the arrest or continued detention of Plaintiff. A reasonable jury could find that no reasonable detective could think that he had probable cause under these circumstances. Therefore, drawing all reasonable inferences in favor of Plaintiff, Defendants have failed to establish the defense of qualified immunity for purposes of this Motion.

## II. Count I: *Brady* Claim

Embedded within Count One of Plaintiff's First Amended Complaint (Dkt. 104) is an attempt to allege a *Brady* claim. In that claim, Plaintiff alleges that Defendants destroyed exculpatory evidence (*e.g.*, the GPR of Gladney's first interview at which he stated that he did not see who shot him, and evidence related to the investigative alert that CPD issued for Slugg) and coerced inculpatory evidence (*e.g.*, Gladney's grand jury testimony identifying Plaintiff as the shooter). In Plaintiff's response brief, however, Plaintiff states that his "Fourteenth Amendment" claims—by which the Court believes that Plaintiff means to refer to his *Brady* claim—are precluded by *Lewis v. City of Chi.*, 914 F.3d 472 (7th Cir. 2019). (Dkt. 187 at p. 15.) The Court notes that the law in Seventh Circuit is unclear about whether an acquitted Defendant can bring a *Brady* claim in the first instance. *See Mosley v. City of Chi.*, 614 F.3d 391, 397–98 (7th Cir. 2010). As the parties agree that this claim should be dismissed, the Court grants summary judgment in favor of Defendants on the *Brady* claim embedded within Count One.

Plaintiff's fundamental claim in Count One is that he was arrested and detained without probable cause. On the record before the Court, including or excluding the allegedly coerced

14

evidence and the allegedly wrongful lack of additional exculpatory evidence, Plaintiff has shown that a reasonable jury could find that Defendants detained Plaintiff without probable cause.

### III. Remaining Claims and *Monell* Claim

While Defendants seek summary judgment on all claims against them, they base their entire argument on the Fourth Amendment claim, arguing that all other claims cannot stand on their own if the Court dismisses the Fourth Amendment claim. Because the Court is not dismissing the Fourth Amendment claim and given the lack of briefing by the parties regarding the other counts, the Court denies summary judgment with respect to Counts II, IV, V, VI, and VII. The *Monell* claim, Count III, remains bifurcated. (*See* Dkt. 77.)

### CONCLUSION

Drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could conclude that Defendants did not have probable cause to detain Plaintiff and that Defendants are not entitled to a defense of qualified immunity. Accordingly, the Court denies Defendants' Motion for Summary Judgment [182] as to Fourth Amendment claim. The Court grants Defendants' Motion as to the *Brady* claim.

_____
Virginia M. Kendall
United States District Judge

Date: March 12, 2020