IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT - LAW DIVISION

OMAR WILLIAMS,

Plaintiff,

vs.                              Case No. 2017 C 5186

CITY OF CHICAGO, COOK

COUNTY, ILLINOIS, CAROL

MARESSO, MARCO GARCIA,

DONALD HILL, and MEGAN

GOLDISH,

Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JUDGE MEGAN GOLDISH

December 13, 2018

2:02 p.m.

311 South Wacker Drive, Suite 2470

Chicago, Illinois

Deanna Amore, CRR, CSR, RPR, 084-003999

EXHIBIT F

APPEARANCES OF COUNSEL

On Behalf of the Plaintiff, OMAR WILLIAMS:

    VITALE, VICKREY, NIRO & GASEY
    MR. PAUL K. VICKREY
    MR. DYLAN M. BROWN
    311 South Wacker Drive
    Suite 2470
    Chicago, Illinois 60606
    (312) 236-0733
    vickrey@wnlaw.com
    dbrown@wnlaw.com

On Behalf of Defendants CITY OF CHICAGO, COOK
COUNTY, ILLINOIS, CAROL MARESSO, MARCO GARCIA:
    RAVITZ & PALLES
    MR. ERIC S. PALLES
    203 North LaSalle Street
    Suite 2100
    Chicago, Illinois 60601
    (312) 558-1689
    epalles@ravitzpalles.com

On Behalf of Defendants DONALD HILL and
MEGAN GOLDISH:
    O'CONNOR & BATTLE
    MR. KENNETH M. BATTLE
    MS. JESSICA GOMEZ-FEIE
    20 North Clark Street
    16th Floor
    Chicago, Illinois 60601
    (312) 786-4600
    kbattle@mokblaw.com
    jgf@mokblaw.com

    * * * * *

---

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | 9.2.2011 Chicago Police Department Case Supplementary Report | 48 |
| Exhibit 9 | 8.14.11 General Progress Report | 48 |
| Exhibit 10 | 9.16.2011 Case Supplementary Report | 53 |
| Exhibit 11 | 9.28.2011 Statement of Andre Gladney | 56 |

(Exhibits 1 and 2 were not marked during the deposition.)

---

I N D E X

| WITNESS | EXAMINATION | |
|---|---|---|
| JUDGE MEGAN GOLDISH | | |
| EXAMINATION BY MR. VICKREY | | 5 |
| EXAMINATION BY MR. PALLES | | 75 |
| EXAMINATION BY MR. BATTLE | | 93 |
| FURTHER EXAMINATION BY MR. VICKREY | | 103 |
| FURTHER EXAMINATION BY MR. PALLES | | 106 |
| FURTHER EXAMINATION BY MR. BATTLE | | 107 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 3 | Probable Cause Statement for Judicial Determination | 6 |
| Exhibit 4 | Chicago Police Department Case Supplemental Report | 9 |
| Exhibit 5 | 8.9.2011 General Progress Report | 15 |
| Exhibit 6 | Case Supplementary Report | 19 |
| Exhibit 7 | Chicago Police Arrest Report for Andre Gladney | 35 |

---

(Whereupon, the witness was duly sworn.)

MR. VICKREY: Please state your name.

THE WITNESS: Megan Goldish.

JUDGE MEGAN GOLDISH, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. VICKREY:

Q. Where did you work in September of 2011?

A. Cook County State's Attorney's Office.

Q. What was your title?

A. I was a trial supervisor in the felony review unit.

Q. What was your first involvement in the investigation of the murder of a Javonne Oliphant?

MR. BATTLE: Objection. Vague.

Do you understand the question?

THE WITNESS: I don't. I wasn't part of an investigation.

BY MR. VICKREY:

Q. Okay. What was your role?

A. I was the felony review assistant who was called out to Area 4 to speak to a witness.

Veritext Legal Solutions

www.veritext.com      888-391-3376

EXHIBIT F

Page 26

the second paragraph, it's about the interview of Andre Gladney. The detectives wrote what Gladney said he observed; correct?

A. Okay.

Q. Is that right?

A. Yes.

Q. And at no time do they say that Gladney observed the murder of Oliphant; correct?

MR. BATTLE: Objection. Asked and answered. She's answered this question before.

Go ahead.

THE WITNESS: No.

BY MR. VICKREY:

Q. Okay. Now, according to the case supp report -- well, let's go back to what you remember about the late night of September 27 and 28.

Approximately how long did you spend looking at the reports, the available reports?

A. You know, I don't know. I'm estimating maybe an hour.

Q. Okay. So you may have started your own interview of Mr. Gladney at about 12:30, 12:40?

A. I don't know.

Q. Do you recall?

Page 27

A. I recall viewing the video, and I don't recall if I reviewed the video before I went and talked to him or after I went and talked to him. So that's why I don't know. So it's roughly -- roughly after an hour is the best I can give you in terms of time.

Q. And then at approximately 4:00 o'clock in the morning, you stopped the interview and went south; correct?

A. I don't know if I was mid-interview, and they stopped an interview or if I was doing something else. That's what I'm saying. I don't know if I was doing a video or not, and then at some point I left the area with ASA Gleason and the detective.

Q. So there were actually two different periods you were interviewing Mr. Gladney; correct?

A. Yes.

Q. And can you tell me approximately how long? Was it three hours -- the first portion was?

A. I'm sorry. I don't remember. I remember coming out there, reviewing reports. As I said, I don't remember if I viewed the video before or after I spoke with him, going in and speaking with

Page 28

him and then at some point leaving the area with the detectives.

Q. When you interviewed witnesses back in 2011, did you ever take notes?

MR. BATTLE: Objection to the extent it calls for an incomplete hypothetical and other matters you're talking about.

Go ahead. You can answer his question.

THE WITNESS: Rarely, if ever. I don't think so.

BY MR. VICKREY:

Q. Why did you stop the interview of Mr. Gladney at approximately 4:00 in the morning on the 28th?

A. I don't know if that's when I stopped it. It may have already been done, and I may have gone out and reviewed the video. That's what I don't recall, if I viewed it before I went in and talked to him or if it was after.

Q. Why did you need to re-interview Mr. Gladney after going out and speaking to Mr. Williams?

A. Because I wanted to document the conversation that we had earlier, and he agreed to

Page 29

have me memorialize it in a handwritten form.

Q. Why didn't you just write it out at the first portion of the interview? Why did you have to stop the interview and go out and talk to Mr. Williams?

A. He had indicated that Mr. Williams was an eyewitness. So I wanted to go out and see what it was that Mr. Williams saw.

Q. And when you went out and talk to Mr. Williams, did you show him the video?

A. I didn't.

Q. Did anybody?

A. The detectives, I think, did. I think the detectives did.

Q. So they brought a laptop out there?

A. I don't recall how they showed it to him. They showed it to him. I just -- I'm sorry. I don't recall how they showed it to him.

Q. And you made no notes of the interview with Mr. Williams?

A. Correct.

Q. Did you wake him up?

It was 4:00 in the morning.

A. No.

8 (Pages 26 - 29)

EXHIBIT F

September 28 of 2011; correct?

A. Correct.

Q. How many of these have you done in your lifetime?

A. Reviews?

Q. Yes.

A. Hundreds. If you count property crimes over the phone, maybe thousands, at least in the high hundreds.

Q. With respect to your time as a third chair, second chair, first chair, how many criminal trials have you had prior to September 28, 2011?

A. In misdemeanor court, I was there for two years and probably doing one, if not two, trials a day for two years.

And as the third chair you do all the trials that are non-murders. So I was probably doing a trial a day as a second chair.

In terms of bench trials, I have probably done hundreds, if not thousands, of bench trials.

For juries I've done roughly 80 felony jurors and roughly 11 misdemeanor juries.

The majority of the bench trials I did as a first chair were murder trials. I have tried and

litigated thousands of motions, motions to suppress, motions to quash, proof of other crimes.

Q. I just wanted to know about your trial experience.

MR. BATTLE: We don't have any further questions.

MR. VICKREY: I have a couple.

FURTHER EXAMINATION

BY MR. VICKREY:

Q. How many times were you brought in to review a potential murder charge that you declined to prosecute?

A. At least -- I would estimate at least 10. There may have been more. It may have been less but approximately 10.

Q. Okay. And what was it about those cases that made you decide not to bring charges?

MR. BATTLE: I am just going to object to the extent of the broadness of the question in terms of relevance.

MR. VICKREY: That's fair. I am going to withdraw that.

BY MR. VICKREY:

Q. You mentioned that you knew Gladney had a

criminal history; correct?

A. Correct.

Q. And you knew, did you not, that his possession of that Ruger could result in a felony charge; correct?

A. The Ruger that was recovered?

Q. Correct.

A. Sure it could.

Q. It could result in a UUW, unlawful use of a weapon?

A. In this case it probably would have been a UUW felon.

Q. Felon. Okay.

So he was facing potential felony charges if, in fact, he was prosecuted for owning that weapon?

A. Correct.

Q. You said that the video shows Omar Williams shooting Oliphant, and, again, looking at the video, did you have personal knowledge that, yeah, that's Omar Williams based on --

A. No, no.

Q. And, in fact, you were told in the reports

that Omar Williams had dreadlocks?

A. If that's what the report said.

Q. But you didn't have dreadlocks in the photo that you attached to the statement; correct?

A. Right.

Q. And the video you saw, it was annotated; correct? It had writing?

MR. BATTLE: Objection. Vague.

BY MR. VICKREY:

Q. For example, one part says "Shooter arrives in van"?

A. I don't recall that.

Q. You don't recall any annotation along with the video?

A. No.

The only time I've seen that is during the trial maybe, the state's attorneys who are trying a trial may have put that.

Q. Were you at the trial?

A. No.

Q. Oh, you mean, like, in another case?

A. Right.

Q. But in the video you saw of the shooting, you didn't see somebody that actually annotated

EXHIBIT F

that?

A. No. There would have been a timestamp, if I recall correctly, but I don't remember any words like "Shooter arrives" or figures like that.

Q. Are you certain that you saw the video?

A. Yes.

Q. And you saw no annotation?

A. No.

MR. VICKREY: That's all I have.

MR. PALLES: I have one question.

FURTHER EXAMINATION

BY MR. PALLES:

Q. I can't let the dreadlocks go. As you're sitting here today, do you remember whether or not Wooga had dreadlocks?

A. No.

Q. Okay. May I ask you would reviewing the picture attached to Gladney's statement refresh your recollection as to whether or not it was Wooga who had dreadlocks?

A. No. Those were -- he knew these guys. He had known them since he was a kid. These were pictures attached, and he's showing me that's who this person is, that's who this person is.

MR. PALLES: Okay. Okay. Thanks.

FURTHER EXAMINATION

BY MR. BATTLE:

Q. I am going to show you what's been marked for identification as Plaintiff's Exhibit 11. This is the handwritten statement that you took; correct?

A. Correct.

Q. I am going to direct your attention to -- give me a second to get the page number -- I just want to direct your attention really quick to Exhibit 11. At the very top it says page 5 of 17.

It indicates, at the beginning of the first full paragraph, "Arky is a relative of Sharky's and Andre also knows him as Omar." Do you see that?

A. Yes.

Q. It continues to say "Andre also knew him as Omar Akbar"; correct?

A. Correct.

Q. It continues and says "Andre now knows Arky's real name to be Omar Williams"?

A. Correct.

Q. "And identified him as the guy in

Exhibit E." Correct?

A. Correct.

Q. So when you're doing this statement, when you're taking a statement from Andre Gladney, you show him the person pictured in Exhibit E, and he told you that's the guy that shot me in the back and shot and killed Oliphant?

A. Correct.

MR. BATTLE: Nothing else. Anybody?

MR. VICKREY: Nope.

MR. BATTLE: Show signature reserved.

(The proceedings concluded at 4:31 p.m.)

C E R T I F I C A T E

I, DEANNA AMORE, a Shorthand Reporter and notary public, within and for the State of Illinois, County of DuPage, do hereby certify:

That JUDGE MEGAN GOLDISH, the witness whose examination is hereinbefore set forth, was first duly sworn by me and that this transcript of said testimony is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this the 31st day of December 2018.

Deanna M. Amore, CSR, RPR

28 (Pages 106 - 109)

EXHIBIT F