IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OMAR WILLIAMS,                          )  Docket No. 17 C 05186
                                        )
                    Plaintiff,          )  Chicago, Illinois
                                        )  April 13, 2021
              v.                        )  9:15 a.m.
                                        )
CITY OF CHICAGO, MARCO GARCIA           )
and DONALD HILL,                        )
                                        )
                    Defendants.         )


TESTIMONY OF MEGAN GOLDISH AND TONI GIANCOLA
EXCERPT TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE VIRGINIA M. KENDALL, and a Jury

APPEARANCES:


For the Plaintiff:      VITALE VICKREY NIRO SOLON
                          & GASEY LLP by
                        MR. PAUL K. VICKREY
                        MR. DYLAN MICHAEL BROWN
                        MS. GRETCHEN LYNNE SCHMIDT
                        MR. PATRICK F. SOLON
                        311 South Wacker Drive, Suite 2470
                        Chicago, Illinois  60606

For the Defendants:     DALEY MOHAN GROBLE PC by
                        MR. ERIC S. PALLES
                        MR. GARY JAY RAVITZ
                        MS. KATHRYN DOI
                        MR. TYLER EASON ROLAND
                        55 West Monroe Street, Suite 1600
                        Chicago, Illinois  60603

(NOTE:  This is an excerpt of proceedings.  Page numbering will
not correspond to any complete trial transcript that may be
prepared.)

Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                        Official Court Reporter
                        219 S. Dearborn Street, Room 2504
                        Chicago, IL 60604
                        312.435.6047
                        gayle_mcguigan@ilnd.uscourts.gov

I N D E X

WITNESS                                          PAGE

MEGAN GOLDISH
      Direct By Mr. Vickrey ..................... 13
      Cross By Mr. Palles ........................ 38
      Redirect By Mr. Vickrey .................... 73

TONI GIANCOLA
      Direct By Mr. Roland ...................... 99
      Cross By Mr. Vickrey ...................... 126
      Redirect By Mr. Roland .................... 137
      Recross By Mr. Vickrey .................... 143
      Further Redirect By Mr. Roland ........... 144

(In open court outside the presence of the jury.)

THE CLERK: 17 C 5186, Williams versus City of Chicago.

MR. VICKREY: Good morning, your Honor. Paul Vickrey, Dylan Brown, Gretchen Schmidt for the plaintiff.

THE COURT: Good morning, everyone.

And good morning, Mr. and Mrs. Williams.

THE PLAINTIFF: Good morning.

MR. RAVITZ: Good morning, Judge. Gary Ravitz, Kathryn Doi, Eric Palles, Tyler Roland. Of course, Officer Hill and Sergeant Garcia.

THE COURT: Okay. Good morning, everyone.

Good morning, Sergeant.

Good morning, Detective.

All right. I know you had some things to go over.

So did you at least get the tape recordings situation figured out or not?

MR. RAVITZ: Judge, I do believe so. And so in that regard, I had proposed I guess a stipulation when you instruct the jury about the use of transcripts. Mr. Vickrey has proposed a modification of that. I think that's the one you have with the green pen. But I think -- I -- that's fine. His version is fine. I just think the jury should be told that -- advised that we've collaborated.

MR. VICKREY: Your Honor, my sole modification was we

don't believe that the transcripts should go to the jury with -- in the deliberation, and I think we cited some case law for that proposition in our brief -- bench brief on that.

MR. RAVITZ: If you want to read that to the jury, that's fine with me. I'm not sure we agree to it, but if you want to read it for purposes of stipulation --

THE COURT: Well, I do think what needs to be given to the jury is this instruction now, which I will give in the jury instructions as well, which is that the tape recordings themselves are the evidence and not the transcripts; that the defense provided you with transcripts that they believe reflect what the tape recordings show. Plaintiff disagrees with those transcripts. And the transcripts are not evidence. They are solely given to you as an aid to understanding the tape recordings.

That's what they should know right now.

We can discuss whether transcripts go back at a later time; but, right now, that's what they should know.

MR. RAVITZ: Judge, the proposal we are submitting regarding -- Emily's testimony yesterday I think clarifies that when she said she produced those transcripts, the transcripts the jury will actually be given are agreed transcripts, that we're in the process of our discussions with plaintiff's counsel yesterday afternoon. So I think, in fairness, the jury should be told that at this point the tapes are -- the tape

exhibits are joint, and the transcripts are agreed, because right now they're labeled as -- she prepared them as defense exhibits and defense transcripts, so --

THE COURT: All right. Do you disagree with what is in the transcripts, Mr. Vickrey?

MR. VICKREY: No, your Honor.

THE COURT: Oh, okay. Well, in that case, then they can -- I mean, they can be called agreed transcripts that are given as an aid for your understanding.

MR. RAVITZ: Thank you.

THE COURT: All right.

What else can I help you with this morning?

MR. VICKREY: Your Honor, a couple of brief things.

First of all, we request permission to lead during Judge Goldish's examination under FRE 611(c)(2) regarding a witness identified with an adverse party.

Ms. Goldish was a co-defendant. She worked closely with the defendants on a key issue in the case, which is the probable cause investigation. And she also worked in the past, you'll hear, with Detective Garcia -- or now Sergeant Garcia.

And just relying on *Ellis v. Chicago*, Seventh Circuit opinion, re -- not reversing, but criticizing Judge Julius Hoffman for not allowing leading questions in a case. And the Court pointed out that each of the witnesses in question -- they were police officers -- were present during portions of

the incident which gave rise to the lawsuit.  Both officers worked closely with the defendant during the period of their employment.  Thus, they clearly qualified as witnesses identified with an adverse party.

So for that reason, we respectfully request permission to lead.

THE COURT:  Okay.  Any objection?

MR. PALLES:  Yes, your Honor.

THE COURT:  Basis?

MR. PALLES:  The basis is that she's not an adverse party.  I mean, she's a, first of all, now a jurist, but, before that, a Cook County state's attorney.  It has nothing to do with the Chicago Police Department.

THE COURT:  All right.  I disagree in the sense -- I mean, she's not an adverse party, but she is someone who worked closely with the police officers at the time.

So I will permit some leading at the critical stages of her testimony.

So one of the things that people tend to do is they lead everything, and that's not appropriate.  Her background, her -- you know, she's not going to fight you on the basics of what -- you know, when she started investigating or things like that.

But when you get to the point where you find it to be critical, the critical matters where you're concerned, then you

direct -- then you can lead.

MR. VICKREY: Thank you, your Honor.

And then a couple of housekeeping matters.

We, even though the entirety of the exhibit was published to the jury, we did formally move for the admission of PX42.

THE COURT: Which one was it?

MR. VICKREY: That was the monitoring records for Keith Slugg.

THE COURT: Okay. Did you have any objection to that, folks? The monitoring --

MR. PALLES: No.

THE COURT: Okay. Then I'll move that into evidence.

MR. VICKREY: Third, we learned this morning -- we did work on a stipulation last night on the toxicology issues.

We understand from defense counsel -- and maybe they can confirm that -- that they have no objection now to the report itself being admitted.

MR. PALLES: No. That's not quite true, your Honor. Here's the situation.

THE COURT: It's so funny how you always think that you have an agreement or not, and I don't --

MR. PALLES: Well, let me tell you --

THE COURT: If this were a marriage, I think we would be in trouble, you know.

(Laughter.)

MR. PALLES: I think we have an agreement -- well, maybe slightly different.

Judge, here's the situation. We don't believe that the tox. report should go in because it gives an aura of trustworthiness to that test that we don't believe is involved.

As we negotiated the substance of the stipulation, it became obvious to me that you reading a stipulation would carry more authority than the actual admission of that toxicology report.

So I object to the admission of the toxicology report; but I am telling you that if the choice is between a stipulation and the admission of that document, we prefer the admission of that document.

THE COURT: Well, I don't read the stipulations.

MR. PALLES: Well, okay.

THE COURT: I mean --

MR. PALLES: I don't think that -- let me say this: The stipulation in its current form is somewhat incomplete, okay?

THE COURT: Well, why don't we just hold off on that and let you work on that a little bit.

Remember, my concern about the report --

MR. PALLES: Judge, I'm sorry, I was consulting with my other better half --

THE COURT: Esteemed colleague, Mr. Ravitz.

MR. PALLES: My colleague.

I'll waive the objection to the toxicology report.

THE COURT: Okay. Well, there you go.

MR. VICKREY: Finally, your Honor, we formally request the ability to read the Gladney criminal trial testimony and close our case after Judge Goldish.

THE COURT: Okay. Well, I haven't heard anything yet from the marshals about finding him, so -- he apparently was not where he is supposed to be as far as the residence that was given on probation because -- you didn't hear anything, did you, Lynn?

THE CLERK: I didn't, your Honor, no.

THE COURT: So I will -- so what is your position about reading in the testimony?

MR. RAVITZ: Judge, still -- you know, we moved *in limine* to exclude that testimony on two grounds: One, Mr. Gladney's availability; but also we made objection under 804(b) that it didn't satisfy that hearsay objection because the state's attorney in the case was not really our predecessor in interest. We briefed that issue. And that's still out there, too.

So even if you -- even if you decide that Gladney is unavailable later this morning, there's still that issue before what would be hearsay, meets that -- can be admitted under that

exception.

THE COURT: Well, I think it's a very complicated issue and one that we should argue and get to the bottom of.

So in the interest of preserving your position, I think what would be best is to say that you conditionally rest, and then maybe we'll take a longer lunch break and discuss that so that we do it the right way.

I was reviewing the case law last night, and I just want to make sure that we make all of the correct findings on the record for what comes in and what doesn't.

MS. DOI: And just for scheduling purposes, Ms. Giancola is ready to testify. She'll be here at 10:30.

THE COURT: Okay.

MS. DOI: So if -- if plaintiff conditionally rests, we would ask to call Giancola in our case-in-chief.

THE COURT: Okay.

MS. DOI: Just so that there's a consistency.

MR. VICKREY: What's the number of the tox. report? The number?

MR. BROWN: 2.

MR. VICKREY: The toxicology report is Plaintiff's Exhibit 2.

THE COURT: Okay. All right. That will be admitted now, since they have withdrawn their objection.

Okay. Can we bring my jury in?

MR. VICKREY:  Yes, please.

THE COURT:  All right, everyone.  All set?

(Pause in proceedings.)

THE COURT:  So are we starting with some defense statements then before -- when the jury comes out?  What are we going to be doing?

MR. PALLES:  Megan Goldish.

THE COURT:  Oh, we are.  Okay.

So go ahead and get her.

(Pause in proceedings.)

MR. BROWN:  Your Honor, would you prefer Ms. Goldish to sit before the jury --

THE COURT:  That's right.  That's fine.

MR. BROWN:  Okay, good.

(Witness enters the courtroom.)

THE COURT:  I'll swear you in.

(Witness duly sworn and takes the stand.)

THE COURT:  There's a little white sleeve there.  You just put it over the microphone.  And when you're done testifying, you'll throw it in the garbage.  Okay?

Thank you.

Are we all set?

THE CLERK:  They're lining up.

I wanted to remind the parties that I'm taking the jury down at the 12:30 break for lunch.

THE COURT: All right. Just so the parties know, the jury has COVID testing at 12:30 today at lunchtime, so don't go down there at the same time, okay?

THE CLERK: They're lining up.

THE COURT: You can take your mask off for testimony.

That was the universal take your mask off --

(Laughter.)

COURT SECURITY OFFICER: All rise.

(Jury in at 9:54 a.m.)

THE COURT: Good morning, everyone.

Thank you for coming back. You all may be seated now. Get comfortable. I hope that you had a nice evening.

And did anybody have anything to report to me about seeing, hearing anything on the news? Internet? No chitchat?

Great.

You look like you have like the Knights of the Round Table in the jury room when I came in the other day to tell you to go home. Not exactly as pretty as a round table, but nice and separated.

(Laughter.)

THE COURT: We are going to pick up again with the defense case right now.

And this is Ms. Goldish. I've already sworn her in.

So, Mr. Vickrey, you may proceed.

MR. PALLES: Your Honor, I'm sorry, it's still part of

Goldish - Direct by Vickrey

the plaintiff's case.

THE COURT: Did I -- didn't I say that?

MR. PALLES: Defendants'.

THE COURT: Oh, I'm so sorry. That was a complete mistake on my part.

He's standing right there. He's the plaintiff's attorney. It's part of the plaintiff's case. Excuse me for that mistake. I didn't even hear it come out.

Thank you for the correction.

MEGAN GOLDISH, PLAINTIFF'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. VICKREY:

Q   Good morning.

A   Good morning.

Q   Please state your name.

A   Megan Goldish.

Q   Are you a judge today?

A   I am.

Q   And prior to that, you worked at the State's Attorney's Office?

A   Yes.

Q   Were you originally a named defendant in the case?

A   Yes.

Q   Along with the Cook County State's Attorney's Office?

A   Yes.

Goldish - Direct by Vickrey

Q   Did you give a deposition in the case?

A   I did.

Q   December of 2018?

A   Yes.

Q   And during that deposition, did you testify about your very first involvement in the Oliphant homicide investigation?

A   I was not involved in the investigation.

Q   Okay.  Did you tell us in your deposition the very first time you came in contact with the defendant detectives about the Oliphant case?

A   Yes.

Q   And that was roughly midnight on September 27?

A   Of 2011.

Q   Yes.

A   Yes.

Q   Did you also testify in your deposition about what Detectives Hill and Garcia told you before you even met Andre Gladney?

A   To some extent, yes.

Q   And in March of 2019, did we, the plaintiff, agree to voluntarily dismiss you and the Cook County State's Attorney's Office from the case?

A   Yes.

Q   That's roughly over two years ago?

A   Yes.

Q   Now, before we get to the Oliphant homicide, how many different felony reviews did you work on while you were an assistant state's attorney?

A   Total?

Q   Yes.

A   It would be in the thousands, if you include property crimes, where someone calls in and speaks to a state's attorney.  In the hundreds if it's violent crimes.

Q   Okay.  And did you prepare for your deposition before testifying in this case?

A   I'm sorry --

Q   Did you prepare for -- before your deposition before you testified?

A   In December of 2018?

Q   Yes.

A   Yes, sir.

Q   You spent at least ten hours?

A   Roughly, yes.

Q   And did you try to use those ten hours to refresh your recollection about what happened?

A   Some of that was spent speaking to my attorney or reviewing things.  I had a pretty strong recollection of this case.

Q   Okay.  You did review documents --

A   Yes.

Q   -- to refresh your recollection, correct?

A    For certain details, sure.

Q    Kindly pull up PX4.  Not agreed.

THE COURT:  Are you connected?

MR. BROWN:  I am, your Honor.

THE COURT:  Let's try this again because it's not doing it.

THE WITNESS:  Do I need to do --

THE COURT:  No, not at all.  Sometimes the first time in the morning it gets persnickety.

THE WITNESS:  It needs coffee.

THE COURT:  I have mine.

All right.  It's not connecting.  Try your cord again.

MR. BROWN:  Okay.

THE COURT:  You know, you all are way too young for this, but when I was young, you used to hit the side of the TV to get the TV to come in.  Not like they would remember --

MR. BROWN:  We're all set, your Honor.  Thank you.

THE COURT:  There you go.

BY MR. VICKREY:

Q    This is the cleared closed report Detectives Garcia and Hill --

A    Yes.

Q    -- submitted on January 28, 2012, correct?

A    That's what it appears to be, yes.

Q    And this was one of the documents you looked at during your

ten-hour deposition preparation, correct?

A   I -- I think so, yes.

Q   And just to be clear, this was a document that was actually submitted four months after you had been involved in this entire situation, right?

A   That's what it appears on the face, that it was submitted in January of 2012.

Q   And just to be clear, this document was not -- was not even around when you worked on this case, correct?

A   Correct.

Q   So you couldn't have seen it back then.

A   Correct.

Q   Now, the report summarizes the interview of Antoine Williams at 4:15 in the morning on September 28, correct?

A   Do you want me to turn to a certain --

Q   Yes.  I mean, do you know?

A   I believe it does.

Q   Okay.  Let's -- why don't we turn to that.

Page 14, please.

A   Okay, yes.

Q   All right.  Now, just to set the stage, at 4:15 in the morning, you, Assistant State's Attorney Gleason, and Detectives Hill and Garcia were in Antoine Williams' bedroom, correct?

A   Yes.

Q    You were standing around his bed, correct?

A    Yes.

Q    And the detectives conducted the interview, correct?

A    Yes.

Q    And it was a short interview, correct?

A    Fairly short, yeah.

Q    And Antoine ended it, correct?

A    Yes.

Q    And the -- if we go to the next page, please -- stop.

The cleared closed report states, does it not, that Antoine said that Omar drove him to the lot that night, correct?

And I can help you out.  If you look --

A    Yes, it does.

Q    Yeah.

It says, "Antoine related Omar drove him their." Correct?

A    Correct.

Q    Scroll up a little bit, please.  Stop.  Keep going.  Up. No, no, you're going the wrong way.  Stop.

And the report indicates, does it not, that the detectives confronted Antoine with the video surveillance footage?

A    Yes.

Q    And you have a very specific recollection of the -- the

detectives showing Antoine the video, correct?

A   I recall they showed him the video.  I don't recall how they showed it to him, but I recall they showed it to him.

Q   But you have a very specific recollection of the defendants showing him the video, correct?

A   Yes.  I just -- I recall the detectives showing him the video; but, again, I don't recall how they did it.

Q   Just to be clear, you have a very specific recollection of that happening.

MR. PALLES:  Objection.  Asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A   Yeah -- yes, I -- they showed him the video.

BY MR. VICKREY:

Q   Now, prior -- wait.

Did the detectives ask Antoine who else drove the van in July?

A   I don't -- I don't recall.

Q   Well, looking at this document, does it refresh your recollection that at least the interview summary reflects no such questions?

A   Agreed, yes.

Q   Okay.  Now, on -- you got to the station at 3151 West Harrison at roughly midnight on the 27th, correct?

A   Of September, yes.

Q    And prior to arriving on the scene that night, you knew nothing about the Oliphant homicide investigation, correct?

A    Correct.

Q    And when you got there, the defendants Hill and Garcia briefed you, correct?

A    Yes.

Q    And they had told you that someone from the Illinois State Police Lab had matched one of the 19 casings found at the scene to a gun found with Carnell Jones, correct?

A    Just so I'm clear -- right when I got there?  I don't believe so.  But at some point when I was there, I was informed of that.

Q    Okay.  And they also told you that Carnell Jones had allegedly told them that he had heard on the street that Omar had killed Oliphant, correct?

A    Yes.

Q    And they also told you that they had presented that same evidence to ASA Cathy Lanahan the night before?

A    I don't know if they told me that or if I knew that somehow; but, yes, I knew that.

Q    And you recall that Assistant State's Attorney Lanahan told them that they needed to re-interview Gladney?

A    I -- I -- I remember that that was a suggestion, yes.

Q    Okay.  And when you arrived, they told you about their re-interview of Gladney, correct?

A    Yes.

Q    In fact, they had picked him up -- just so the chronology is correct, they picked him up at noon on the 27th?

MR. PALLES:  Objection.  Lack of foundation.

THE COURT:  I'm not so sure about that.  Overruled.

BY THE WITNESS:

A    I know that their paperwork said that, but I don't have any personal knowledge --

BY MR. VICKREY:

Q    Okay.  You weren't there, but you -- they didn't tell you that they picked him up at noon?

A    No.

Q    Okay.  But in any event, from however long they -- from when they picked him up until midnight, you don't know what happened in terms of the Hill and Garcia questioning of Gladney that day.

A    Correct.

Q    But they told you about it.  They summarized it.

A    Yes.

Q    And they summarized their questioning of Gladney to you, correct?

A    Yes.

Q    And Detectives Hill and Garcia told you that their interview of Gladney on September 27 matched what Gladney told them on August 9, correct?

A   Correct.

Q   And what they told you -- they also said that what they told you was consistent with the handwritten statement that you prepared and that Gladney signed at 5:40 a.m. on the 28th, correct?

A   I'm sorry, can you clarify?  I don't understand.

Q   Let me try it again.  It was a little garbled.

What they told you about their interview --

A   Okay.

Q   -- of Gladney was consistent with the facts that you put in your handwritten statement that Gladney signed at 5:40 in the morning, correct?

A   Yes, but I don't know if he signed it at 5:40 or if I started the statement at 5:40.

Q   Okay, fair enough.  Whatever time he actually signed it, what they told you before about their interview of Gladney on the 27th was consistent with the facts that showed up in your handwritten statement, correct?

A   Correct.  Correct, yes.

Q   Okay.  Now, before interviewing a witness, you check on the witness's criminal history, correct?

A   Usually.

Q   And you did that before meeting with Gladney?

A   I believe I did.

Q   Okay.  You knew of Gladney's criminal history, correct?

A     I knew he had a criminal history, yes.

Q     And if he were charged for owning the Ruger found at the scene, that would have been a felony, correct?

A     Correct.

Q     Let's go to Plaintiff's Exhibit 11 now in evidence. Agreed.

        This is the handwritten statement that you prepared?

A     It appears to be, yes.

Q     I'm sorry?

A     Yes.

Q     And you and Andre Gladney and Detective Garcia all signed each page?

A     Yes.

Q     And Detective Garcia was present for your -- when this was being prepared, correct?

A     While I was speaking to Gladney, was Detective Garcia present?

Q     Yes.

A     Yes.

Q     Okay.  Now, in this statement, Gladney identified the motive for the shootings, correct?

A     Yes.

Q     And that was the prior murder of Napoleon Gilmore, correct?

A     Correct.

Q     And if we turn to page 5, go to the bottom.

There's where you started writing about the -- Napoleon Gilmore, right?

A   Yes.

Q   And keep going.

And you go on to write that this was a big source of friction between Omar Williams and Gladney, correct?

A   That Andre was friends with the person who was arrested for the murder of Napoleon Gilmore, yes.

Q   And Andre used to say things to Omar like F you and PO -- keep going.

A   Correct.

Q   But he never had any physical fights with Omar, Sharky, or Wooga before July of 2011?

A   That's what he told me, yes.

Q   The handwritten statement also has Andre Gladney as witnessing Omar Williams shoot Oliphant, correct?

A   Correct.

Q   In addition to seeing Omar Williams shoot him in the back, correct?

A   I don't know if he says he saw him shoot him in the back, but he does say he saw him shoot him.

Q   Okay.

A   Andre saw Omar shoot him.

Q   All right.  Now, departing from the statement for just a second, you saw the surveillance video, correct?

A    Yes.

Q    And you couldn't identify Omar Williams as being present in the video, correct?

A    I could identify somebody who I was told that's Omar Williams.

Q    Okay.  But you -- you saw a photo -- in the course of your roughly 10 1/2 hours involved in this case, you did see photos of Omar Williams, correct?

A    I have the photos that are attached to the handwritten statement --

Q    So that's a yes?

A    -- that Andre identified as Omar.

Q    Okay.  But assuming then that was Omar Williams, you knew what he looked like, correct?

A    Yes.

Q    And looking at the surveillance videos, you couldn't identify Omar Williams in those videos, correct?

A    I personally could not, no.

Q    Okay.  And -- but your review of the videos led you to believe that two people were acting in concert, correct?

A    Correct.

Q    Not three.

A    My view of the video showed to me two.

Q    Two.  Two people acting in concert.

A    According to the video, yes.

Q   Now, you never showed the video to Gladney, correct?

A   Correct.

Q   Now, before you interviewed Gladney, were you told or did you read that Kenneth McNeal had identified Omar Williams as being on the scene?

A   You know, I know he put some people out there.  I -- and upon further review, I don't think he put Omar out on the scene.

Q   Okay.  Kindly pull up the deposition.  Page 45.

        MR. BROWN:  For publication, Paul?

        MR. VICKREY:  Yes, please.

        MR. BROWN:  If you don't mind, your Honor, please.

        Thank you.

BY MR. VICKREY:

Q   Going to line 22, kindly read that, and then we'll go to the next page.

A   Right.  That's what I was saying.  Upon further review.

        "Mr. McNeal -- is it your testimony that Mr. McNeal identified Omar Williams as being present at the scene?"

        And I said:  "Yes."

        "You said how -- who told you that?"

        And I answered:  "I recall reviewing that in a report. I never spoke to him."

        You showed me a report then.

Q   We'll stop right there.

Is it your testimony that you never spoke to Kenneth McNeal with Detective Hill and Detective Garcia --

A    Correct.

Q    -- on the 27th through the 28th?

A    Correct, I never spoke to him.

Q    Okay.  Now, in Felony Review, there's something called a fact sheet, correct?

A    That might be something that's administrative, that the administrators enter that's called a fact sheet.

Q    Did you ever work on a fact sheet or have access to a fact sheet prepared by ASA Gleason in this case?

A    I probably did at the time.  I haven't seen it since 2011.

Q    Can you explain what a fact sheet is?

A    I want to make sure -- when -- when someone is called on a felony review, they have a felony review folder.  And in the folder, there are sections for identifiers of people who are being interviewed, you know, what date you're interviewing them, what their age is, what their address is.  And then there's a section that says -- that would be a paragraph, a summary of the events.  And that might be what you're talking about the fact sheet, where after -- it usually starts out on above date, time, location, the following occurred.  And that's the state's attorney's summary of what they believe happened after speaking to all the witnesses.

Q    In a case such as this, various assistant state's attorneys

might come into the case at different times for a short period of time or a long period of time, correct?

A   Correct.

Q   And the fact sheet is essentially kind of a running dialogue on what's going on.

A   Sometimes, yeah, sure.

Q   Okay.  Pull up the fact sheet.  Not for publication.

THE COURT:  Hold on a second.  Okay.

MR. BROWN:  Thank you, your Honor.

BY MR. VICKREY:

Q   Is this one of the documents you looked at to prepare?

A   No.

Q   Okay.  This -- you recognize this as a fact sheet for the Omar Williams case.

A   That's what it appears to be, yes.

Q   And it's dated September 28, 2011?

A   Yes.

Q   If we go to the end, the very end, you'll see assigned state's attorney, Richard Gleason?

A   Yes.

Q   And that's the person you were at the station with on -- from midnight of the 27th to roughly 10:30 on the 28th?

A   Yes.

Q   Okay.  Now, if we go to the second page, bottom, we see a witness Kenneth McNeal identified.  Do you see that?

A    I -- yes.  Most of the identifiers are redacted.

Q    And then if we go to the next page, there's nothing actually written about any interview of Kenneth McNeal, correct?

A    Correct.

Q    And if we go to the last page, there's various pieces of evidence identified.  Do you see that?

A    Yes.

Q    And that's consistent with how these case -- I'm sorry, fact sheets are prepared?  You identify witnesses and you identify key evidence?

A    Usually.

Q    And the first piece of evidence is a gun.  The first of the four, correct?

A    It says Number 2 on there, so ...

Q    It --

A    It's out of order, but yes.

Q    It goes 2, 3, 1, 4?

A    Correct.

Q    All right.  The first listed, it's actually 2, but that's the gun that was found at the scene, the Ruger?

A    Correct.

Q    The second is photographs?

A    Photo array.

Q    Yeah.  And then in a description, if one of the witnesses

has seen it, you typically say that, right?

A   This does, yes.

Q   And this shows that the photo array was viewed by victim 2. That's Andre Gladney, correct?

A   I'm assuming that, that -- because victim 1 was deceased.

Q   Okay.  And then the final two of the four, items 1 and 4, are surveillance video, correct?

A   Correct.

Q   And in the descriptors, there's nothing about any witness seeing the video?

A   No.

Q   And when you met with Andre Gladney, you didn't show him the video, correct?

A   Correct.

Q   Now, one of the things that you do when you arrive at the scene -- arrive at the station is, in addition to interviewing the detectives, you look at the reports, correct?

A   Going -- this says case notes August 10th of 2011.

Q   If you look at the first page -- go to the first page. First page is dated 9/28/2011?

A   Okay, yeah, I'm sorry -- I'm not familiar with this. That's all.  I'm sorry.

Q   You can take that down.

One of the things you do, in addition to interviewing the detectives, find out what they know, you look at the

reports, correct?

A    Sure.

Q    The reports that are actually in the file.

A    Whatever they had available for me, I would have reviewed.

Q    And some of those things are called case supp. reports?

A    Yes.

Q    And you saw the case supp. reports of prior interviews, correct?

A    I don't know if I saw case supp. reports or what they call GPRs, handwritten notes of interviews.

Q    Do you remember, sitting here today -- we can -- I'll pull it -- but do you remember seeing the case supp. report of the interview with Jason Jones --

A    I recall seeing something about Jason Jones, yes.

Q    Okay.  You remember that Jason Jones was the security guard who identified the shooter as being dreadlocks, 5' 7", 170 pounds?

A    Yes.

Q    And another -- there were at least two other case supp. reports after that.  Do you remember that?

A    No.

Q    Okay.  We'll help you out.

Let's go to the PX8.  Not for publication.

Okay.  You'll see that this is a case supp. report prepared by Detective Hill?  Do you see that?

A    Yes.

Q    Date submitted, September 22, 2011?

A    Yes.

Q    So that's -- that was -- that would have been available to you back then.

A    Yes.

Q    Not the cleared closed report, that comes later.  This one was in the file.

A    I don't want to misstate what I -- I don't remember specifically what I reviewed.  Whatever they had available to me, I would have reviewed.

Q    Okay.  And if we go to the second page.

        This identifies Omar Williams, correct?

A    Correct.

Q    And the description is 5' 7", 170, black hair, dreadlocks?

A    Correct.

Q    And that's consistent with I think what you just told me about Jason Jones, what he witnessed?

A    You know, I don't remember if he gave a dread -- I think he did do the same description, yes.

Q    Okay.  And if we go to PX6.  Again, not for publication. Go to the front page.

        Okay.  Here's another case supp. report.  It's got the same date, but it has different information.

A    Yes.

Goldish - Direct by Vickrey

Q   Again, dated September 22, 2011, correct?

A   Correct.

Q   So there's another report that theoretically would -- should have been available for you to review, correct?

A   Agreed, yeah.

Q   And if we go to the second page.

Again, we see the description of Omar Williams, correct?

A   Yes.

Q   5' 7", 170, black hair, dreadlocks?

A   Yes.

Q   Just to close the loop on any interviews with Kenneth McNeal on -- that you were -- could have been involved in with Detectives Hill and Garcia, the cleared closed report, PX4 that we looked at before, that you looked at in advance of your deposition -- and, by the way, did you look at it again before coming here to trial?

A   No.

Q   Okay.  And we can pull it up.

Did you see anything in the cleared closed report summarizing an interview of Kenneth McNeal on September 27, September 28?

A   The date of his interview or on the 27th and 28th did I review it?

Q   The date of his interview.  Did you see any summary of an

interview that took place on September 27 or September 28 of Kenneth McNeal?

A    I know there's a summary in there of Kenneth McNeal.  I just -- I don't remember what the date was.  I know that I had reviewed that prior to the deposition.

Q    Okay.  But in the cleared closed report submitted in January -- we can pull it up.  Do you want us to pull it up?

A    Please.

Q    Okay.  PX4.

MR. BROWN:  It's up.

BY MR. VICKREY:

Q    Let's scroll through it.  Go to when the interviews start. Keep going.

Okay, now start.  Stop right there.  Go back to 11.

There's an interview of Carnell Jones, correct?

A    Correct.

Q    And this is something that the detectives told you about because you -- I mean, you weren't there.

A    Correct.

Q    Okay.  Keep going.

There's Jason Jones.

A    Yes.

Q    Okay.  Keep going.  Keep going.

There's something about Gladney.  And it's one sentence about what happened in the prior -- in the interview

that happened.  Do you see that?  In the middle of the page?

A    Yes.

Q    And then Antoine Williams.  Do you see that?

A    Yes.

Q    Keep going.  Keep going.

Andre Gladney, correct?

A    Yes.

Q    Keep going.  Keep going.  Go to the --

Jarvaris Oliphant?

A    Yes.

Q    And -- okay, stop.  Go back to the fact sheet.

Before we do that, does our review of PX4 refresh your recollection that there was nothing in there about Kenneth McNeal?

A    I didn't see anything in there in that exhibit you just showed me about Kenneth McNeal.

Q    Okay.  And then going back to the fact sheet, page 3, there's a reference to Jarvaris Oliphant as a witness.  Do you see that?

A    Yes.

Q    Now, is there anything written in there about a summary of interview?

A    No.

Q    Okay.  Take it down.

Now, going back to Gladney, did Detectives Hill or

Garcia ever tell you that Gladney owned the Ruger P345 found at the scene?

A    No.

Q    And going back to Plaintiff's Exhibit 11, and let's publish, please.  Page 11 -- I'm sorry, at page 7.  Okay, here we go.  Keep going, keep going.

In the statement you wrote Gladney is saying that he didn't have a gun, correct?

A    Correct.

Q    And we see right there, "Andre did not have any weapons."

Were you ever told that there was a federal warrant out for Gladney's arrest?

A    No.

Q    During your entire career as a state's attorney, you never allowed a witness to leave and not be arrested if you knew there was a warrant out for his or her arrest, correct?

A    Correct.

Q    Did the detectives tell you that Gladney was high on PCP that night?

A    No.

Q    But you asked whether Gladney had been drinking or using, correct?

A    Correct.

Q    And you do that because that can reflect on the reliability of a witness, correct?

A    Sure, yes.

Q    All right.  And, in fact, in the statement you wrote, Gladney was saying that he wasn't high, correct?

A    Correct.

Q    If we go -- scroll down a little bit.  Stop.

     "Andre had drank a small cup of Grey Goose and lime juice."

     "Andre was not drunk."

     Right?

A    Correct.

Q    Now, Andre Gladney also told you that Antoine sold heroin, guns, and cocaine out of the van, correct?

A    Correct.

Q    And you put that in the statement.

A    I did.

Q    Now, were Omar Williams' fingerprints found on any evidence linked to the crime?

A    At the time I was reviewing, no.  I don't know about after.

Q    And was Omar Williams' DNA found on any evidence linked to this crime?

A    Same thing.  At the time I was reviewing, no.  I don't know about afterwards.

Q    You approved the murder charge and the attempt murder charge at 10:21 a.m. on September 28?

A    Correct.

Q   And under Illinois law, that put the case in a mandatory no bail category, correct?

A   At the time, yes.

Q   And that's because murder is an offense where there's a life -- life sentence may be imposed?

A   And because there was a firearm discharged.  I forgot how -- the actual terminology.  It's changed.  But, yes, at the time, it was mandatory no bail.

Q   Murder is mandatory no bail.

A   Correct.

        MR. VICKREY:  That's all I have.  Thank you.

        THE WITNESS:  Sure.

                        CROSS-EXAMINATION

BY MR. PALLES:

Q   Good morning.

        You stated you are currently a judge, correct?

A   Yes.

Q   And where?

A   The Domestic Violence Division.

Q   How long have you been a judge?

A   Since 2014, so over six years.

Q   Okay.  And just so the jury is clear, that would be in the Circuit Court of Cook County, correct?

A   Yes.

Q   Okay.  Well, now, Judge Goldish, you know there's only one

presiding judge in the court, and she sits to your right.

A   Yes.

Q   So if I refer to you as Ms. Goldish, you won't take it as a sign of disrespect?

A   Absolutely not.

Q   Okay.  Thank you very much.

Okay.  Tell us, where did you go to law school?

A   Northwestern University School of Law, now Northwestern University Pritzker School of Law.

Q   Okay.  And after attending law school, where did you begin working?

A   I worked for -- originally, I had done a study abroad in Cambridge University in England.  I worked for a professor for a short period of time.  And then I came back and worked at the State's Attorney's Office in the Appellate Division.

Q   When did you begin working --

A   August 18th, 1997.

Q   Okay.  And after you were in the Appeals Division of the State's Attorney's Office, where did you go?

A   I then was a misdemeanor assistant in the Domestic Violence Division.

Q   Let me ask you about domestic violence a little bit, if you don't mind.

In the case -- dealing with victims of domestic violence would you agree requires some sensitivity?

A    Yes.

Q    Often victims are reluctant to talk.  Am I correct?

A    Yes.

Q    So over the period of time that you worked in Domestic Violence, did you learn how to deal with the witnesses in order to obtain information from them?

A    I felt that I was able to speak to certain witnesses in a way that they would know that I understood that it was difficult for them to give certain information.

Q    Okay.  Anytime you're dealing with a victim as a prosecutor, though, you know, would you agree that it takes a certain -- you have to develop some trust with the victim?

A    Yes.

Q    Okay.  And that's to get them to tell their story completely.

A    Yes.

Q    Okay.  So, now, what did you do after Domestic Violence?

A    I went into the, what was then the Preliminary Hearings, Homicide/Sex Unit, and I dealt with some child sex cases.  And then I went into the -- I'm sorry, before -- after Domestic, I went to Felony Review for my first time.  Then I went to the Preliminary Hearing, Homicide/Sex Unit.

Q    Okay.  How many times during your career at the State's Attorney's Office were you in the Felony Review Division?

A    So my first time I was a line assistant, and then I was on

as a trial supervisor twice, so three times total.

Q   Okay.  Now, as of September 28th, 2011, you were a felony review supervisor.  Am I correct?

A   Yes.

Q   Okay.  Now, you were asked how many Felony Reviews you did. And as I recall, it was hundreds or thousands.  Am I correct?

A   Yes.  If you count the property, it's definitely thousands.

Q   How about criminal trials?  Did you have an opportunity to try criminal cases?

A   Thousands.

Q   Thousands?

A   Thousands.

Q   Some of those were murders?

A   Especially when I was a felony assistant in a first chair, almost all of my trials would have been murder cases or child sex victim cases.

Q   Tell me a little bit about your -- what professional associations you're affiliated with?

A   I am the current President of the North Suburban Bar Association.  I'm the Vice-President of the Decalogue Society of Lawyers.  I'm in the Women's Bar Association of Illinois, I'm a committee chair.  I am a member of the Illinois State Bar Association.  The Chicago Bar Association.  And LAGBAC, which is the Lesbian Gay Plus Bar Association of Illinois.  And the Hellenic Bar Association.

Q    The what?

A    The Hellenic Bar, the Greek Bar Association.

Q    Gotcha.

So, now, I also understand that you serve as a mock trial judge?

A    Correct.

Q    Can you explain to the jury what a mock trial judge is?

A    Sure.  I am an adjunct -- an adjunct coach at my high school.  And there's a huge mock trial where these kids all act as attorneys, they act as witnesses, they act as experts.  Quite frankly, they're better than a lot of attorneys you've seen, but -- and there's a huge competition.  Thousands of high schools compete to become the state champion.  And a lot of people continue to do that in college.  A lot of people continue to do that in law school.  So it's what it sounds like.  It's a fake trial.  And I served as both a coach and as a judge for that.  I have judged for various law schools as well.

Q    Which law schools have you judge mock trial --

A    I teach over at Northwestern.  I teach at Kent -- every Monday night, I teach at Kent.  And most Tuesdays and sometimes also Wednesdays, I teach at Northwestern.

Q    I understand, too, that you're associated with the Chicago Lighthouse for the Blind; is that true?

A    I am.  I am the head of their junior board.  They have a

legal clinic there, the Kane Legal Clinic.  I believe there would be a conflict if I did anything for the legal clinic, so I assist in obtaining volunteers who assist people who are Blind or visually impaired with filling out -- sometimes it's social security paperwork, sometimes it's just having a conversation with them about landlord/tenant issues.  I don't -- I don't do any of that -- I don't do any legal work for them.

Q    Okay.  And then, finally, I understand that you're involved with something called The Abolition Institute?

A    Correct.

Q    Can you tell me what that is?

A    Sure.  There's -- when I was a state's attorney, I was part of a special -- specialized call, the WINGS call, which dealt with women and transgender individuals who are charged with non-violent offenses, usually prostitution or retail theft. Many of these people had been trafficked.  So it was a program to get mostly women job training, education, and get them out of a dangerous lifestyle.  Through that, I became very close with someone who had founded something called The Abolition Institute, which was originally formed to address -- slavery was legal up until 2007 in the country of Mauritania.  And since then, even though it's not on the books, it's still something that has been somewhat practiced.  And there's a human trafficking issue.  And that's what The Abolition

Institute is designed to address.  It kind of expanded from just the Mauritanian issue into really an international -- they try to address international human trafficking.

Q    Thank you.

Let's get to the night that you came to Area 4, September 27 to 28 of 2011.

Now, as the Felony Review supervisor appearing on that scene, what were your responsibilities?

A    Because I had a line assistant out there with me, some of it would be teaching and kind of walking him through certain steps.  As I recall, he was a senior line assistant, meaning that he had done that before a few times.  And I would go out. I would talk to detectives.  I would review whatever reports they had available to me.  If there was a witness, I would speak to a witness if they wished to speak to me.  If there was an accused who wished to speak to me, I would speak to an accused.  And sometimes I would memorialize their statements or document it in a handwritten form.

Q    Okay.  The assistant who you were mentoring that night was Rich Gleason, correct?

A    Correct.

Q    Just so we're clear on who he is.

A    Correct.

Q    Okay, good.

And would you agree that when you arrived, one of your

responsibilities would have been to determine whether or not a crime was committed and whether or not a particular person had committed it?

A    Yes.

Q    And when I say "determine," actually am I correct that you would determine whether or not there was probable -- you were to determine whether or not there was probable cause to associate a particular individual with the crime?

A    Yes.

Q    Okay.  Now -- so you stated that you spoke with detectives, looked at their reports, reviewed the video.

        Did the video have any annotations on it?

A    No.

Q    Okay.

A    There was a -- like a time stamp or like a clock --

Q    Okay.

A    -- that you would see like on an old-school VCR.

Q    Okay.  Did it appear to you, when you looked at the video, that there were two shooters acting in concert?

A    Yes.

Q    Okay.  And just to go over this, I know you testified about this a little while ago, but you learned that Carnell Jones or Wooga was in custody and that certain guns in his possession had been linked to the scene of the crime, right?

A    Correct.

Q   Okay.  And you were aware that Wooga had said, after denying he was on the scene, he admitted he was on the scene, and he also said that the word on the street was that Arky had shot G Baby, correct?

A   Correct.

Q   Okay.  And, by the way, you remember all these nicknames, correct?

A   I do now, yes.

Q   You do now, okay.

Okay.  So, now, let me ask you this:  You were shown a memoranda from Rich Gleason concerning -- it was described as a fact sheet.  And there was a description of a photo array viewed by V2.

A   Correct.

Q   Okay.  Now, there is evidence in this case that Jason Jones, a CHA official, had viewed the photo array and was unable to make an identification of Carnell Jones.

If that were the case, would you agree that Mr. Gleason was -- had made an error in identifying Mr. Jones as victim 2?

A   I -- I know there was something about a physical lineup --

Q   A physical lineup.

A   -- Jones had viewed.

Q   I see.

A   But I don't -- I think what we're calling fact sheet is

whatever Gleason would have been entering into the system or the secretaries may have entered, but it's under his code, so that's why it says Gleason assigned.

Q   Okay.  Well, anyway, after you had reviewed some information, you went in and spoke with Andre Gladney, correct?

A   Yes.

Q   Okay.  And, now, part of the time the detectives were present and part of the time they were not, correct?

A   There was a very brief period of time where I would -- was alone with Gladney, yes.

Q   Okay.  And the purpose of that was to determine whether or not he had been coerced or threatened by the police officers?

A   Every single -- every single Felony Review case I ever did, I made sure that I was alone with every witness that I spoke to, every accused that I spoke to, so that I could come into court and say definitively under oath I was alone with this person and I asked them how they were treated.  So just like the thousands of other times, I absolutely asked Andre Gladney how he had been treated.

Q   Okay.  Now, there -- you were referred to a description -- several descriptions in some of the case reports that referred to Omar Williams as 5' 7" and wearing dreadlocks.  Do you recall that?

A   Yes.

Q   Okay.  Now, did that description in that report have any

effect on your evaluation of this case?

A   No.

Q   Okay.  And were you aware or are you aware now that Carnell Jones, in fact, had dreadlocks?

A   In the picture, he had dreadlocks.

Q   Okay.  So, now, was Andre Gladney cooperative with you?

A   Yes.

Q   Did he show any signs of visual -- of visible injury?

A   None.

Q   Okay.  Now, would it be fair to say that you used your skills to get information from Andre Gladney?

A   He was really chatty.

Q   Okay.

A   I --

Q   Okay.

A   It was just a conversation.

Q   Okay.  All right.  Now -- and by the way, whatever problems Gladney had with the law, you didn't pick him as the victim in this case, did you?

A   No.

Q   Okay.  And -- but as a victim, he's entitled to the same respect as any other victim, correct?

A   Yeah, that's my job, yes.

Q   Notwithstanding the fact that he may have a criminal record.

A   Correct.

Q   Okay.  Now, here, I'm going to -- I'm going to walk up a hard copy of Plaintiff's Exhibit 11, the Gladney statement, so you can flip through the pages.

A   Okay.

(Document tendered to the witness.)

BY MR. PALLES:

Q   Okay.  So Plaintiff's Exhibit Number 11 is the handwritten statement that you made -- that you took from Andre Gladney, correct?

A   Correct.

Q   All right.  It's in your handwriting, right?

A   Yes.

Q   The statement itself is in your handwriting?

A   My awful handwriting, yes.

(Laughter.)

BY MR. PALLES:

Q   Well, at some point in this statement, I think you got Andre Gladney to agree that he could read your handwriting.

A   He did.  I had him read it out loud to me to make sure that he could read my handwriting.

Q   Okay.  Well, I'm not going to ask you to read it.  I assume if Andre Gladney could read it, the jury can read it.  So leave it at that for now.  I'll probably come back in a moment for a few points.

But on each page of this, at the bottom, you also signed your name, correct?

A    Yes.

Q    As did Andre Gladney?

A    Correct.

Q    As the Detective Garcia?

A    Correct.

Q    Okay.  And any time there was a change to be made, a scratch-out, et cetera, you got Andre Gladney to initial that change, correct?

A    Correct, any addition or correction.

Q    Okay.  And then every time he initialed a change, you and Marco as well --

A    Yes.

Q    -- initialed the change?

A    Detective -- okay, yes.

Q    Detective Garcia.

A    Yes.

Q    Now, one of the things that Gladney told you was that Antoine Williams, Sharky, was an eyewitness, correct?

A    Correct.

Q    Okay.  And is that the reason that you went out to interview Antoine Williams?

A    Yes.

Q    Okay.  And by now it's a little bit after 4:00 in the

morning, correct?

A   Correct.

Q   Okay.  By the way, you didn't -- you did not interview Kenneth McNeal, correct?

A   Correct.

Q   Okay.  And that's because when you -- well, you tell me. Why is it?

A   I -- I asked Andre about him, and I recall that there was a summary where he told the detectives if I did see anything, I wouldn't tell you.

Q   Okay.  In addition to that, he also said that he didn't see the actual shooting, correct?

A   Correct.  And I believe that was corroborated by Andre saying that he had walked away right before the shooting.

Q   Okay.  But did you know from looking at Mr. -- at the summary of Mr. McNeal's interview that he, too, had placed Sharky, Wooga, and Gladney out at the scene?

A   Yes.

Q   Okay.  And, now, when you went over to see Antoine Williams, did he confirm that he was out on the scene?

A   Yes.

Q   Did he confirm that Omar Williams was out on the scene?

A   Yes.

Q   Did he confirm Gladney's version of the events that had G Baby, Javonne Oliphant, kissing Antoine Williams?

A    Yes.

Q    Okay.  At any time, did he mention the name Keith Slugg?

A    No.

Q    Did Gladney ever mention Keith Slugg?

A    No.

Q    Okay.  Can you tell me, do you remember anything else about the Antoine Williams interview?

A    I remember that Andre thought that when Mr. Oliphant kissed Antoine Williams, that it was a sign of disrespect.  And I remember that Antoine Williams took it as a sign of respect.

And in my head, that's something I remember specifically about the case, this Michael Corleone kind of kiss, how they were all describing it differently.

I remember that he referred to himself as a menace, and that he still goes by Sharky because he's earned the name.  He did it all.  He was a soldier.  He was a shooter.  I remember that.  And I remember that his house was very clean.

Q    Okay.  And as I understand it -- please correct me if I'm wrong -- he denied seeing the actual shooting?

A    He ended the interview before we got to the actual shooting portion of the conversation.

Q    Okay.  Okay.  And that's, of course, when you went back to -- after visiting Antoine Williams, you went back to Area 4, correct?

A    Yes, yes.

Q    And that's when you produced Plaintiff's Exhibit Number 11 in conjunction with Andre Gladney, right?

A    Yes.

Q    Now, I'm just going to touch on a few points of this particular statement.  As I said, we can let the jury read it.

Now, do you recall -- and you can flip through the pages if you need to refresh.

Do you recall Gladney telling you that he and G Baby were playing dice with guys named Crack, Flop, and Moochie?

A    Yes.

Q    Okay.

COURT SECURITY OFFICER:  Excuse me, your Honor.  One of the jury members --

THE COURT:  Do you need a break?

JUROR:  Yeah.

THE COURT:  Sure.  I'm sorry.  I didn't notice it.  Let's take a short break, okay?

MR. PALLES:  Thank you, your Honor.

THE COURT:  Thank you for telling me.

COURT SECURITY OFFICER:  All rise.

(Recess at 10:53 a.m., until 10:59 a.m.)

(In open court outside the presence of the jury.)

THE COURT:  Any plaintiffs around?  I just want to give a report.

Judge, you can take a break.  She's not feeling well,

so we're going to take a little bit longer of a break.  Okay?

THE WITNESS:  Okay, no worries.

Should I go back out across the --

THE COURT:  Yes, I think that's fine.  I'm just waiting for plaintiff.

(Pause in proceedings.)

MR. PALLES:  Sounds like you may have some news on Andre Gladney?

THE COURT:  I can tell you, and I'll tell the plaintiff when they come back, that they didn't find him at his house this morning.

MR. PALLES:  Right.

THE WITNESS:  I have the statement.  I'm just going to leave it right --

MR. PALLES:  You know what?  I'm going to have to have you read it.

THE COURT:  Okay.  Thanks, Mr. Vickrey.

I just wanted to report on the status of our juror.

She is starting to feel like visual migraine symptoms, so she needed to take a break.  I gave her an ice pack, offered her Excedrin, which is what usually I do.  Diet Coke and Excedrin.  She didn't take that.  She said she'll be feeling better soon.  But let's take a little bit longer break for her, to get her feeling better.  We don't need her to get a migraine and then have your whole case put on hold.

So let's come back.  Let's say 20 minutes after -- let's say 25 minutes after, just to give her some peace.

The other news to report is simply that Gladney was not at his residence this morning, which would be a violation, of course, because he's supposed to be residing at a particular place, and so they are looking for him now.

Okay.  We'll come back at 25 after.

THE CLERK:  All rise.  Court is in recess.

(Recess at 11:00 a.m., until 11:24 a.m.)

(In open court outside the presence of the jury.)

THE COURT:  You can be seated.

I've got a few announcements, but I don't have Mr. Vickrey.  And if we can get the state's attorney back -- I'm sorry, the judge back on the stand.

The jury will be coming out momentarily.

(Pause in proceedings.)

MS. DOI:  Your Honor, before the next witness takes the stand, which is ASA Giancola, ASA Honingford, who came with the Cook County Stroger Hospital witness, she would like to make another notation on the record.  If we can do that on a break.

THE COURT:  Okay.

MS. DOI:  Would you want me to get her right now to get that out of the way?

THE COURT:  Yeah -- well, no, let's do it at lunch,

because we'll let her finish up here first.

MS. DOI:  Okay.

THE COURT:  Okay.  So Mr. Gladney is in custody.  He is over at the MCC right now getting COVID tested.  So when he arrives here at the building, I have to arrange for him to have counsel with the Federal Defender Program.  And Mr. Eberhardt is going to represent him.

(Witness Goldish enters the courtroom.)

THE COURT:  However, the Federal Defender has stated that their employees are not coming into the office, so I have to do this, you know, virtually and set up some virtual communication between him and Mr. Eberhardt, and then I'll have Mr. Eberhardt come in through our system, our phone system, as far as his advice.  But that's your status on Mr. Gladney.

As far as the juror is concerned, she says she's fine. I've told her to, you know, wave her hand or tell me or Louie. Normally, I see them -- I did notice at one point that she seemed a little flustered, but I didn't realize she needed some break.  But we'll keep an eye on her.  And if she has any trouble, she's promised to just raise her hand and let us know, okay?

So they're going to be coming in any minute, right?

THE CLERK:  I'll make sure.

COURT SECURITY OFFICER:  All rise.

(Jury in at 11:27 a.m.)

THE COURT: Welcome back, everyone. Come on in and get comfortable. Wonderful. Everyone take a seat.

We're going to go about another hour. So if you have any issues, please get my attention or Louie's attention.

And we will move forward.

Mr. Palles?

MR. PALLES: Yeah.

BY MR. PALLES:

Q   Ms. Goldish, before we broke, I had indicated that I was just going to kind of bounce over the top of the Gladney statement. And I was looking at it, and I'd say that the handwriting starts well and maybe deteriorates towards the end.

It's too important.

Would you mind reading Gladney's statement that he gave you that night?

A   Sure.

Q   We're going to let the jury follow along, if they want, on the monitor.

Thank you. Any time you feel --

A   Okay.

Q   Do you need any water up there?

A   No, I'm good.

(Reading:)

This is the statement of Andre Gladney taken 9/28/11 at 05:40 a.m. at Area 4 Detective Division. Present, ASA Megan

Goldish, Detective M. Garcia, Number 21408.

This statement is taken regarding the shootings of Andre Gladney and Javonne J. Oliphant, which occurred on July 1, 2011, at approximately --

JUROR: Did you say you're publishing --

MR. PALLES: The jurors are helping, your Honor, so --

THE COURT: Oh, thank you. I've got it in front of me so I'm comfortable.

(Laughter.)

THE COURT: Hang on a second.

THE WITNESS: This is when you've got to do --

THE COURT: There you go. Sorry. I was reading right along with it.

(Laughter.)

THE WITNESS: (Reading:)

This is the statement taken regarding the shootings of Andre Gladney and Javonne J. Oliphant, which occurred on July 1, 2011, at approximately 23:15 at a parking lot near 1304 West Hastings in Chicago.

Having been advised that Assistant State's Attorney Megan Goldish is an attorney, a prosecutor, and not the attorney for Carnell Jones or Omar Williams, and not his attorney, and not Javonne Oliphant's attorney, Andre Gladney agreed to give the following statement, which is a summary, and not a word-for-word account.

Andre states as follows:

Andre is 23 years old and his birthday is, redacted.

Andre lives at, redacted.

Mother, Rhonda Burt; his sister, Amber Burt; and his auntie, Shay Burt.

Andre finished up to the 11th grade at Crane High School on Jackson in Chicago.

Andre used to work at the Dominick's on Division and Clybourn, and he worked there for eight months.

Andre has a one-year-old girl named Trinity Watkins with his ex-girlfriend Dorika Watkins.

Andre used to live in the ABLA Homes at 1520 West Hastings.

Andre's right arm has a tattoo "1520" to signify this address.

Andre's nickname is Little Red because his daddy's nickname was Big Red.

Andre has known Javonne Oliphant his whole life, and he was one of Andre's best friends. They would talk almost every day. Javonne's nickname was G Baby. Andre thinks that was his nickname because G Baby was so short.

Andre identified Javonne as the person in Exhibit A.

Andre knows a guy named Wooga, and now knows his real name to be Carnell Jones. Andre has known Wooga for almost 10 years because he lived in the building across from Andre

when they lived in the ABLA Homes. Wooga now lives down the street from Andre and his family on Warren.

Andre wasn't really friends with him. Andre did not have any problems with Wooga before July 1, 2011. Andre identified the person in Exhibit B as Wooga.

Andre also knows Tezo, and now knows his name to be Kenneth McNeal. Andre has known Tezo for about five years through a friend of his named Amos.

Andre wasn't friends with him. Andre never had any problems with Tezo. Andre identified the guy in Exhibit C as Tezo.

Andre also knows Sharky, and now knows Sharky's real name to be Antoine Williams. Andre has known Sharky for almost -- excuse me, for about 10 years because he lived across the street when Andre lived at the ABLA Homes, and he used to live across the street from Andre's elementary school Medill Elementary School. Andre identified Sharky as the guy in Exhibit D. Sharky can't move his arms or legs and he has been in a wheelchair for at least a few years because he was shot.

Andre is not friends with Sharky. And even though they are not enemies, Andre does not like Sharky very much. Sharky is known to sell cocaine, heroin, and guns, and he is usually driven around by a relative, Arky, in a van that is specially made for Sharky. Andre used to see Sharky in that van a few times a week.

Arky is a relative of Sharky's, and Andre also knows him as Omar. Andre also knew him as Omar Akbar. Andre now knows Arky's real name to be Omar Williams and identified him as the guy in Exhibit E. Andre went to school with Omar's sisters. Andre wasn't really friends with Omar, but he had no problems with him before July of 2011.

Andre also knows a guy named Napoleon Gilmore, and knows him as PO. Andre knew PO since they were kids, and Andre did not really like PO. Andre and PO have fought with each other in the past. Andre identified PO as the person in Exhibit F. PO was friends with Omar, Sharky, and Wooga. PO was killed last year, and a friend of Andre's named Congo was arrested for possible involvement in PO's death. Omar used to make comments to Andre about his friend Congo and PO. Andre knew that Omar knew that he did not like PO, and Andre used to say things to Omar like F you -- it says fuck you and PO. Andre never had any physical fights with Omar, Sharky, or Wooga before July of 2011.

On the evening of July 1, 2011, Andre and Javonne went over to The Village in the ABLA Homes near 13th and Hastings. They used to hang out over there a lot, usually gamble, play dice, drink, visit Javonne's daughter, or talk to some of Andre's people, meaning his friends.

That night, July 1, 2011, Andre and Javonne were playing dice in The Village with some other people, including

Moochie, Flop, and Crack. Andre doesn't know their real names. Andre lost about $70, and Javonne lost about $100.

When the dice game was over, Andre and Javonne walked over to the lot on Hastings where everyone hangs out. Andre had drank a small cup of Grey Goose and lime juice about 10 minutes before they walked over to the lot. Andre was not drunk. Andre did not have any weapons on him, and he knows Javonne didn't either because Javonne would have told him.

Sharky's van was already in the lot when Andre and Javonne walked over to the lot. Wooga, Sharky, and Omar were near Sharky's van, and Sharky was in his wheelchair. He and Javonne had walked over to Sharky because Javonne wanted to buy cocaine from Sharky. Javonne did not have any problems that Andre knew of with these three guys. But if Andre was not with Javonne, he would not have gone over to the lot where these guys were.

Javonne began to talk to Omar, Sharky, and Wooga. And there was a guy a little bit away from the group whom Andre had seen before, but whose name Andre does not know. Andre was texting his girlfriend to come pick him up because his cousin had dropped he and Javonne off in The Village earlier and Andre didn't have a car with him.

Sharky and Javonne began to have a verbal argument as Sharky refused to sell Javonne any cocaine. Sharky was saying things to Javonne like get the fuck on, meaning to leave, and

made a comment about Javonne hanging out with Andre when Andre is friends with Congo. Sharky was saying these types of things to Javonne for a few minutes, while Omar and Wooga were right there. Javonne said something to Sharky like you're still my homeboy, and kissed Sharky on the face. Andre thought the kiss was a sign of disrespect to Sharky.

Tezo walked up and began shaking everyone's hand. Tezo got a cup from someone in the group to use for his liquor, and then Tezo walked away from the group. Tezo had not been there when Sharky and Javonne were jawing, meaning having a small verbal argument with each other.

As Tezo walked away, Omar came up behind Andre. Andre had been leaning up against a parked car. Nobody was in that car.

Omar grabbed Andre, and they began wrestling. Omar shot Andre in the back, and Andre fell forward onto the ground. Omar had not said anything to Andre before he shot Andre. Omar had shot Andre about three times before Andre fell to the ground.

Andre believes the gun was a semi-automatic because there were pieces coming out of the gun.

Omar then ran over to where Javonne was standing near the path at the car and the bushes, and Omar and Javonne began to struggle. Omar then shot Javonne at least three more times. Javonne fell to the ground.

Wooga began to shoot at Andre and run at Andre. Andre was running away from Wooga. Wooga shot at Andre at least three times, and Omar also began to shoot at Andre.

Omar shot about three more times.

Andre had been running towards the park to get away, but he fell in the wood chunks by the park because he had been shot.

Andre had been hit in his back and his legs. Andre was hit by bullets several times, but was able to get up and run towards 13th Street before he fell to the ground. That's when Andre noticed Kates, which is the ABLA security guard.

The only people Andre saw shooting at him were Wooga and Omar. The only person Andre saw shoot at Javonne was Omar.

Andre noticed that Javonne was on the ground, as Andre was running away from Omar and Wooga, so he knew Javonne had been hit.

Andre didn't know Javonne was dead until Andre's mom -- mother told him the next morning.

Andre was taken to Stroger Hospital, and he was in a lot of pain from his gunshot wounds. While Andre was at the hospital, later that day, Chicago police detectives came to speak to him and asked him how he got shot. Andre was not entirely truthful with the police while at the hospital because he did not want the police involved. Andre had planned to take care of this himself, meaning to possibly retaliate.

Andre told the detective that he and Javonne were hanging out at the ABLA Homes, and that he turned away from Javonne to text on his cellphone.  Andre told the detectives he heard several gunshots, so he ran towards Hastings Street, and that was when he felt that he had been shot several times.  Excuse me.

Andre did not tell the detectives while he was in the hospital that it was Omar and Wooga who had shot him and Javonne.

Andre was in the hospital for a few days, and then he went home to heal.  Andre also went to Javonne's funeral.  Andre decided that retaliation was a very bad idea because they would have reported Andre to the police, and Andre did not want any more trouble.  It was enough that Andre had already lost his best friend.

On August 9, 2011, the police came to Andre's house on Warren and brought him to the police station on Harrison and Kedzie.

Andre agreed to go with the police.  Andre were honest with the police in August and told them what Omar and Wooga had done to Andre and Javonne.  Andre did it for the closure and so the people who had done this to Javonne would be locked up.

In August, after Andre told the police what happened, they watched the video surveillance of the shooting, and Andre pointed out who everyone was on the video.

Goldish - Cross by Palles

During this conversation, Andre also identified photos of the people who were involved and present, and he signed these photos.

Exhibit G is the photo of Tezo that Andre signed on August 9, 2011.

Exhibit H is the photo of Wooga that Andre signed on August 9, 2011. Andre wrote Wooga on the exhibit as well.

Andre signed Exhibit I, the photo of Omar, who Andre identified on August 9, 2011. Andre had also written Omar Akbar, Arky, on this exhibit.

Andre also signed Exhibit J and identified Sharky on August 9, 2011.

Last night, September 27, 2011, Andre came to Area 4 to speak with the detectives.

Andre again described how Omar and Wooga shot him and how Omar shot Javonne.

Andre was treated well while at the police station. Andre was given a Polish sausage, pop, chips, and fries. Andre was allowed to use the bathroom whenever he wanted.

Andre is not under the influence of alcohol or drugs as he gives this statement, and he was not under the influence of any alcohol or drugs when he spoke to the police in August of 2011 about the shooting.

Andre was treated, quote, good by Assistant State's Attorney Megan Goldish. Nobody promised or threatened Andre to

get him to give this statement. Andre is telling the truth and giving this statement so that the police know who shot him and Javonne.

Andre can read and understand English. Andre demonstrated that he can read and that he can read ASA Goldish's handwriting, by reading out loud from the handwritten portion on page 1 of this statement.

After this statement was completed, ASA Goldish read the statement out loud to Andre while Andre and Detective Garcia followed along. Andre was allowed to make any additions or corrections to this statement, and he initialed these additions and corrections. Andre signed the bottom of each page to show that it had only truthful information.

Andre signed all of the exhibits used in this statement, including A through J.

Andre also signed Exhibit K to show that's a picture of the van Sharky was next to at the lot on the night of the shooting.

And then there's exhibits.

BY MR. PALLES:

Q   Okay. And this -- oops, okay.

If we can just scroll through the pictures.

We can keep going, Tyler.

These are the exhibits that were attached to the statement?

A    Correct.  Correct.

Q    Okay.  Now, Gladney told you in this statement that the only two people he saw shoot him were Omar and Carnell, and that the only person that he saw shooting Oliphant was Omar.

Now, the jury has heard evidence that Carnell Jones was convicted for first-degree murder in this case.

Can you explain to us why that is?

A    Why I -- why both were charged with the same offense?

Q    Yes.  And as well as how that -- that information could support a conviction.

A    Sure.  So there's the legal theory of accountability, what one person -- what two people do together, they're both responsible for each other's actions.

So, for example, if my friend and I go to rob a bank and I sit in the car as the getaway driver, whatever my friend does in the bank I'm responsible for.  If my friend holds a gun up to the teller's head, it's as though my hand is on that gun holding it up to the teller.  If my friend is grabbing money out of the vault, it's as though my hands are on the vault.

Similarly, anything that I'm doing in the car, if I run somebody over trying to get away, it's as though my friend was behind the wheel of the car.

So in this case, what Omar is doing, Carnell is responsible for, and what Carnell is doing, Omar is responsible for because that's what the law says.

And in this case, they completely acted in concert. They were shooting together. There was evidence of two different types of shell casings, meaning at least two firearms were used. If you look at the video, there's flashes from two different firearms. You can see where one person starts to fall, Omar is running over and shooting Javonne, and then you can see Wooga coming up and assisting. So they're in it together. And what one person does, the other one is responsible for.

Q    Okay. Now, before you talked about certain aspects of Andre's statement being corroborated in small detail by others, correct? Do you remember that?

A    Can you say that again? I'm sorry.

Q    Yeah.

A    I just want everyone to know, I never robbed a bank with my friend.

(Laughter.)

THE COURT: Now that she's on --

THE WITNESS: Now you pull a portion of that --

THE COURT: Now she's on the transcript that has that, right?

MR. PALLES: Right.

BY MR. PALLES:

Q    What I was saying was that before I believe you made a statement to the effect that certain aspects of Gladney's

statement had been corroborated.

A   Correct.

Q   Okay.  I'd like to go through those with you.

First of all, of course, the fact that he was -- had eight to ten bullet wounds would suggest that, in fact, he was shot, right?  That would corroborate that fact?

A   Yes.

Q   Okay.  And let me ask you this:  Are victims generally motivated to truthfully identify their attackers?

A   Usually, yes.

Q   Okay.  And I believe, as you testified before, Gladney identified the individuals on the scene, as did Kenneth McNeal, as did Antoine Williams, as did Carnell Jones, correct?

A   Correct.

Q   Okay.  And, in fact, Gladney confirmed -- excuse me.

Kenneth McNeal, at least the report that you saw of his interview, confirmed that, in fact, he had approached Gladney for the purpose of getting some cups --

A   Correct.

Q   -- is that correct?

Now, in addition to that, you learned that Carnell Jones had been arrested with two handguns that matched the scene.

A   Yes.

Q   Okay.

A    I know one -- one of the hand --

Q    Okay.

A    He was arrested with multiple handguns, and at least one of the handguns with which he was arrested matched one of the shell casings out on the murder scene.

Q    Right, right.  Thank you.

10 years ago, and you remember it better than I do.

The -- in addition to that, Gladney testified that Omar was -- he told you that Omar was carrying a semi-automatic pistol, correct?

A    Correct.

Q    Okay.  And -- well, I don't know if you know.  Do you know whether the .40-caliber pistol was a semi-automatic?

A    I don't.

Q    Okay.

A    I know -- I know one of the guns out there was a semi-automatic because there were shell casings, which is different than a revolver, which has that cylinder which, you know, basically holds instead of pieces flying out from the firearm.

Q    Gotcha.

And you're aware that Carnell confirmed that he and Gladney had known each other since they were kids?

A    Yes.

Q    And, of course, Carnell placed -- said that he heard on the

street that Omar had shot G Baby, correct?

A    Correct.

Q    Okay.  And Gladney was also -- Gladney's version of the events was also corroborated by the action on the video, correct?

A    Yes.

Q    Which he did not see in your presence.

A    Correct.

Q    Okay.  And Gladney confirmed that Antoine Williams had a specialized van?

A    Yes.

Q    And he confirmed -- and Antoine confirmed that G Baby kissed him.

A    Yes.

Q    Now, did Detectives Garcia or Hill ever pressure you to charge Omar Williams with murder?

A    No.

Q    Knowing now, as you do, that Omar Williams was acquitted by a jury that found that he was not guilty beyond a reasonable doubt, do you feel that you were misled by anything the detectives told you?

A    No.

Q    Okay.  Now, Mr. Vickrey mentioned that you were originally a party to this case.

Now, you were dismissed, correct?

A    Yes.

Q    And that dismissal was with prejudice?

A    Correct.

Q    Okay.  Meaning that Omar Williams can never sue you again for this incident, right?

A    Correct.

Q    Okay.  Now, you have recited your interactions with these detectives today, have you?

A    Sure, yes.

Q    Okay.  Now, the question that I have is that there's an allegation in the original complaint that you entered into an agreement with Detectives Hill and Garcia to fabricate or invent evidence against Omar Williams.

Did you do that?

A    Of course not.

Q    Thanks.  That's all the questions I have.

                     REDIRECT EXAMINATION

BY MR. VICKREY:

Q    You told the jury that the video showed Omar running over and shooting Javonne Oliphant?

A    Yes.

Q    And did you see Omar in the video do that?

A    I saw the driver who went around to the passenger side, the driver was identified as Omar, that driver then struggled with where Andre was, and I saw that driver then run over to where

the bushes line were and shoot Javonne.

Q   Okay.  So let's be clear.  When you told the jury that you saw Omar in the video run over and shoot Javonne Oliphant, you couldn't identify Omar in that video, correct?

A   No.

Q   In fact --

A   I personally could not, correct.

Q   What you did just now is say that the video showed that the driver of the van was the shooter, correct?

A   One of the shooters, yes.

Q   Right.  And you told us that there were two people acting in concert, right?

A   The evidence showed me that there were two people acting in concert.

Q   The video showed you that, correct?

A   That's one of the things, yes.

Q   Not three.  Two.

A   Correct.

Q   Okay.  And isn't it true that Gladney never, in any report you saw, identified Omar Williams as driving the van that night?

A   Andre says that the van was already there when he and Javonne walked up.

Q   So just to confirm, nothing in your handwritten statement says that Omar drove the van that night, correct?

We can go over it again.

A    No.  Andre did not say that.  No.

Q    Okay.  Andre never said that to you, correct?

A    Correct.

Q    And nowhere in the official file that you looked at is there any statement by Andre Gladney that Omar was driving the van that night, correct?

A    Correct.

Q    Okay.  I think you said that Kenneth McNeal corroborated that Omar Williams and Carnell Jones were at the lot that night?

A    I don't think I said that.

Q    Well, let's be clear because I thought I said -- I thought you said that.

A    The question I was asked was whether he corroborated that he walked up to Andre for a cup of -- for -- to use for liquor.

Q    Okay.  So let's be absolutely sure.  You've seen nothing stating that Kenneth McNeal saw Omar at the lot that night, right?

A    I saw nothing that said that, correct.

Q    Okay.  And did you see anything that had Kenneth McNeal place Carnell Jones at the lot that night?

A    I don't recall if that was in his interview or not.

Q    All right.  Talk about Carnell Jones.  You said that you heard that he placed Omar -- he heard that Omar was the

shooter, right?

A    Correct.

Q    And you never heard Carnell Jones say that, right?

A    I never spoke to Carnell.

Q    So what you're saying is what you knew at the time came from the detectives, correct?

A    Some of -- most of what I knew came from the detectives, yes.

Q    Well, let's be very certain about this.  Carnell Jones saying that he heard on the street that Omar was the shooter, that came out of the detectives' mouths and no other source, right?

A    You know, I -- I know that I had read it on something.  I just don't remember physically what it was, what reports were there, if it was a GPR, if it was a state's attorney note.  I don't know.

Q    Let's look at the state's attorney's notes.  Let's go to the fact sheet.

A    Not -- not those.  If there were notes that had been prepared by whomever had been out there beforehand.  I don't know.

Q    All right.  But are you aware of anybody other than the two defendants who talked to Carnell Jones that night?

A    I'm not, no.

Q    Okay.  And to be sure -- to be clear, Carnell Jones was

interviewed by these defendants in an interview room with a video, correct?

A   I don't know.  I don't know if they had it set up for videos then.

Q   Let's see if we can help you.

Not agreed.  Not published.  Go to the fact sheet, please.

MR. BROWN:  Thank you, your Honor.

BY MR. VICKREY:

Q   This is the fact sheet, correct?

A   Okay, yes.

Q   Dated September 28, 2011?

A   Correct.

Q   And if we scroll down a little bit, we see Carnell Jones, right?

A   Yes.

Q   Statement begin 9/26/2011, so that's the day before you came down to the station, correct?

A   Correct.

Q   And you weren't there, correct?

A   Correct.

Q   And just so we're clear, the record shows no prosecutor present, correct?

A   According to this, correct.

Q   It's Detective Hill and Detective Garcia, correct?

A    Yes.

Q    And the last statement confirms that the statement was not videotaped.  Correct?

A    Correct.

Q    All right.  And not to diminish your interrogation skills or questioning skills, just to be clear, what you wrote down in the statement that morning before Gladney signed it on the 28th was -- contained the same facts that the Detectives Hill and Garcia told you before you even met Mr. Gladney, correct?

A    Yeah -- well, yes, with a little more detail.

Q    Okay.  But the key facts match exactly what Detectives Hill and Garcia told you after their interview of Gladney, correct?

A    I believe so, yes.

Q    That's all I have.

        THE COURT:  Would you like to recross?

        THE WITNESS:  Do you want to take the exhibit back?

        MR. PALLES:  Yeah, sure.  We're done with --

        THE COURT:  Okay.

        MR. PALLES:  Thank you very much.

        THE COURT:  All right.  Well, Judge, you can go back and do your other work now.

        Thank you.

        And you're excused.

        THE WITNESS:  Thank you.

    (Witness excused.)

THE COURT: Ladies and Gentlemen, I'm going to take an earlier lunch break because we have had a development that we need to address with just the lawyers.

So let's come back at 1:20, okay? A little bit longer lunch break.

Enjoy. Don't talk about the case. All right?

Thank you.

COURT SECURITY OFFICER: All rise.

(Jury out at 11:58 a.m.)

THE COURT: All right, everyone can be seated.

Mr. Gladney is here. He is out in the hallway, so I'm going to see if we can get him in.

I'll text my courtroom deputy.

(Pause in proceedings.)

THE COURT: Can you tell the marshals to bring in Gladney?

THE CLERK: Do you want Mr. Eberhardt to call in as well?

THE COURT: Yes, that would be great.

Is he that way or that way?

THE CLERK: Mr. Gladney?

THE COURT: Yes.

THE CLERK: I think he's just getting here.

THE COURT: Oh, I thought he was here.

THE CLERK: So I have to call the marshals real quick,

and then I'll call Mr. Eberhardt.

THE COURT: We'll wait. Thank you.

THE CLERK: Two minutes.

(Pause in proceedings.)

THE CLERK: I have to set up the teleconference, and Mr. Eberhardt will call in.

MS. DOI: Should he move?

THE COURT: They're going to come out of that door.

MS. DOI: Back to the pews.

THE COURT: I think just step aside for when they come out, and then you can sit back down again. I think you'll be fine there.

MS. DOI: Thanks.

THE COURT: I think you're all right. Let's see how many come.

(Pause in proceedings.)

THE CLERK: I told them to give me a couple minutes.

THE COURT: Sure.

(Courtroom deputy places phone call.)

THE COURT: We're going to dream that beginning, for years to come, right?

(Laughter.)

THE COURT: It's every day.

I might have broken a little early. I thought they were outside in the hallway.

THE CLERK: I wasn't sure either, your Honor, where they were.

(Marshals enter the courtroom.)

THE COURT: I'm all set. Yes, if you can bring him out.

Thank you.

Look how dressed up you gentlemen are.

(Andre Gladney enters the courtroom.)

THE COURT: Come on in, Mr. Gladney, over here in front of the Court. If you can bring him right in front of the Court.

Put your mask over your nose, sir.

Thank you.

I'm Judge Kendall. And you were subpoenaed to testify here at this trial, and you did not appear, so we had to come and get you, which is something I don't like to send the deputies out to do.

But you are being asked to testify by the plaintiff in this case.

And I have gotten an attorney for you to advise you as to your rights regarding that testimony. Okay?

MR. GLADNEY: Yeah.

THE COURT: Now, the way this is going to work is that he's going to be calling in right now on this telephone, and we will inform him of the situation, and then you're going to go

back to the lock-up and have a phone call with him regarding your advice -- his advice to you.

Once you get that advice, we're going to have you come back to court, and then we'll get back on the telephone with him and you here present to tell me what your position is about testifying. All right?

MR. GLADNEY: Yeah.

THE COURT: Is he on the phone yet?

THE CLERK: He's not yet, your Honor.

THE COURT: Give us a minute, folks. Thanks.

(Pause in proceedings.)

THE COURT: Your attorney is not going to meet you in person -- there he is.

THE CLERK: Mr. Eberhardt?

MR. EBERHARDT: Yes.

THE COURT: This is Judge Kendall.

Could you please state your full name for the record?

MR. EBERHARDT: Stephen, S-T-E-P-H-E-N. Eberhardt, E-B, like boy, E-R-H-A-R-D-T, the on-duty Panel Attorney for today.

THE COURT: I appreciate you appearing for us, Mr. Eberhardt.

We have here in my courtroom an individual named Andre Gladney.

Mr. Gladney has been subpoenaed to testify as a trial

witness in this case, and Mr. Gladney did not appear on his subpoena, so the deputy marshals had to go out and do a body attachment and bring him in today.

What I will permit is for you to have a short conversation with both the defense attorney in this case and the prosecutor -- I mean, the plaintiff's -- excuse me, the plaintiff's attorney and the defense attorney in this case so that they can give you the underlying facts.

Mr. Paul Vickrey is the plaintiff's attorney who has subpoenaed your client.

And who wants to talk -- Mr. Gary Ravitz is the defense attorney.

What I would like you to do is have that conversation first so that you understand the scope of the testimony and what you need to advise Mr. Gladney regarding.

And then Mr. Gladney is going to go back up to the lock-up, and we'll have you talk with him.

And then when you're done with both of those conversations, we're going to call him back down, and we'll have you call in and tell us his position for this testimony.

Does that sound like a plan you can work with?

MR. EBERHARDT: Yes, it does. Very good, your Honor. Thank you.

THE COURT: So what would the best way be for the three of you to have your first discussion, meaning Mr. Ravitz

and Mr. Vickrey?

MR. VICKREY: Your Honor, could that be outside the presence of the witness?

THE COURT: Absolutely. Yes. Oh, absolutely.

So I think that -- Lynn, do you have his telephone number?

THE CLERK: I do, your Honor. Yes, I do.

THE COURT: Okay. So, Mr. Eberhardt, how about if we have the attorneys call you on that number? Does that sound like a plan?

MR. EBERHARDT: Okay. And will they be conferenced in, talk to both at the same time or talk sequentially?

THE COURT: You can talk to them at the same time in the sense that we'll let the plaintiff tell you what he intends to do, and then the defense attorney can add any other comments so that you know both sides. We want you to be able to advise the witness. Okay?

MR. EBERHARDT: Yes, your Honor.

THE COURT: All right. That sounds great.

Thank you for appearing.

And, gentlemen, I think you can put him back in the lock-up until -- does he have a way to talk to an attorney up there?

MARSHAL: Yes, ma'am.

THE COURT: All right. So when you're done talking

with the attorneys, we'll have you talk with him. All right?

Thank you.

MR. EBERHARDT: Very good. Thank you.

(Andre Gladney exits the courtroom.)

THE COURT: Have a good day. We'll talk soon.

Okay. So I told the jury, what, 1:20?

So you can have that conversation with him now. And then we'll see if they can talk with each other over your lunch break. Okay?

All right. Thank you.

MS. DOI: Your Honor, did you want me to get the state's attorney --

THE COURT: Oh, sure. I forgot all about her, Ms. Doi.

MS. DOI: Let me just go down --

THE COURT: I forgot all about her. Thank you.

(Pause in proceedings.)

THE CLERK: Can I provide the phone number to them?

THE COURT: Yes. You can just go in a witness room and make that call.

(Pause in proceedings.)

(Assistant State's Attorney Megan Honingford enters the courtroom.)

MS. HONINGFORD: May I approach?

THE COURT: Yes, please.

MS. HONINGFORD: Good afternoon, your Honor. Megan Honingford from the Cook County State's Attorney's Office.

I'm here today with a witness that's being called. She's a current ASA, and there's another current ASA coming tomorrow, I believe.

I just wanted to make a statement on the record that the State's Attorney's Office is here. Our witnesses are ready to participate.

We -- we do have some concerns about testimony getting into thought -- mental impressions and case strategies. That's something that we want to limit.

THE COURT: I understand. I understand the scope. And I would be -- I will be watching for it.

And I'm sure you will, too, Ms. Doi.

MS. DOI: Yes, your Honor.

THE COURT: So we'll make sure that we are vigilant, okay?

MS. HONINGFORD: Thank you, Judge.

THE COURT: Thank you for your comments.

MS. DOI: I would just say, your Honor, that Ms. Giancola is waiting right now. And if -- I don't know how long this process is going to take --

THE COURT: Well, we're on lunch break, so we're not going to do her until after lunch.

MS. DOI: Right. But in terms of taking her out of

order of the plaintiff's case --

THE COURT: Oh, I see.

MS. DOI: -- I understand he wants to bring Mr. Gladney in --

THE COURT: Sure.

MS. DOI: -- if we could just present her out of order.

THE COURT: I don't mind that. I don't mind that.

MS. DOI: If the plaintiffs have no objections.

THE COURT: Okay. Do you have any objection to that?

MR. BROWN: I'm sorry. I did not hear that. I'm very sorry.

MS. DOI: Just that we wanted to present Ms. Giancola out of order because she's here, and she was very limited in the time she could --

MR. BROWN: Before Andre Gladney?

MS. DOI: Right.

MR. BROWN: I'd love to talk to Paul before I --

THE COURT: All right. Well, you can talk to him, but I would most likely allow that, okay?

MR. BROWN: Yeah, and I'm sure we wouldn't object. I just want to make sure --

THE COURT: Because an ASA has lots of work to do, I'm sure.

MR. BROWN: That's true. That's true. I don't think

that should be a problem.

MS. DOI: Okay. Appreciate it.

THE COURT: All right. We're going to take our lunch break. I'll see you in an hour, folks.

THE CLERK: All rise. Court is in recess.

(Lunch recess at 12:16 p.m., until 1:16 p.m.)

(In open court outside the presence of the jury.)

THE COURT: How are we doing? Do we have Mr. Eberhardt on?

THE CLERK: We do, your Honor. We also have Probation.

THE COURT: Excellent.

You can bring Mr. Gladney out, please.

(Andre Gladney enters courtroom.)

THE COURT: Okay, Mr. Gladney, come over to the podium, please.

Okay, Mr. Eberhardt, have you had a chance to talk with Mr. Gladney, sir?

MR. EBERHARDT: I have, your Honor.

THE COURT: And did you talk to him about testifying?

MR. EBERHARDT: Yes, your Honor.

THE COURT: Okay. Is he going to testify for us?

MR. EBERHARDT: No, he's not, your Honor.

THE COURT: And the reason?

MR. EBERHARDT: After discussions, he understands that

he has constitutional rights; and pursuant to those constitutional rights, he's exercising those and does not wish to make any further statements.

THE COURT: Okay. So as far as his constitutional rights, are you saying that he would incriminate himself?

MR. EBERHARDT: We believe so, yes.

THE COURT: Okay. If he were to testify --

MR. EBERHARDT: Correct.

THE COURT: -- regarding the issues that were explained to you?

MR. EBERHARDT: Yes, your Honor.

THE COURT: Okay. Do the parties want to ask any questions to determine whether his Fifth Amendment right is being asserted properly?

MR. PALLES: Not for us, your Honor.

MR. VICKREY: No, your Honor.

THE COURT: Then, Mr. Eberhardt, I will take your statement that he is invoking the Fifth Amendment right to not incriminate himself, and that will be my ruling on him for today.

Now, as far as his failure to comply with the subpoena, I don't know whether Judge Blakey wanted to see him or not, but I don't know if Judge Blakey is in, because that's a violation of his probation.

So let me ask the probation department what your

position is.

PROBATION OFFICER: Your Honor, we did inform Judge Blakey, submitted to the Court yesterday.

THE COURT: And he did not set it for a rule to show cause yet?

PROBATION OFFICER: He did not. We asked the Court -- we submitted the 12A asking for no court action; however, we have not heard anything whether or not Judge Blakey wanted to schedule a court hearing.

THE COURT: Okay. Excellent. All right.

So that means, gentlemen, that he can be released because he is done with me here, and then he'll have to address any other future issues before the judge who is monitoring his supervision.

In the future, Mr. Gladney, a court subpoena is a court order, and you must comply with it, okay?

MR. GLADNEY: Yes, ma'am.

THE COURT: I didn't hear you.

MR. GLADNEY: Yes, ma'am.

THE COURT: All right. You may be released.

And thank you, gentlemen, for your help today.

MR. EBERHARDT: Thank you, your Honor.

THE COURT: Thank you, Mr. Eberhardt, for your help.

MR. EBERHARDT: Glad to be of service.

THE COURT: Thank you.

THE CLERK: I'm going to disconnect the teleconference line, so you can hang up now.

Thank you.

THE COURT: Okay. So now you have an unavailable witness due to his invocation of his Fifth Amendment right.

And so I assume now Mr. Vickrey would like to put in his trial testimony.

And Mr. Ravitz, you're objecting, correct?

MR. RAVITZ: Yes, your Honor, for the reasons stated in our motion *in limine* on this subject.

THE COURT: Okay. So I believe that one of your main purposes for objecting to him having the testimony read in is that his interests are not aligned with the state prosecutor's interests -- your clients' interests are not aligned with the state prosecutor's interest.

MR. RAVITZ: Yes. And we cited cases, I think the Judge St. Eve opinion --

THE COURT: Right.

MR. RAVITZ: -- and another opinion that we think are on point in that regard, and they express more eloquently than we could why that is.

But specifically as to the discrete issue in this case, which is really the claim of coercion, you can see that the state's attorney who prosecuted this case had really no interest in that issue whatsoever. She simply used the

opportunity of Gladney to impeach him with other materials at hand. She never addressed at all his claim that he was coerced or threatened by the police in this case, so we never had anybody standing in our shoes who explored what really is the main issue here in this case.

So I just don't think 804(b) has been satisfied for all the reasons we stated -- I'm not going to waste the Court's time, unless you want some more discussion about it, why that is. I think our motion was relatively straightforward in that regard. I just don't think it meets the 804 criteria.

THE COURT: Okay. Mr. Vickrey?

MR. VICKREY: Yes, your Honor, we laid out extensive opposition to this and pointed out some -- the key analysis in the *Volland* case where Judge Shadur talked about these -- this kind of a situation and how the State's interest in securing a conviction and the defendants' present interest in avoiding damages show that -- they're a little bit different, but they had the -- the State had a requisite stake here to do what they did with Gladney, which is they went crazy trying to impeach him, and they -- his -- and his claim of coercion, in fact, much of the closing argument was dedicated to that, and also in that case similar motive -- doesn't mean identical motive.

And then we also relied heavily on the *Fields* case where Judge Kennelly encountered a very similar situation and also went that way.

I think it -- this is a critical piece of evidence, and so far the jury has heard only the signed statement extensively. The whole thing was read in. And, obviously, we had a very different situation at trial. And this is -- we have somebody talking about the critical facts at issue in the case and in that testimony.

So for all these reasons, we believe that the criteria are met in this case.

MR. RAVITZ: May I --

THE COURT: You may.

MR. RAVITZ: The *Volland* case, which is the critical case he relies on, as we pointed out in our memo, is factually distinguishable.

*Volland* involved a traffic stop. Two cops, the defendant cops in a civil case stopped Mr. Volland in a routine manner. It escalates*. Volland* gets arrested. And so you had a situation in that case where the prosecutor was, on the one hand, representing the interests of the police, but was also -- who were then also the victims because they claimed that Volland had assaulted them or battered them in some way. So because of -- that's a unique circumstance. It simply isn't present in this case. And so you can distinguish *Volland* on that ground alone.

In terms of -- you know, as Judge Shadur said, it was, quote, a traffic stop gone wrong. That's what the case is

about. And so factually it has -- you can see where a prosecutor under those circumstances, where the cops are both arresting officers and victims simultaneously, the prosecutor who decides to go after the victim in this case, Mr. Volland, would be deemed as a predecessor in interest. She is representing the police interest in that circumstance.

That simply wasn't the case here. This case is much closer to Judge St. Eve's opinion in *Hill versus City of Chicago* and in, of course, Judge Hamilton, then District Judge Hamilton's opinion in *Butler versus Indianapolis Metropolitan Police Department*. These, of course, are cited in our memos. I won't elaborate beyond that.

But I think factually, *Volland* being so distinguishable, is not to really be persuasive authority at all.

As for the *Fields* case, a very well-known case, as far as -- I mean, I think Judge Kennelly says in that case: Hey, if I'm wrong, I disagree with Judge St. Eve.

So two judges could reasonably disagree, I suppose, about the meaning of it. But I don't see where that case is any -- is remotely close to what you have before you.

A fair reading of the transcript in our case is that the -- is that the prosecutor made a decision not to go after -- she was aware of his claim of coercion. She had interviewed him the weekend before the trial. She brought him

in and put him into protective custody, and he told her at that time I'm going to recant. So she was well aware of those circumstances at the time she put Gladney on the stand as a prosecution witness and he recanted.

So I think it's a fair inference that it was a studied choice on her part not to delve into his claims of coercion or threats made by the police.

And under those circumstances, she's not a predecessor in interest to my officers in this case.

I don't think it meets 804(b), and we've made that argument.

And if you have some questions, Judge, I'm happy to answer any lingering questions you might have about it. It's an important issue.

THE COURT: I didn't hear the last thing you said.

MR. RAVITZ: I said I'm happy to answer any questions you might have about it that I haven't addressed. And I know you've had some time to study it. I have every confidence you have. But unless you have questions, I'll stand on what was said in the motion.

THE COURT: Okay. All right. Here's the situation:

First of all, I do think that there's been a lot of focus on this idea that the motive to cross-examine in the previous proceeding has to be the same, and I don't think that's what the case law or the rule says. The rule says

similar, and its history makes clear that similar doesn't mean same. Basically, the idea is to make sure that the opposing party in the current case has had, through the surrogate of the cross-examining lawyer in the earlier proceeding, a fair crack at going after the witness.

And so the *Hill* case is different in that in that case the hearsay declarant Young was a defendant in the criminal case, and the ASA that was cross-examining him, this future plaintiff, is different than here where it's a witness that had been a state's witness in the grand jury. And the grand jury then -- so he had a statement for the state's attorney and then flipped them essentially at trial.

And I totally agree about the language in *Butler* and *Hill* about arguable differences in motivations to cross-examine between the criminal prosecutor and a civil attorney, but the calculus here is different because there was tremendous motivation and actually significant cross-examination to go after Gladney at the underlying trial because he had flipped his testimony. And so the whole concept there was to explore his motivation for flipping, to show that he had flipped, to show that he was lying at that time.

And so I do think that it applies, and I will permit the testimony to come in, which also means that the 806, which governs any other testimony that conflicts, also comes in. So his testimony comes in, his grand jury statement, and any other

statements that, under 806, would show that he's not telling the truth in that statement.

And I'm not sure what that comprises out of your ballgame of pieces of evidence.

So that is my ruling.

And how are we going to proceed with the jury now?

MR. VICKREY:  Your Honor, I would like -- at the first opportunity, I would like to read in that testimony.

THE COURT:  Okay.

MS. DOI:  Here's the issue:  We have a witness waiting --

THE COURT:  Oh, yeah.

MS. DOI:  -- who is a deputy supervisor ASA, who can't wait through us reading in deposition testimony -- or --

THE COURT:  Well, she will --

MS. DOI:  -- trial testimony.

THE COURT:  She will wait if I tell her to wait.

MS. DOI:  I understand, your Honor.

THE COURT:  But that's not the agreement that we had. We said we would call her so that we won't disturb her schedule any longer.  So, yes, we will call her.

MR. VICKREY:  Just one thing on that, your Honor.

I don't know if they plan on reading the grand jury testimony in through her, which is fine, but I just don't want it read in twice, just for cumulative basis.

THE COURT: Well, is the statement the only thing that was read into the grand jury or --

MR. VICKREY: No, no, no, no, no. His grand jury testimony, which is what ASA Giancola actually asked the questions, so I -- that's fine if they want to put that on through her. My only -- I'm just telegraphing that --

THE COURT: Okay. Let's not rule on preview of coming attractions. Let's rule on what we have in front of us.

Chelsea, please get the jury for me -- oh, you. I'm sorry. I forget you're here.

Lynn, please get the jury for me. Taking advantage of you.

(Pause in proceedings.)

(Witness enters the courtroom.)

THE COURT: You can come right up here. Raise your right hand.

(Witness duly sworn and takes the stand.)

THE COURT: Okay. There's a little white envelope thing there. You stick it over the microphone. See? Yeah. It's like a little sleeve, and you put it over the microphone. When you're done testifying, you can throw it in the garbage.

Thank you.

All set.

THE CLERK: All rise.

(In open court in the hearing of the jury.)

THE WITNESS: Can I remove my mask?

THE COURT: Yes, you may.

Welcome back, everyone. Thank you, folks.

We did some work over your lunch hour to handle some issues so we could continue on.

So please get comfortable.

You may be seated, everyone.

Mr. Vickrey is going to call the next witness.

I've sworn her in outside of your presence, and she's ready -- I'm sorry. This is the second time today.

The defense is calling this witness, so please take note.

By the way, when you are completed with all of your work, you will get an instruction that says regardless of who calls a witness, you are to take into account all of the evidence.

So please proceed.

MR. ROLAND: And also to advise the Court, your Honor, I've given Ms. Giancola a packet of paper exhibits that we're going to be using -- referring to today.

THE COURT: Okay.

TONI GIANCOLA, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. ROLAND:

Q    Good afternoon.

Would you please introduce yourself to the jury?

A    My name is Toni Giancola.  T-O-N-I.  Giancola.
G-I-A-N-C-O-L-A.

Q    Thank you.

And where are you employed?

A    At the Cook County State's Attorney's Office as an
assistant state's attorney.

Q    How long have you been an assistant state's attorney?

A    Since August of 2005.  And I was sworn in November of 2005.

Q    Do you have a current assignment?

A    Yes.  Within the office, I'm still with the Cook County
State's Attorney's Office, and right now I am assigned to the
Bridgeview Courthouse, which is a suburban courthouse, also
known as the Fifth Municipal District, as the deputy
supervisor.

Q    And as the deputy supervisor, what are your job
responsibilities?

A    I supervise everything that goes on at the courthouse, from
misdemeanors to traffic to preliminary hearings, grand jury,
and felony courtrooms.

Q    And do you still try cases?

A    Yes.

Q    And prior to becoming deputy over at Bridgeview, what were
your prior assignments?

A    Right before that, I was a deputy supervisor in the Felony

Review Unit of our office.  That was my very first spot as a supervisor.

And prior to that, I was all through the office.  I started out in Appeals.  Then I went to the Markham Courthouse. I did misdemeanors over there.  I did grand jury and preliminary hearings at the Markham Courthouse.  Then I did Felony Review.

Then from there, I did city preliminary hearings and Branch 66.

Then I went back to Felony Review a couple of times as well, but then I landed in the Felony Trial Division and worked my way up from a third chair to a second chair and eventually to a first chair.

Q   That's it?

A   Yes.

Q   Why don't you tell us about Branch 66.  What's that?

A   Branch 66 is known as the Homicide/Sex Crimes Unit.  We handle cases; back then, when I was assigned there, we handled police shootings; we handled juvenile automatic transfer cases; we handled murders; and we also handled sex cases; also involving failures to register of sex offenders; and a few random cases here and there.

Q   So -- and around what time were you assigned to Branch 66?

A   In 2011.

Q   So while you were at Branch 66, did you get assigned to the

criminal case against Omar Williams?

A   I did.

Q   And what was your involvement?

A   When you receive a file at Branch 66, if you are going to be the one who handles the file, most of the time you do the bond hearing.  So in this matter, I did the bond hearing, and then I eventually brought witnesses in front of the grand jury to testify.  And then I eventually asked the grand jury to return a true bill of indictment, meaning charging the case.

Q   And on what date was the bond hearing for Mr. Williams?

A   I would have to refer to the actual transcript for the exact date.

Q   I think the transcript would be Defendants' Exhibit Number 45.  We're not publishing.

If you could take a look at that and tell me if that refreshes your recollection, please.

A   Yes.

Q   You can go ahead and keep that out because we're going to be referring to it for a little bit.

A   It was September 29 of 2011.

Q   Now, for those that might not be familiar with a bond hearing, will you explain that for the jury?

A   A bond hearing is when you -- it's a judicial determination of whether or not there is probable cause to detain an individual.  In the legal world, we call it a Gerstein hearing.

So we give the judge a general facts -- the general facts of the case as well as the criminal history of an offender who is charged with a crime.

Q    And during a bond hearing, is the defendant represented by counsel?

A    Yes.

Q    Can they choose counsel of their own choice or the public defender, either or?

A    Either or.

Q    So at the September 29, 2011, bond hearing, was Mr. Williams represented by counsel?

A    Yes.  According to the transcript, there is a counsel listed.

Q    And who was that counsel?

A    The counsel listed on the transcript is Mr. William Wolf.

Q    Was he with the Public Defender's Office?

A    Yes.

Q    Okay.  With regard to Mr. Williams' bond hearing, what happened?

A    At the bond hearing, I gave the judge the general facts of the case.  I gave Mr. Williams' criminal background.  And I asked for a mandatory no bail, along with special conditions of bond.

Q    And what were the special conditions of bond that you asked for?

A    In every case, I ask for absolutely no contact with any even family members of victims or witnesses in the criminal matter.

Q    Okay.  And what did the Court rule regarding bond?

A    No bail.

Q    And were special conditions of bond entered?

A    Yes.

Q    I'm going to direct you to Defendants' Exhibit Number 8.

I would like to publish.

Any objection?

THE COURT:  Is there any objection?

MR. VICKREY:  What is it?

MR. ROLAND:  The special conditions, the bond.

MR. VICKREY:  Let me see.

MR. ROLAND:  Number 8.

MR. VICKREY:  No, your Honor.  No, no objection, your Honor.

THE COURT:  Okay.  I've got it going.  Let's try it again.

BY MR. ROLAND:

Q    Do you recognize this document, Ms. Giancola?

A    Yes, I recognize it.  That's my handwriting.

Q    What is it?

A    That's the special conditions of bond.

Q    And would you read the special conditions of bond?

A    I checked the box that says, "Not contact or communicate with any complaining witness, witnesses, or member, members, of their immediate family, families."  And I wrote in under that, "Absolutely no contact by any means with any victims or witnesses or the families of those victims and witnesses."

Q    Okay.  And then at the -- at the bond hearing, did the Court admonish Mr. Williams regarding the special conditions of bond listed here?

A    Yes.  According to the transcript, which I have reviewed, she did make Mr. Williams verbally acknowledge that he understood.

Q    And he did so verbally acknowledge, correct?

A    Yes.  It's in the transcript.

Q    And subsequent to the grand jury -- excuse me.

     Subsequent to Omar Williams' bond hearing, were you further involved in his criminal case?

A    Yes.  After the bond hearing, then I brought forth witnesses in front of the grand jury.  And like I said, I was the one who asked the grand jury to return a true bill of indictment on the case.

Q    Before we get into the specifics of Mr. Williams -- the grand jury impaneled regarding Mr. Williams, could you tell the jurors, what is a grand jury?

A    A grand jury is jurors selected randomly, much like the jury in this case would be, or a criminal jury, they're just

random citizens who receive a jury summons, and then they're eventually selected for the grand jury instead of a specific trial, and they serve about a month.  And they do nothing but listen to witness testimony, sometimes return documents that are subpoenaed in investigations, and, when appropriate, they issue true bills of indictment when charges are asked for on criminal cases.

Q    And what is the evidentiary burden that must be met for a grand jury to return a true bill of indictment?

A    Well, they -- in the legal world, we call it probable cause, but they must have sufficient evidence to believe a crime has occurred, and that the offender we are asking for charges against is the one who committed those offenses.

Q    Okay.  Typically in the grand jury process, what are your -- what steps do you take in the grand jury process?

A    In terms of what?

Q    Preparing to present evidence to the grand jury.

A    Well, if -- we try to subpoena as many witnesses as we can to come and talk to us.  Sometimes witnesses come voluntarily, so we don't always need to subpoena a witness.  But we talk to anyone that we can regarding the case, bring them in front of the grand jury to testify if they are willing, and sometimes we ask for a return of documents as well during the investigation because the grand jury does have subpoena powers as well.

Q    What about with regard to witnesses?

A    What is my procedure --

Q    Yes.

A    -- when I bring them in?

Q    Yes.

A    Well, I do the same thing in every single case that I handle.  And when a witness shows up to the grand jury, it's at the -- it's at 26th and California.  It's on the 4th floor is where my office and my colleagues' office are for Branch 66.  There's an administrative or a sheriff that is outside the office.

And when a witness shows up, the state's attorney assigned to the case gets notified.

I then walk out to -- there's two benches where they wait for me to come out of my office.  I introduce myself to the witness.  I explain to them that I am a lawyer, I'm a prosecutor, but I'm not a lawyer that represents them or anyone else involved in the case.  I make them verbally respond that they understand who I am and what I do.  And if they don't, then I obviously continue on to explain in more detail what that means.

Once they understand who I am, then I ask them if they would be willing to talk to me.

If they're willing to talk to me, I bring them back in my private office that is a small, very boring office with a desk and a computer, and I ask them open-ended questions about

what they observed or didn't observe or, you know, any information they have regarding the case.

I -- after we do that, then I explain to them what the grand jury is, and I ask them if they would be willing to testify in front of the grand jury.

Q   Now, just take us a couple steps back.

When you -- when grand -- when witnesses come to meet with you at the grand jury, do you stagger the schedule so that witnesses don't overlap, like you don't have two witnesses on the same matter appearing at the same time?

A   Yes.

Q   Why do you do that?

A   Number one, for scheduling, because it takes a long time to talk to somebody, bring them in front of the grand jury. Sometimes other witnesses are already in front of the grand jury, you have to wait. There's also safety precautions because you never know when a witness may know someone else involved in the case, so you don't want anyone crossing paths and being there at the same time. In addition, you don't want anyone else to know -- because it's a secret proceeding, you don't want anyone else to know that they're there, quote, unquote, cooperating with the State's Attorney's Office. So you try to stagger it so that witnesses aren't there on the same day. And, obviously, that's always not possible due to people's schedule. But, yes, we do try to stagger it.

Q   And when you take the witnesses into your office, is there anyone other than yourself present?

A   No.

Q   And you'll -- you told us that you ask open-ended questions.  Why is that?

A   Well, I am trying to find out what they know without influencing them in any form or fashion, so I ask open-ended questions.  And, obviously, I have to ask follow-up questions, if they bring something up that I don't understand.  But I try to keep it all open-ended in our initial interview so that I can find out everything they know, and they can tell me instead of me directing them in a certain way.

Q   So you're not trying to suggest answers to them in any way.

A   Yes.

Q   Now, what happens once you're done with your interview?  Do they go testify before the grand jury?

A   Well, they have to be willing to.  So I do ask them, after I explain what the grand jury is, I ask them if they would be willing to testify in front of the grand jury.  If the answer is yes, then we walk down the hall.  There's some paperwork you have to get stamped before you go in front of the grand jury for the court reporters.  And then we go -- we wait outside the doors of the grand jury because they are closed and there are many other investigations going on at the same time.  And once they're ready for us, then I walk the witness inside the grand

jury, just myself and the witness.

Q   What does it look like in there?

A   It's a big room.  It's smaller than this, though.  There's kind of stadium seating to where there's different levels for the grand jurors.  So there's a podium just like this where the witness sits.  The grand -- if I was the witness, the grand jurors would be out this way.  (Indicating.)  And then my back would be to the grand jury because I would be across from the witness asking them questions.  There would be a court reporter kind of in front of the witness area.  And there is a little extra seat next to the witness where the foreman for the grand jury usually sits.  But sometimes they don't sit there.  They sit within the gallery-type stadium seating.

Q   And then you ask the witness a series of questions?

A   Yes.

Q   Does the grand jury itself have any investigative powers?

A   They have the right to question a witness, and they have a right to subpoena documents.

Q   Do they have the right to subpoena witnesses, additional witnesses?

A   Yes.  They have subpoena power, yes.

Q   And can you, as a state's attorney, can you curb or limit their right to subpoena a witness, ask questions, or subpoena documents?

A   No, I have no power over what they do.

Q   Does anyone in the State's Attorney's Office?

A   No.

Q   And before we go into some more detail involving Mr. Williams' grand jury procedures -- grand jury testimony, did you conduct the Williams grand jury any different than you had previous grand juries?

A   No.

Q   And how many grand juries had you conducted before you did the Williams grand jury?

A    I would say at least 50 while I was in Branch 66, but hundreds when I handled Markham's grand jury indictments as well and witnesses through Markham.  So I was only a misdemeanor assistant doing that, but I did hundreds of those. Specific to Branch 66, I would say at least 50.

Q   For the Williams grand jury, who were the witnesses that testified before the grand jury?

A    In front of the grand jury, Kenneth McNeal, Andre Gladney, Jason Jones.

Q   And did Marco Garcia also testify?

A    Yes.  He testified when I asked for the true bill of indictment at the very end.

Q   And did Donald Hill -- Detective Donald Hill testify?

A   No.

Q   So let's start with Andre Gladney's testimony.

        Did you interview Gladney?

A    Yes.  I do the same thing in every case.  So, yes, I talked to him in my office.

Q    And what did he tell you?

A    I have no independent recollection of what he told me prior to our meeting; but everything that he would have told me, I then asked him in the grand jury.  So all of it is transcribed.

Q    Okay.  If you could prepare -- would the grand jury testimony from Mr. Gladney refresh your recollection?

A    Of course, yes.

Q    You can pull out -- it's Defense Exhibit Number 16.  Not for publication.

     If you can recall, did Andre Gladney tell you that Omar Williams was present at The Village -- in The Village on the night of July 1st, 2011?

A    I have reviewed the transcript, and yes.

Q    And in your review of the transcripts, did Andre Gladney ever say that Keith Slugg was present in The Village on that evening?

A    No.  That name is nowhere within the transcript that I've reviewed prior to my testimony.

Q    If during your interview Mr. Gladney said that Keith Slugg was present at The Village, would you have elicited that testimony from him?

A    Yes.

Q    Where did Andre Gladney say he was standing at that night?

A    In terms of when?

Q    Let me start -- withdraw the question.

Where was Mr. -- where was Mr. Gladney at about 11:15 p.m. in The Village?

A    According to the transcript and the questions he gave from the grand jury, he explained he was at The Villages, he was shooting dice, and then he walked into a parking lot area.

Q    What did he do in the parking lot area?

A    He was talking with a group of individuals.

Q    And did he identify who those individuals were?

A    Andre Gladney identified Omar Williams, Carnell Jones, Antoine Williams.  And he did say Kenneth McNeal at some point was also in the parking lot.

Q    But did he say Kenneth McNeal -- did Kenneth McNeal stay around for the duration?

A    No.  That's why I said "at some point" because he said he came up and then he walked off.

Q    Did he describe to you how the shooting occurred?

A    He explained that there was a dispute, in a sense, between Javonne and an individual nicknamed Sharky, which is Antoine Williams.  And then he was grabbed from behind from Omar Williams.  And when he turned, he was shot by Omar Williams.

He said that -- I believe he said he fell to the ground, and then Javonne came and grabbed Omar Williams.  And that's when Javonne was also shot.

He said he was running away.  And then after Javonne was shot, then Omar Williams and Carnell Jones both shot at him again as he was running away.

Q   So Omar -- so Mr. Gladney confirmed that Omar Williams was the individual that shot him.

A   Yes.

Q   And did he say who shot Javonne, G Baby?

A   Omar Williams.

Q   And he testified this in -- he testified to this in front of the grand jury, correct?

A   Correct.

Q   And in the course of your preparations for conducting this grand jury, did you read Andre Gladney's written statement?

A   Yes.

Q   And is it your -- is it your opinion that the testimony that Mr. Gladney gave at his deposition was consistent?

A   At his deposition?

Q   Not at his deposition, excuse me.  Before the grand jury was consistent with his written statement?

A   Yes.  I believe I even asked him a question that was he telling me the same thing he had previously told an assistant state's attorney -- was he testifying to the same thing that he had previously told an assistant state's attorney, Megan Goldish.

Q   And the grand jury would have been given an opportunity to

review that written transcript -- that written statement, correct?

A    Yes.  I would have shown him a copy.  And I believe I also introduced it as an exhibit.

Q    And did the grand jurors have an opportunity to question Mr. Gladney?

A    Yes.

Q    Did they do so?

A    No.

Q    Turning now to another witness that you said testified, Kenneth McNeal.

What did Kenneth McNeal tell you about the evening of July 1st, 2011?

A    He said he was at a barber shop, I think for a friend or -- he was -- or his friend who was a barber, and he left to go get a cup.  And he went to this parking lot, thinking he could find a cup, to drink.  And so when he went into that parking lot, I asked him who he saw in the parking lot, and he told me Little Red.

Q    Did he ask if -- did you ask if he saw any other people?

A    Yes.  I asked the open-ended question:  Did you see anyone else out there?  Something along that lines.  And he said he didn't pay attention.

And then I asked a second open-ended -- well, a second question, along the lines of:  Well, could there have been more

people out there?  And he said, yes, there were other people out there, but he didn't pay any attention to them.

Q   And then after -- then what did he do after he came over to greet Little Red?

A   I believe he said he was walking away.  And he heard shots, turned, and he mentioned -- he never said that he saw the shooter's face, but he did I believe say the individual appeared to be male.  And he referenced that he heard two -- what he believed to be two different types of guns being fired.

Q   Like from -- he heard shots from two different guns?

A   Yes.  Sorry.  The -- he referenced hearing the gunshots.  And I asked him a question regarding that, did it appear -- did it sound like it was coming from the same gun or two different guns.  And his answer was that it was two different guns.

Q   And did Kenneth McNeal tell you that he was pressured by the police to testify?

A   No.

Q   Did he testify freely and voluntarily?

A   Yes.  Those are questions that I have him under oath ask -- asking and answering.

Q   Now, if you turn to -- strike that.

        Did Mr. McNeal indicate that he had a meeting with Assistant State's Attorney Megan Goldish on about September 27th, 2011?

A   In my transcript, I do ask him about that.  I have no

independent recollection of where I gained that information from, whether it was from him, a report, or somewhere else. I'm not sure because I don't have independent recollection as to where I gained that information, but I did ask him those questions.

MR. ROLAND: One moment, please.

(Pause in proceedings.)

BY MR. ROLAND:

Q   If you turn -- if you take out Exhibit -- Defense Exhibit Number 17. This is the Kenneth McNeal transcript.

A   Okay.

Q   Page 17, line 13 -- 13 through 15.

Could you read that? And let me know whether it refreshes your recollection where you gained that knowledge from.

A   I did ask him the question, "Did you tell me the same thing that you had previously told Assistant State's Attorney Goldish?" And he answered "yes."

Q   When Andre Gladney testified before the grand jury -- sorry to backtrack -- did he give -- did he testify freely and voluntarily?

A   Yes.

Q   Did he indicate that the detectives had pressured him in any way?

A   No.

Q    Did he indicate the state's attorney's office had pressured him in any way?

A    No.    Those are questions that I asked him under oath.

Q    And when you interviewed Andre Gladney, did you ask him whether he was -- had been pressured to testify falsely or make a false statement?

A    Yes.    I do ask all the questions I'm going to ask in front of the grand jury, so I would have asked him in our private meeting as well as in front of the grand jury.

Q    He denied it each time?

A    Correct.

Q    You also said you -- Jason Jones was a witness before the grand jury.

A    Yes.

Q    And who was Jason Jones?

A    My understanding from his testimony was that he was a security guard at The Villages or ABLA Homes.

Q    And was he present on the night of July 11 -- July 1st, 2011?

A    Yes.    He was working in his capacity as a security guard.

Q    And what did he tell you about the shooting incident?

A    I believe, from the transcript, he gave me the information that he was working.    He heard gunshots.    He started going in the direction of where the shots were coming from.    He saw people running back towards his direction.    And they were

yelling "they're shooting" or something along that lines.  He tried to find out where the shots were coming from and did see the -- an individual shooting, but he did not see that individual's face.

Q   And did he -- did he tell you about any special skills or training that he had?

A   He did reference in the transcript his military skills when he was describing how he was kind of like crawling on the ground to get closer to the shots and hiding behind bushes and stuff.  He referenced using his military skills.

Q   Because why was he trying to get to the playground again?

A   He -- he said he was trying to find out where the shots were coming from.  And he also mentioned that there were women and children in there, and he was trying to protect them.

Q   And while he was -- did he say -- while he was trying to protect the women and children in the playground, did he maintain eye contact or -- with the shooter?

A   He mentioned in the transcript that he did lose sight of the shooter after he initially saw the shooter because he concentrated on getting the women and the children on the ground, so he did lose sight of the shooter at that time.

Q   What clothing did Mr. McNeal say the shooter was wearing?

A   He -- I believe it was a white shirt and dark jeans.

Q   And did -- did Mr. Mc -- did Mr. Jones say anything about the dress of the crowd of people that were present in the area,

what they were wearing?

A   He did reference that only when he said when he lost sight, it was because when he looked back up, there was a bunch of other people with the similar clothing, and he in a sense blended in.

Q   So he blended in with a bunch of other people with white tees.

A   Yes.

Q   And did Mr. Jones indicate that he related the same information he gave you to the police?

A   Yes.

Q   That would be Detectives Hill and Garcia?

A   Yes.

Q   So did he -- did Mr. Jones say that the detectives pressured him or threatened him?

A   No.  Again, those are questions I asked him under oath.

Q   And did Mr. Jones testify freely and voluntarily?

A   Yes.

Q   And did the grand jurors have any questions for Mr. Jones after he concluded his initial testimony?

A   No.

Q   And then you also said you had Mr. Garcia testify before the grand jury, correct?

A   Correct.

Q   And for what purpose?

A    To inform the grand jurors of the investigation in its entirety and asked for a true bill of indictment.

Q    And after he informed the grand jurors of his investigation in its entirety, did they issue a true bill of indictment?

A    Yes.  We -- the procedure is him and I have to leave, they deliberate, and then they notified me that they came back with a true bill of indictment.

          MR. ROLAND:  One moment, please.

     (Pause in proceedings.)

BY MR. ROLAND:

Q    I'm sorry, my computer is slow.

          I put up -- I put on the screen what has been marked as Defense Exhibit Number 23.

          I would like to publish.

          Any objection?  It's the true bill.

          MR. VICKREY:  23?

          MR. ROLAND:  Yes.

          MR. VICKREY:  I don't think so.  Hang on one second.

     (Pause in proceedings.)

          MR. VICKREY:  No objection.

          MR. ROLAND:  Thank you, your Honor.

BY MR. ROLAND:

Q    Would you please take a look at Exhibit 23 and tell me what this is?

A    That's the return of the true bill of indictment.  That's

the formal indictment of first-degree murder.

Q   Was he indicted on any other offenses?

        MR. VICKREY:  One second, your Honor.

     (Pause in proceedings.)

        MR. VICKREY:  Your Honor, we don't have an objection
to the indictment on the murder, attempted murder, but --

        MR. BROWN:  Tyler, hold on.

        MR. VICKREY:  It's the -- we have another issue with
this --

        THE COURT:  Okay.  Let's hear a sidebar --

        MR. ROLAND:  I'm only doing those two.

        MR. VICKREY:  Okay.

        THE COURT:  Okay.

BY MR. ROLAND:

Q   Was he also indicted for first-degree murder -- I mean
attempted murder?  Excuse me.

A   Yes.

Q   And this means that the grand jurors, that are jurors just
like everyday people like we have here, found that there was
reasonable -- probable cause for -- to issue the indictment,
correct?

A   Yes.  They found sufficient facts that the criminal offense
was committed, and that the person that they returned a true
bill of indictment on is the person that committed that
offense.

Q   Okay.  I'm going to show you what's been marked as Defendants' Exhibit Number 3.

It is the First Amended Complaint in this matter.

I'm going to scroll down to paragraph 31 and ask you to read it.

And tell me when you're done.

A   Just 31?

Q   Yes, just 31.

A   Okay.

Q   I'm also going to direct you to paragraph 48.

I want you to read that paragraph.  And tell me when you're done.

A   Okay.

Q   Are you aware that you're being accused of conspiring with Detectives Garcia and Donald Hill to frame Omar Williams?

A   According to the paragraphs you just had me read, yes.

Q   What is your response to that?

A   I in no way conspired with the detectives in this case.  We handle our own -- not -- I don't want to call it investigation. We handle the case on our own.  And there's no way for me to control a witness in front of the grand jury.  They are free to speak whatever they know.  There's no way I can script what they're going to say.  So to accuse me of purposely questioning someone in a certain fashion is impossible to do because there's no way for me to prevent them from saying whatever they

want in front of the grand jury.

Q   Is there a way for you to prevent the jury from asking questions?

A   No.

Q   Did Marco Garcia, did he ever give you a list of scripted questions to ask the witnesses in the Omar Williams grand jury?

A   No.  I don't even have a scripted list of questions that I ask in front of the grand jury.

Q   Did Marco Garcia or Detective Hill tell you what witnesses to subpoena before the grand jury?

A   No.

Q   Did Marco Garcia or Detective Hill tell the grand jurors themselves not to ask questions?

A   No.  They're not allowed in the room.

Q   Did either detective instruct you that this is what we want the jurors -- the witness to tell the grand jury?

A   No.

Q   If either Garcia or Hill had done that, what would you have done?

A   That's completely improper, and I would have gone to my supervisor.

        MR. ROLAND:  One moment.

    (Counsel conferring.)

BY MR. ROLAND:

Q   A few follow-ups from the brain trust.

(Laughter.)

BY MR. ROLAND:

Q   Did Andre Gladney, Kenneth McNeal, and Jason Jones all testify under oath at the grand jury?

A   Yes.

Q   And just to be clear, the testimony that McNeal gave, that he was interviewed by Assistant State's Attorney Goldish, you just took his word at that, correct?  You took him at his word when he said that.

A   According to the transcript, yes.  I did not have any follow-ups after that.

Q   Do you have -- did you have any other independent source of that information, other than Mr. McNeal?

A   I have -- it was 10 years ago.  I have no independent recollection of what exact information I had.  What I go by is the questions I asked under oath.

Q   And going back to Mr. McNeal again, because I may have misspoke, did Kenneth McNeal testify freely and voluntarily at the grand jury?

A   Yes.

Q   And did he deny being pressured by the police?

A   He denied, because I do ask every witness, "Have you been threatened or promised anything," and the answers were all negative.

Q   And going back to the bond hearing, did Mr. Carnell Jones

appear at the same bond hearing as Mr. Williams?

A   Yes.   According to the transcript, both were present.

Q   And they were both subject to the same special conditions?

A   Yes.

Q   And did Mr. Jones also indicate that he understood what those special conditions were?

A   Yes.   He verbally acknowledged to the judge in the transcript.

MR. ROLAND:   No further questions.

Thank you very much.

CROSS-EXAMINATION

BY MR. VICKREY:

Q   Good afternoon.

A   Good afternoon.

Q   Detective Garcia helped you prepare for the examinations, correct?

A   No.

MR. VICKREY:   Your Honor, may I read from Detective Garcia's testimony which was earlier read in evidence about that?

THE COURT:   It was already read into evidence?

MR. VICKREY:   Yes.

THE COURT:   Is there any objection?   I'm not --

MR. RAVITZ:   Can I see what counsel is referring to specifically?

THE COURT:  Let's find out.

(Counsel conferring.)

MR. ROLAND:  We're going to object, your Honor.

THE COURT:  Is there a sidebar?

MR. ROLAND:  Yes.

THE COURT:  Okay.

(At sidebar outside the hearing of the jury.)

MR. ROLAND:  They're trying to read it in to try to impeach the witness, but it's not the witness's own words. They're trying to impeach by the statements of Detective Garcia.

MR. PALLES:  Which is impeachment by collateral --

THE COURT:  Right, but what -- so what is the statement and what are we trying to do here?

MR. VICKREY:  Here it is, your Honor.

(Reading:)

"Did you talk to the ASA ahead of time about your interview of McNeal?"

"Answer:  Yes, I would have.

"Question:  To help her prepare for the examination?

"Answer:  Him or her, yes.

"Same thing for the examination of Gladney with the grand jury, did you assist the ASA for that?

"Yes.

"Tell her what happened in the prior interview.

"Yes, she would have the reports.

"In addition to the actual report, you would actually fill in some information orally, correct?

"Yes."

THE COURT: Collateral impeachment. That's an argument for you to show the jury at the end, that they have inconsistent testimony. You can't impeach her with his words.

MR. VICKREY: Thank you, your Honor.

THE COURT: Sustained.

(In open court in the hearing of the jury.)

BY MR. VICKREY:

Q   I want to start with the bond hearing.

You were at the bond hearing, September 29?

A   Yes.

Q   And one of the things you told the judge, that the murder was also captured on surveillance video?

A   Yes.

Q   And you told the judge that it was the State's position that pursuant to 725 ILCS 5/110-4(a), that the defendant, Omar Williams, must be held without bond because this is an offense where life sentence may be imposed and that the defendant personally discharged a firearm that proximately caused a victim's death and the proof is evident and the presumption is great that defendant is guilty of the offense and he is identified by the surviving victim and the murder is caught on

video.

Do you remember saying that?

A   Yes.

Q   Okay.  And do you remember at the very first hearing, two days after my client was arrested, he demanded trial.  Do you remember that?

A   I don't.  I might have been there at a status date after, but you would have to show me a transcript as to what happened two days after the bond hearing.

Q   Well, no, this is two days after the arrest.  It's actually at the bond hearing.

A   Oh, at -- what was your question again?  I'm sorry.

Q   At that first hearing, Omar Williams demanded a trial.

A   It's commonplace for defense attorneys to demand trial, yes.

Q   Did Omar Williams demand a trial that day?

A   If it's in the transcript, his attorney did.

Q   Okay.

A   Yeah.

Q   So at the grand jury, we've got Gladney, correct?

A   Yes.

Q   We've got McNeal?

A   Yes.

Q   And McNeal didn't say anything about my client being there, have anything to do with the murder, correct?

A    Correct.

Q    You've got Jason Jones, correct?

A    Correct.

Q    And he said nothing about my client being there, having anything to do with the murder, correct?

A    Correct.

Q    We've got Detective Garcia, correct?

A    Yes.

Q    Four witnesses.

A    Right.

Q    There was a fifth witness that you talked to before putting him on, correct?

A    I --

Q    Antoine Williams?

A    I know you asked me this during the deposition, and I explained that I -- there's no written records.  I have no personal independent recollection if I did or did not speak to Antoine Williams.  If a subpoena was voted in for him and there's proof that he was served, then I probably did.  But if there's not a subpoena that was voted in, I can't say whether or not I did or did not talk to him.

Q    And isn't it -- part of the reason is that you've worked on so many cases over the years that, without looking at the documents, it's hard for you to remember exactly what was going on independent of looking at the records?

A   Because it's so old, yes.

Q   Okay.  And did I hear you correctly that you only asked for a true bill after the testimony of Detective Garcia, correct?

A   Yes.  I brought the witnesses in; and at the very end, on a different day, I asked for the true bill of indictment.

Q   And you've looked at the transcript of the questioning of Detective Garcia, correct?

A   Yes.

Q   And those weren't open-ended questions, right?

A   No.

Q   For example, at page 4:

"Did your investigation reveal that the defendant Omar Williams approached Andre Gladney and shot him numerous times?

"Yes, it did."

That's not open-ended, right?

A   No.  Any time we bring a detective to explain the investigation, instead of it being long and lengthy, we just direct the questions in terms of a summary so that we're not there all day.

Q   And you've looked at the transcript of the questioning that you gave to -- excuse me -- Kenneth McNeal, correct?

A   Correct.

Q   And I want to direct your attention to page 15.  Here's the question.

"Now, on September 27th, 2011, did you speak to an

assistant state's attorney by the name of Goldish?

"Answer:  Yes."

Are you with me?

A   Yes, I'm following.

Q   That name had not been brought up before?

A   In --

Q   In this examination, correct?

A   No, that -- that's fair to say.  That's the first time her name appears.

Q   And that's not an open-ended question.

A   No.

Q   And is it your testimony that Kenneth McNeal prompted that or somebody else did?

A   Well, when I'm asking about their prior conversations or any -- if there were any threats, those are all direct questions and specific.

That information that I learn during my open-ended, "did you have any prior conversations," things like that, I know that information, so I direct them to a specific -- because what I do is I ask did the state's attorney threaten you, are you testifying to the same thing you told her.  Then I go to the police.  Then I even do my own self, and I say when I met you today, did I force or threaten you, things like that.

So it's -- it's just, you know, the way that we get through the treatment -- what we call the treatment portions in

the prior statements.

Q   Okay.  But who told you, if you know, that Megan Goldish met with Kenneth McNeal -- I actually want to follow it up. There are actually two questions about it.

"On September 27, 2011, did you speak to an assistant state's attorney by the name of Goldish?

"Yes.

"And that was also at Area 4 headquarters?

"Answer:  Yes."

So as you sit here today, do you know who told you about that interview?

MR. ROLAND:  Objection.  Asked and answered.

THE COURT:  Overruled.  She can answer it.

BY THE WITNESS:

A   No, I have no independent recollection.

BY MR. VICKREY:

Q   Okay.  And just to confirm, you asked over 109 questions or something, or 108 questions, of Mr. McNeal, but at no time did you ever ask him whether Omar Williams was at the lot that night, correct?

A   I'm not sure how many questions I asked him, but I did not ask a specific name to influence his testimony in any way.  If he had not brought up Omar Williams during our conversation, then I would not have.

Q   Okay.  But did you ever ask him in front of the grand jury

whether he saw Omar Williams at the lot?

A    No.

Q    Let's talk a little bit about the grand jury testimony of Andre Gladney.

In response to your questions, he told you -- and this is -- you can follow along if you want, I'm at page 12 -- that he and Omar never got along?

A    What line are you at?  I'm sorry.

Q    Page 12.

A    Uh-hum.

Q    Line 5.  And then specifically line 13.

They never got along?

A    He does reference he did not get along with them.

Q    Not just -- he never got along, right?

A    Right.  Omar, along with two other individuals.

Q    And then at page 15, in response to your questions, Mr. Gladney said that he was sober, correct?

A    What line are you looking at?

Q    No.  I'm sorry.  It's 14.  The bottom of the page.

A    Of page 15?

Q    I'm sorry, 14.

A    I did ask him if he was under the influence.  He did admit to drinking.  So he doesn't admit to being completely sober. He just says he did not -- he was not under the influence.

Q    Okay.  And he also told you that he wasn't carrying a gun?

That's at 15.

A   Yes.  I did ask him if him or Javonne -- did you have a gun?  The answer was no.

Q   And at page 21, he also told you that Napoleon Gilmore was the motive for the shootings?  Specifically line 15.

A   He didn't say that's the motive.  He said that's why he believes Sharky doesn't like him.

Q   Okay.  And then at page 26, he testified in response to your questions that Omar grabbed him from behind, correct?

A   "And who was behind you grabbing you?"

        "Omar."

        Yes.

Q   And then he said -- in response to your question at line 9:

        "And once you turned, what happened?"

        "He shot me."

        Omar shot Gladney once Gladney turned around after being grabbed by Omar?

A   Yes.

Q   And then you asked him, at page 49, if he gave the statement freely and voluntarily?

A   What line?

Q   Line 12, page 49.

A   Yes, in response to the interview with Megan Goldish.

Q   And you asked him whether he had any pending cases at line 15.

A    Yes.

Q    And he said that he had no pending cases, correct?  None.

A    He did not.  He said --

"Do you have any pending cases?"

"Yeah."

"What type of -- do you have pending?"

"I don't know.  None pending.  I'm on probation."

Q    Okay.  So, in other words, none pending.

A    Oh, I'm sorry.  Yes.  Sorry.

Q    And page 51.  You asked him, line 7:

"Did you tell me the same things that you told the detectives on August 9?"

He says:  "Yeah."

Correct?

A    Correct.

Q    When you say, "Did you tell me the same things," in other words, while he's testifying in front of the grand jury, is this the same thing that he told the detectives on August 9, correct?

A    Yes.

Q    And he says: "Yes."

"And those are the same facts that you told Assistant State's Attorney Goldish on September 28."

And he says:  "Yes."

Correct?

A    Correct.

Q    "And those are the same facts in the handwritten statement."

I think that's it.

Thank you.

THE COURT:  Mr. Roland, any redirect?

MR. ROLAND:  Yes, your Honor.

REDIRECT EXAMINATION

BY MR. ROLAND:

Q    Mr. Vickrey brought up the reasons behind the no bond bail and implied it was a mandatory no bond bail, correct?

A    Yes.

Q    I'm showing you, if I can get this to work without my mouse and just the track pad -- one moment.

THE COURT:  Ms. Doi was pretty adept at that, but not me either.

MS. DOI:  Barely.

MR. ROLAND:  It's my inferior male genetics, I guess.

THE COURT:  Is this an agreed exhibit or not?

No, okay.

MR. BROWN:  No.

MR. VICKREY:  No.

MR. ROLAND:  45.  It's the bond hearing transcript.

BY MR. ROLAND:

Q    Ms. Giancola, would you read the Court's reasoning for no

bail no bond, starting on page 11, line 16?

A    (Reading:)

"THE COURT:  Okay.  So noted for the record.  The Court will make the following findings of fact:  That the evidence set forth in the petition for discretionary no bail" --

MR. VICKREY:  Your Honor, could we have a sidebar, please?

THE COURT:  Yes, you may.

(At sidebar outside the hearing of the jury.)

MR. VICKREY:  Your Honor, they keep trying to get in the felony convictions because if he keeps reading, the judge says -- talks about various felony convictions.  I did not get into that.  I asked a very specific question about what this witness asked for in terms of mandatory bail and what she said about it.

And, I mean, it's also beyond the scope.  They brought up the bond hearing, and I returned to it.  I didn't get into this.

There's already been the criminal history that's come up in this bond hearing.  The jury has heard it now twice.

But to have this witness read about felony convictions I think is prejudicial and in contrary to your prior rulings.

THE COURT:  Well, first of all, it's hearsay, so why is she reading hearsay into the record?

MR. PALLES: It's a self-authenticating document, Judge.

THE COURT: The transcript is?

MR. PALLES: Yeah. I think we've got a certified copy of it, if I'm not mistaken.

THE COURT: Well, I didn't see anybody present that to me as a self-authenticating document.

MR. PALLES: Okay.

THE COURT: But either way, what is she reading it in for? What are you trying to direct on?

MR. ROLAND: Because I feel that Mr. Vickrey is minimizing the reasons -- the full reasons why Mr. Williams was held without bail and no bond. He's saying they did it as a matter of course just because of the nature of the charges, and that's not -- that's not true.

THE COURT: Okay. Well, you can have her read it and then -- to herself and then ask her does that remind you as to what the reasons were.

MR. VICKREY: Obviously, the danger in that is that then she says the felony convictions.

They've already gone into this twice, that -- that the judge also mentioned the criminal history in this. The jury has already heard it twice.

THE COURT: And that's true. It's true. So if that's the reason why she detained at that time, and you were showing

that it was just a perfunctory kind of automatic detention --

MR. VICKREY:  No, all I was establishing was that in this case the charge itself -- in and of itself meant a mandatory bail --

THE COURT:  Right, but she did more than that.  She did more than that.

MR. VICKREY:  I know.  And the jury has heard that now twice.

THE COURT:  Okay.  It's overruled.  You can still bring it in, but not the way you're doing it, not having the judge's words read.  You can ask her.

MR. ROLAND:  Okay.

THE COURT:  Okay?

MR. VICKREY:  Your Honor, can she be asked not to say felony?

MR. ROLAND:  I'll lead her.

THE COURT:  Okay.

(In open court in the hearing of the jury.)

THE COURT:  You may proceed, Mr. Roland.

BY MR. ROLAND:

Q   Ms. Giancola, could you just read that paragraph to yourself?  And tell me when you're finished.

A   I'm finished.

Q   Thank you.

And is it true that the Court issued a discretionary

no bail?

A    Yes.  Yeah.  It was -- she made findings of fact, so --
based on the petition for discretionary no bail.

Q    Thank you.

Give me a couple more seconds.

Now, let's not -- I don't want anybody to get
confused --

A    Actually, sorry.  The way -- I'm sorry.  The discretionary
was asked for one -- for Jones.  The mandatory was asked for
Williams.  And then she says --

MR. ROLAND:  One moment.

BY THE WITNESS:

A    There's a difference.

BY MR. ROLAND:

Q    Okay.  Moving on.

I want to clear something up about the nature of the
questions that you asked the witnesses during the interviews.

During the interviews, you will ask open-ended
questions, correct?

A    During my initial interview are you talking about?

Q    Yes.

A    Yes, I ask open-ended questions.  And then if there's any
follow-up for specifics or things I need clarification on, yes.

Q    So the fact that there's some -- maybe some more pointed or
leading questions in the grand jury transcripts, that doesn't

mean you asked those same type of leading and pointed questions during your interview, correct?

A   Correct.

Q   And as far as Mr. McNeal testifying that he met with Megan Goldish, it is possible that the source of that information was McNeal himself, right?

A   Yes.  That is a possibility.

Q   And that you took -- you just simply took him at his word about that.

A   When he testified to it under oath?

Q   Yes.

A   Yes.

Q   And while McNeal testified under oath, he refused to sign any of the exhibits that were submitted to him, did he?

A   He did.

Q   Was that a common occurrence?

A   No.

Q   What impression did that leave with you?

A   Well, that the witness was becoming more uncooper --

        MR. VICKREY:  Objection.

        THE COURT:  Did I hear an objection?

        MR. VICKREY:  Yes, your Honor.  Impression.

        THE COURT:  No, I think this is going to be based upon her experience; and, therefore, it's overruled.

BY THE WITNESS:

A    That the witness was becoming more uncooperative.

(Counsel conferring.)

BY MR. ROLAND:

Q    And the documents that he decided not to sign, specifically what were they?

A    I believe they were photographs.

Q    Photographs of whom?

A    I would have to look at the transcript for specifics.

Q    No further questions.

THE COURT:  Okay.  Mr. Vickrey, on that, sir?

MR. VICKREY:  Just one, your Honor.

THE COURT:  Okay.  Let him unhook his machine there.

MR. VICKREY:  Just one.

RECROSS-EXAMINATION

BY MR. VICKREY:

Q    Kenneth McNeal never refused to answer any of your questions, right?

A    No.

Q    Thank you.

THE COURT:  Okay.  Based on that, you are allowed to leave and get back to do your own work, right?

THE WITNESS:  Thank you.

THE COURT:  Have a good day.

THE WITNESS:  You, too.

THE COURT:  Ladies and Gentlemen, let's take an

afternoon break right now.

MS. DOI:  Your Honor --

THE COURT:  Who is saying "your Honor"?

MS. DOI:  It's Ms. Doi.

THE COURT:  Okay.

MS. DOI:  I'm sorry.  We just had one clarification question for the witness before she's released.

THE COURT:  Oh, I'm sorry.

MS. DOI:  It will take very little amount of time.

Thank you.

THE COURT:  Just when you thought you were going to get out.

THE WITNESS:  Sorry.

MS. DOI:  My apologies.

(Counsel conferring.)

MS. DOI:  Defendants' 17, page 14.

MR. ROLAND:  Sorry about that.

(Counsel conferring.)

FURTHER REDIRECT EXAMINATION

BY MR. ROLAND:

Q    Ms. Giancola, if you refer to Defendants' Exhibit Number 17.  Page 13, line 14.

MS. DOI:  No.  Line 7.

MR. VICKREY:  Objection.  Beyond the scope.

THE COURT:  I don't see it, so I can't tell you

whether it is or not.

(Counsel conferring.)

BY MR. ROLAND:

Q    (Reading:)

"Now showing you what's been marked as Grand Jury Exhibit Number 1, who is that photograph?

"Answer:  Little Red.

"And that's the individual who -- that you shook hands with?

"Answer:  Yes.

"Question:  You do not know his real name?

"Answer:  No."

MR. VICKREY:  Objection.  Beyond the scope.

THE COURT:  It's overruled.  He can put it in.

BY MR. ROLAND:

Q    (Reading:)

"Question:  Who would -- would you sign and date" --

THE COURT:  But is there a question pending here?

MR. ROLAND:  Yes.  I'm going to ask -- I'm going to ask a question.

THE COURT:  You're reading -- you're reading in hearsay right now, so -- you have to have a question.  You referred her to the segment of the document.

MR. ROLAND:  All right.

BY MR. ROLAND:

Q   Ms. Goldish -- Ms. Giancola, what was your Exhibit Number 1 at the grand jury?

A   A photograph of Little Red.

Q   And did Mr. McNeal sign that photograph?

A   No.  He refused.

Q   And with regard to Jury Exhibit Number 2, what was that?

I refer you to the same page, line 18.

A   It was who he called G Baby.

Q   And who is G Baby?

A   Javonne.

Q   One of the victims?

A   Yes.

Q   Did he refuse to sign that photograph?

A   He did.

(Counsel conferring.)

MR. ROLAND:  I'm done for real this time.

THE COURT:  Okay.

(Laughter.)

THE COURT:  All right.  We'll take you at your word.

All right.  You may step down and be excused and get back to work.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  And you all may go have a snack and take a break.

So come back at 3:00 o'clock, okay?

COURT SECURITY OFFICER: All rise.

(Jury out at 2:43 p.m.)

THE COURT: Go ahead and take your break, folks.

(Recess at 2:44 p.m., until 3:04 p.m.)

(In open court outside the presence of the jury.)

THE COURT: You can be seated.

All right. Now, remind me where we're going.

MR. VICKREY: Your Honor, we plan on reading the trial testimony of Andre Gladney. And because there's impeachment going on, it might be kind of confusing. We were going to propose, with your Honor's permission, that Pat Solon play the role of Andre Gladney, and I would play the role of ASA Swanson and defense attorney Paul Vickrey.

THE COURT: Oh, you're going -- how are you going to do that?

MR. VICKREY: By asking questions. I'm reading the entirety of the trial testimony.

MS. DOI: We haven't seen the transcript yet that they plan on using.

THE COURT: I don't -- I hear people talking in the background, but I don't know what the issue is.

What do you want to say, Mr. Palles?

MR. PALLES: Yeah, I want to say, Judge, that in the event that you're going to read the transcript, we've prepared

a short statement that we would like you to review.

Basically, we think that it's appropriate that you tell the jury that the reason the testimony is coming in is because Mr. Gladney has already -- is unavailable because he's asserted his Fifth Amendment rights. And I have --

THE COURT: Well, why would I tell them that he's asserted his Fifth Amendment rights?

MR. PALLES: Because he has. You know? I mean, otherwise, we would like to bring him back and put him on to show the jury that he's going to take Five. He's --

THE COURT: Yes. Okay. Let me see what you're going to -- what you proposed.

MS. DOI: I put it in an email that I can forward to the clerk or --

MR. PALLES: And I wrote it in hand.

MS. DOI: There's one addition. It's prior sworn testimony.

MR. PALLES: I'm sorry.

THE COURT: Have you seen this?

MR. VICKREY: I have, your Honor.

THE COURT: What's your position?

MR. VICKREY: I don't -- I don't see why the jury has to be told that he's asserting his Fifth Amendment rights because that just creates a lot of speculation.

THE COURT: Well, it does. That's what the assertion

generally allows, is that --

MR. PALLES: Right.

THE COURT: -- his testimony would be against his interest.

Now, of course, it makes complete sense because you're going to have -- regardless of anything else, he has completely different testimony under two tribunals, so that's perjury in one regard. So I don't think that's damning to them at all.

So the only thing I would say with this one is I would say that under the rules of evidence, it is now appropriate for the parties to read the transcripts --

MR. PALLES: Great.

THE COURT: -- of his prior testimony.

MR. PALLES: Great. And we were going to put in sworn testimony --

THE COURT: I didn't hear what you said.

MR. PALLES: I'm sorry. We were going to put in the word "sworn" in front of "testimony," but --

THE COURT: Okay.

MR. PALLES: -- up to you.

MR. RAVITZ: Judge, just so we can clarify, are we reading in the whole record? Is that what you propose to do?

MR. VICKREY: Yes.

THE COURT: Okay. All right. Go ahead and get the jury, Chelsea.

MR. VICKREY: May Pat Solon take the stand for --

THE COURT: Yes.

MS. DOI: Could plaintiffs identify for the record what they're using to testify from by exhibit number?

MR. VICKREY: The transcript of the proceedings, starting at page 59 --

LAW CLERK: All rise.

MR. VICKREY: 57.

MS. DOI: Is it a plaintiff's exhibit? 43?

(Counsel conferring.)

(In open court in the hearing of the jury.)

THE COURT: Okay, folks, please get comfortable and sit down.

Anyone have anything to report to me?

Okay. All right. Folks, while you were taking your lunch break today, Mr. Andre Gladney appeared before me. And on the advice of his counsel, he exercised his rights against self-incrimination under the Fifth Amendment. And, therefore, under the rules of evidence, it is now appropriate that both parties may read into evidence the transcript of his prior sworn testimony.

So now what you're about to see is really just some play-acting. This is not Mr. Gladney. (Indicating.) But he's going to play him in my courtroom. And Mr. Vickrey and his co-counsel are going to read that transcript.

This is the transcript under oath from the jury trial of Mr. Williams. Okay?

You may proceed.

MR. VICKREY: Thank you, your Honor.

And I will tell you which portion of the transcript -- in the beginning portion of the transcript, I am asking the questions asked by the Assistant State's Attorney Karen Swanson at the criminal trial.

So for the first part of this, I'm playing ASA Karen Swanson.

And then I'll be playing myself when I cross-examine Mr. Gladney, who is actually Mr. Solon, who is part of our trial team.

Mr. Solon, please take off your mask.

THE COURT: That's fine.

MR. BROWN: Are we doing it on the screen?

MR. VICKREY: Yes.

MR. BROWN: So, your Honor, would you mind connecting us for Pat, please?

Thanks so much.

THE WITNESS: The real trick is whether I need to keep my glasses off or on. Okay, I can see it.

MR. BROWN: Thank you, your Honor.

MR. VICKREY: We can publish it or not publish it. Anyway.

(Further proceedings were had which were reported but not transcribed at this time.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript of the EXCERPT of proceedings in the above-entitled matter.

*/s/ GAYLE A. McGUIGAN* *April 14, 2021*
GAYLE A. McGUIGAN, CSR, RMR, CRR
Official Court Reporter